In The

# United States Court of Appeals

### For The Federal Circuit

# FREDERICKSBURG NON-PROFIT HOUSING CORP.,

*Plaintiff – Appellant*,

**v.**

# UNITED STATES,

*Defendant – Appellee.*

**APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 1:10-CV-00885, JUDGE NANCY B. FIRESTONE.**

———————

### BRIEF OF APPELLANT

———————

**Edward M. Lavin**
**LAW OFFICE OF EDWARD M. LAVIN**
**8918 Tesoro Drive, Suite 418**
**San Antonio, Texas 78217**
**(210) 829-1938**

*Counsel for Appellant*

FORM 9.   Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Fredericksburg Non-Profit _____ v. US _____

No. 14-5030 _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Fredericksburg Non-Profit Housing Corporation

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Fredericksburg Non-Profit Housing Corporation

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

_____

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Edward M. Lavin, Law Office of Edward M. Lavin

_____

December 20, 2013 _____          /s/ Edward M. Lavin _____
Date                                        Signature of counsel

                                            Edward M. Lavin _____
                                            Printed name of counsel

Please Note: All questions must be answered
cc: Antonio Soares antonia.soares@usdoj.gov

124

Table of Contents

Page

Table of Authorities ..................................................................................................... ii

Statement of Related Cases ...................................................................................... iv

Jurisdictional Statement ............................................................................................ 1

Statement of the Issues Presented for Review ........................................................ 1

Statement of the Case ............................................................................................... 3

Summary of the Argument ........................................................................................ 7

Argument and Authorities ......................................................................................... 9

     Standard of Review ............................................................................................ 9

     Issues Presented for Review ............................................................................. 9

Conclusion and Prayer ............................................................................................ 32

Opinion and Order the Subject of the Appeal ....................................................... 33

Addendum

Certificate of Filing and Service

Certificate of Compliance

# Table of Authorities

Page(s)

Cases

Abbott Laboratories v. Gardner,
    387 U.S. 136, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967) ...............................25

Danzig v. AEC Corp.,
    224 F.3d 1334 (Fed. Cir. 2000) ...................................................................21

Dell Computer Corporation v. Rodriguez,
    390 F.3d 377 (5th Cir. 2004) ......................................................................18

Entergy Nuclear Fitzpatrick, LLC v. U.S.,
    711 F.3d 1382 (Fed. Cir. 2013) ....................................................................9

Euclid Chemical Co. v. Vector Corrosion Technologies, Inc.,
    561 F.3d 1340 (Fed. Cir. 2009) ..................................................................12

Martin v. Donley,
    886 F. Supp. 1 (D.D.C. 2012).....................................................................25

Newport News Shipbuilding and Dry Dock Company v. Garrett,
    6 F.3d 1547 (Fed. Cir. 1993) .....................................................................30

Novamedix Ltd. v. NDM Acquisition Corp.,
    166 F.3d 1177 (Fed. Cir. 1999). ..................................................................9

Packard v. OCA, Inc.,
    2009 WL 334645 (E.D. Tex. 2009) ...........................................................19

Pagosa Oil & Gas, LLC v. Marrs & Smith Partnership,
    323 S.W.3d 203 (Tex. App. – El Paso 2010, writ denied)...........................19

Rusk v. Cort,
    369 U.S. 367, 82 S. Ct. 787, 7 L. Ed. 2d 809 (1962). ..................................25

Statutes

28 U.S.C. § 1295(a)(3) ...........................................................................................1

28 U.S.C. § 1491(a)(1) ...........................................................................................1

28 U.S.C. § 2501 ....................................................................................................3

Rules

Fed. R. App. P. 4(a)(1)(B)(i) ................................................................................1

RCFC 12(b)(1) .......................................................................................................3

RCFC 12(b)(6) ....................................................................................................3, 4

Other Authorities

Black's Law Dictionary (9th ed. 2009) .................................................................21

FY 2013 Income Limits published by HUD on its HUD User web site:
http://www.huduser.org/portal/datasets/il/il13/index.html ......................................28

HUD Handbook 4350.6, Section B, paragraph 11-5 ..............................................16

HUD Section 8 Renewal Policy dated February 15, 2008,
Chapter 2, page 3 ............................................................................................ 15-16

"Income Limits by Program" chart found in HUD Handbook 4350.3, page 3-
8, figure 3-3 ..........................................................................................................30

U.S. Dept. of Labor CPI web site inflation calculator:
http://www.bls.gov/data/inflation_calculator.htm ...................................................28

<u>Statement of Related Cases</u>

There have been no other appeals in or from the same civil action or proceeding in the lower court before this or any other appellate court.  There are no other cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

## Jurisdictional Statement

A. The U.S. Court of Federal Claims had jurisdiction as the trial pursuant to 28 U.S.C. § 1491(a)(1) as this is a claim against the United States found upon an express contract.

B. The U.S. Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) as it is an appeal from a final decision of the U.S. Court of Federal Claims.

C. The trial court's judgment was entered on October 25, 2013 (Appendix P. A00026). Pursuant to Federal Rules of Appellate Procedure 4(a)(1)(B)(i), Fredericksburg had 60 days from that date to appeal since the other party is the United States. Fredericksburg filed its notice of appeal on December 9, 2013.

D. This appeal is from a final order or judgment that disposes of all parties' claims (Appendix P. A00001-A00025).

## Statement of the Issues Presented for Review

Statement of issues presented for review are set forth below and are grouped as set forth in the Argument and Authorities portion of this brief.

**The trial court erred in holding that HUD's failure to provide Section 8 subsidies meant that Fredericksburg's claim for rescission of the parties' contract is time barred.**

**The trial court erred in granting HUD's motion to dismiss Fredericksburg's claims for rescission of the parties' contract.**

The trial court erred in holding that the parties' contract, including the Plan of Action, limited HUD's obligation to provide Section 8 subsidies to five years.

When read in its entirety, the parties' contract, including the Plan of Action, contemplates HUD providing Section 8 subsidies for the duration of the property's useful life.

The trial court erred in disregarding, in whole or in part, the Plan of Action as part of the parties' contract.

The Plan of Action forms part of the parties' contract.

---------------------------------------------------------------------------------

The trial court erred in holding that Fredericksburg had not shown that HUD repudiated and anticipatorily repudiated HUD's obligations under the parties' contract.

The trial court erred in holding that HUD's July 22, 2010 letter to Fredericksburg did not state an intention to repudiate the parties' contract.

The trial court erred in holding that Fredericksburg's February 4, 2010 letter to HUD did not make clear to HUD the facts establishing Appellant's claim for rescission of the parties' contract.

---------------------------------------------------------------------------------

The trial court erred in requiring that Fredericksburg must seek administrative relief from HUD as to the property's economic non-viability and then wait for HUD's decision on that request, as a precondition to seek judicial relief for rescission of the parties' contract.

The trial court erred in holding that there is no basis to assume that an administrative request from Fredericksburg to HUD for relief would be denied.

---------------------------------------------------------------------------------

**The trial court erred in holding that Fredericksburg's allegations are purely speculative and will not support its claim for rescission of the parties' contract.**

**The trial court erred in holding that Fredericksburg's claim that HUD will hold Fredericksburg to certain low income rental profiles is pure speculation.**

<u>Statement of the Case</u>

1. Fredericksburg does not know whether the opinion of the U.S. Court of Federal Claims will be published.  This case involves a 1995 agreement between the Department of Housing and Urban Development (HUD) and Fredericksburg Non-Profit Housing Corp. (Fredericksburg) to provide low income housing at the Apartments Northwest apartment complex in San Antonio, Texas.  Fredericksburg claims that HUD breached the 1995 agreement when it failed to provide certain Section 8 rent subsidies.  Fredericksburg seeks rescission on the grounds that HUD has repudiated and anticipatorily repudiated the contract.

2. HUD has moved to dismiss the complaint pursuant to Rule of the Court of Federal Claims (RCFC) 12(b)(1) for lack of jurisdiction and RCFC 12(b)(6) for failure to state a claim on which relief can be granted.  The parties have also cross-moved for summary judgment.

3. The trial court found that Fredericksburg's claims for unpaid Section 8 rent subsidies are time-barred under 28 U.S.C. § 2501, and accordingly dismissed Fredericksburg's claims under RCFC 12(b)(1).  The trial court also held that Fredericksburg had not shown that HUD repudiated or anticipatorily repudiated

any contractual obligations, and therefore dismissed Fredericksburg's claims under RCFC 12(b)(6).

4. As there were then no surviving claims for relief, the parties' cross-motions for summary judgment were denied as moot. This appeal followed.

5. Fredericksburg is a Texas non-profit corporation doing business in San Antonio, Bexar County, Texas under the trade name Apartments Northwest, which property is located at 2909 Fredericksburg Road, San Antonio, Texas 78201. HUD exercises regulatory supervision over Apartments Northwest and over Fredericksburg.

6. Fredericksburg is the owner of an apartment complex known as Apartments Northwest located at 2909 Fredericksburg Road, San Antonio, Texas 78201, and now legally described as Lot 26, New City Block 8416, according to plat recorded in Volume 6100, Page 84, Deed and Plat Records, City of San Antonio, Bexar County, Texas. The property was formerly legally described as the west 8.296 acres of Lot 22, NCB 8416 and further by metes and bounds as set forth in a warranty deed dated December 15, 1995 recorded at Volume 6629, Page 0639, Official Records of Bexar County, Texas. Appendix P. A00055.

7. This property was originally developed and owned by Quincy Lee, who acquired same on or about November 25, 1968. On that date he executed a note, a Deed of Trust recorded at Volume 6060, Page 530 of the Official Records of Bexar

4

County; and a Regulatory Agreement for Limited Distribution Mortgagor Projects

Under Section 221(d)(3) of the National Housing Act, as Amended (regulatory

agreement) and recorded at Volume 6060, Page 538 of the Official Records of

Bexar County. Appendix P. A00059-A00074.

8. On an exact date unknown to Fredericksburg but after November 25, 1968

and before June 9, 1981, the property was acquired from Quincy Lee by J.C. Burch

Apartments, Ltd., which entity presumably also assumed and agreed to be bound

by the aforementioned note and deed of trust and regulatory agreement. Then on

June 9, 1981 the property was sold to Fredericksburg's predecessor in title, Bion

Development Corporation (Bion), which company assumed and agreed to be

bound by the aforementioned deed of trust in an Assumption Agreement recorded

at Volume 2425, Page 1293, Official Records of Bexar County. In that same

instrument Bion further agreed to be bound by the aforementioned regulatory

agreement. Appendix P. A00075-A00079.

9. On December 15, 1995 Bion conveyed the property to Fredericksburg.

Fredericksburg assumed and agreed to be bound by the aforementioned note and

deed of trust. Appendix P. A00054-A00058. Also on December 15, 1995

Fredericksburg executed a Use Agreement and Amendment of Existing Regulatory

Agreement for Multifamily Projects Insured or Assisted Under Section 221(d)(3)

(Below Market Interest Rate) of the National Housing Act and Subject to the Low

Income Housing Preservation and Resident Homeownership Act of 1990 with a Capital Grant and Sale of Property (LIPHRA Use Agreement), recorded at Volume 6629, Page 663 of the Official Records of Bexar County. Appendix P. A00080-A00089.

10. The note was paid in full at the end of its full term in December, 2008. On February 3, 2009 the lender's successor executed a Release of Lien which was recorded as document number 20090021494 on February 9, 2009 in the official records of Bexar County, Texas. Appendix P. A00090-A00092.

11. It was only after Fredericksburg paid off the mortgage – a full term payoff as opposed to those owners who prepaid their mortgages – that HUD cited the LIPHRA Use Agreement and began to insist on enforcement of the very draconian restrictions it places on Fredericksburg's future use of the property. At the beginning of this dispute but before this suit was filed, HUD representatives provided Fredericksburg with a copy of a Plan of Action which Fredericksburg says forms a part of the agreement between the parties. Appendix P. A00111-A00147.

13. Upon reviewing that Plan of Action, Fredericksburg learned of the very important Section 8 rent subsidies that should have been provided by HUD to Fredericksburg, but were not. HUD had never previously acted on or implemented the Plan of Action.

6

14. In early 2010 Fredericksburg attempted to convince HUD of the obvious mutual mistakes and breaches by HUD of the parties' agreement and of the resulting need for HUD to cancel the LIPHRA Use Agreement. Appendix P. A00100-A00108. However, on July 22, 2010 in writing HUD refused to do so and demanded that Fredericksburg continue to comply with the LIHPHRA Use Agreement while refusing to perform its own obligations under the parties' agreement. Appendix P. A00109-A00110.

## Summary of the Argument

1. We ask this Court to interpret a low income affordable housing contract between Fredericksburg and HUD which dates to 1995. That contract, governed by HUD's LIHPHRA program and designed to retain low income housing whose mortgages were paid off by providing incentives to the owner, contained among other incentives an obligation by HUD to furnish Section 8 rent subsidies to the property. In return, the property owner agreed to rent primarily to very low and low income tenants and to a few moderate tenants, with the tenant portion of the rent capped at dollar amounts much lower than the fair market rental for the apartment units, with the expectation that the difference between the tenant's share of the rent and the market rent would be made up by the Section 8 subsidies.

2. The contract provided for an initial five year term for the subsidies but also made clear the parties' intent the subsidies would extend for so long as the

7

affordable rent requirements were maintained by the owner and during the life of the parties' agreement. HUD never furnished any of the Section 8 rent subsidies, a fact not known to the current management of Fredericksburg until after the mortgage was paid off in 2008 at the end of its 40 year term.[1] Efforts to secure repayment from HUD to Fredericksburg of the unpaid subsidies, amounting to several million dollars, were ignored by HUD. In February 2010, therefore, Fredericksburg attempted to persuade HUD to rescind the contract which HUD had breached by non-payment of the rent subsidies. In July 2010 HUD categorically denied the relief sought by Fredericksburg and demanded that Fredericksburg continue to cap tenant rents at the well below market rates of the LIHPRHA program while refusing to either repay or provide current subsidies.

3. Fredericksburg then filed suit to, among other things, rescind the contract due to HUD's repudiation and anticipatory repudiation of it. The U.S. Court of Federal Claims, ruling that Fredericksburg's claim for damages for the past unpaid subsidies was barred by the federal contract statute of limitations, also held that Fredericksburg's rescission claim was barred by limitations and accordingly dismissed all of Fredericksburg's claims for relief.

---

[1] The Plan of Action was negotiated with Fredericksburg's predecessor, Bion Development Corporation. Compare Appendix A00148 (Plan of Action approved by HUD June 29, 1995) with Appendix A00054-A00058 (property not conveyed to Fredericksburg until December 15, 1995, almost six months later).

4. This appeal followed.  Fredericksburg concedes its claim for past

subsidies is barred by limitations.  Fredericksburg contends, however, that this

does not change the fact that, in the past, present and future, HUD has and will

continue to deny Section 8 subsidies to the property while mandating that

Fredericksburg rent apartments for far below the current market rate, and that

accordingly in this continuing contract, Fredericksburg's claim for rescission is not

time barred.  Fredericksburg asks this Court to reverse that portion of the trial

court's ruling denying that relief and order that the contract between

Fredericksburg and HUD be rescinded at this time.

<u>Argument and Authorities</u>

<u>Standard of Review</u>

This court reviews legal conclusions of the Court of Federal Claims,

including contract interpretation, de novo.  <u>Entergy Nuclear Fitzpatrick, LLC v.</u>

<u>U.S.</u>, 711 F.3d 1382, 1386 (Fed. Cir. 2013).  Construction of a contract is a matter

of law that is subject to plenary review on appeal.  <u>Novamedix Ltd. v. NDM</u>

<u>Acquisition Corp.</u>, 166 F.3d 1177, 1180 (Fed. Cir. 1999).

<u>Issues Presented for Review</u>

**The trial court erred in holding that HUD's failure to provide Section 8
subsidies meant that Fredericksburg's claim for rescission of the parties'
contract is time barred.**

**The trial court erred in granting HUD's motion to dismiss Fredericksburg's
claims for rescission of the parties' contract.**

**The trial court erred in holding that the parties' contract, including the Plan of Action, limited HUD's obligation to provide Section 8 subsidies to five years.**

**When read in its entirety, the parties' contract, including the Plan of Action, contemplates HUD providing Section 8 subsidies for the duration of the property's useful life.**

**The trial court erred in disregarding, in whole or in part, the Plan of Action as part of the parties' contract.**

**The Plan of Action forms part of the parties' contract.**

1. The trial court erroneously tied together two claims for relief sought by Fredericksburg and then, on the basis that the claim that HUD's failure to provide Section 8 subsidies was time barred, dismissed both claims. Appendix P. A00002-A00003. The two claims are for money damages for the amount of the subsidies HUD failed to provide, and for rescission for HUD's breach of the parties' contract. Appendix P. A00035. Fredericksburg concedes the money damages claim is barred, but the rescission claim survives.

2. The trial court singled out one provision in the Plan of Action for its holding that "any Section 8 subsidy contract was limited to only $500,000 per year for only five years." Appendix P. A00017. The trial court also erroneously held that there was no evidence of HUD's obligation to furnish Section 8 subsidies beyond this five year period, then held that, accordingly, limitations on

10

Fredericksburg's Section 8 based claims would have run on December 15, 2006. Appendix P. A00017.

3. The trial court is wrong for two reasons: First, there is indeed evidence in the contract documents that HUD was obligated to furnish Section 8 subsidy for the life of the parties' contract. Second, even if the express obligation of HUD to furnish Section 8 subsidy expired after five years and assuming HUD did not renew the subsidy, Fredericksburg then had, and still retains, the right to terminate the parties' agreement.

4. At this point a look at the key documents forming part of the parties' contract is important. There are three and they are:

a. Capital Grant Agreement dated December 18, 1995. Appendix P. A00041-A00053.

b. Use Agreement dated December 18, 1995. Appendix P. A00080-A00089.

c. Plan of Action (Appendix P. A00111-A00147), which was approved by HUD on June 29, 1995. Appendix P. A00148-A00150.

5. In the trial court HUD has taken the position that the Plan of Action does not constitute part of the parties' contract while insisting the Capital Grant Agreement and the Use Agreement are binding, and will undoubtedly do so in this Court, too. However, The Capital Grant Agreement expressly incorporates into itself "the approved Plan of Action, which is attached as Exhibit 1, [and] the Use

Agreement, which is attached as Exhibit 2." Appendix P. A00041. It appears the

trial court considered the Plan of Action to be part of the parties' contract.

Appendix P. A00022, footnote 19. To the extent the trial court held otherwise or

failed to rule on this important issue, Appendix P. A00019, footnote 16, the trial

court erred.

There is evidence in the contract documents that HUD was obligated to
<u>furnish Section 8 subsidy for the life of the parties' contract</u>

6. When confronted with an issue of contractual interpretation, the role of a

court is to give effect to the intent of the parties to the agreement. The court should

examine the contract as a whole and presume that the intent of the parties is

reflected in the language used in the contract. The court should look to the plain

and ordinary meaning of the language used in the contract unless another meaning

is clearly apparent from the contents. When the language of a written contract is

clear, a court may look no further than the writing itself to find the intent of the

parties. On the other hand, where a contract is ambiguous, a court may consider

extrinsic evidence to ascertain the parties' intent. <u>Euclid Chemical Co. v. Vector</u>

<u>Corrosion Technologies, Inc.</u>, 561 F.3d 1340, 1343 (Fed. Cir. 2009).

7. Viewed from this standard, it is clear that when the trial court singled out

one provision of the contract and ignored all the rest, it committed harmful error.

If this Court needs more than the four corners of the parties' contract to determine

12

the intent, the regulations of the federal contracting party (HUD) should lay that question firmly to rest.

8. The Use Agreement requires Fredericksburg to continue low income affordability of the property for its remaining useful life. In return, "HUD has agreed to provide certain incentives, as set forth herein." Appendix P. A00080. "Remaining useful life" is defined at paragraph 1d of the Use Agreement, and at paragraph 2 it specifies that "the Owner may petition HUD to make a determination that the remaining useful life of the project has expired note less than 50 years from the date of approval of the Plan of Action for the project, with the owner having the burden of proof and HUD having the right to presume the useful life has not expired. Appendix P. A00081.

9. The Plan of Action was approved June 29, 1995, Appendix P. A00148-A00150. So this means that, at the very earliest, the contract contemplates Fredericksburg bound to the contract's affordability until June 2045, with HUD having the right even then to deem the useful life to not have expired.

10. This property was first constructed in 1967-1968 when the original HUD Regulatory Agreement was executed. Appendix P. A00066-A00074. By 2045 this property will be <u>77 years old</u>, at which time, for the first time, HUD "might" entertain an expiration of useful life request from Fredericksburg.

11. The Use Agreement requires that Fredericksburg maintain the property as affordable, renting only to very low income (91 units), low income (32 units) and moderate income (17 units) as those terms are defined by HUD. Appendix P. A00082. The unit numbers listed above total 140 which equals to the total number of units on the property. Appendix P. A00116. The Use Agreement requires Fredericksburg to adhere to these requirements until at least 2045. Yet, according to HUD and the trial court, HUD's only obligation was to furnish Section 8 subsidy from 1995 to 2001. How is Fredericksburg to keep their rents this low without Section 8 subsidy during the life of the parties' contract?

12. Plainly, both the contract and HUD regulations contemplated more than just a one-time, five year Section 8 subsidy. In Section II, page II-1 of the Plan of Action the second purpose for the assistance requested is "to meet the project's operating expenses and to establish adequate reserves." Appendix P. A00119. There is no mention of only meeting the project's expenses and reserves for the first five years.

13. The very first requested federal incentive reads **"<u>SECTION 8</u>: The Department of Housing and Urban Development (HUD) will provide Section 8 assistance for a total of 140 units in the project. The project is currently receiving no Section 8 assistance."** Appendix P. A00119. There is no mention of an expiration date for the assistance.

14

14. Nowhere in the contract is it contemplated that Section 8 assistance is limited to the first five years. At the top of page II-2 of the Plan of Action it says "Since the current gross annual contract authority is non-existant [sic] it is not sufficient to fund the federal incentives without any current contract terms. Therefore, current term contract authority must be implemented as **illustrated** below." Appendix P. A00120. After this first paragraph on page II-1 there is a little chart showing as follows:

| # of Units | Contact [sic} # | Term | Annual Authority |
|------------|-----------------|------|------------------|
| 140 Units | TX??-M000-??? | 5 Years | $500,000.00 |

Appendix P. A00120. It was this little chart on which the trial court based its interpretation that the parties' contract only required Section 8 assistance for the first five years. This is nonsense.

15. First, as stated in the above-quoted material (Appendix P. A00120), the little chart is obviously for illustrative purposes only – note the fictitious contract number. Second, relying solely on the little chart ignores the open-ended implications of the portions of the Plan of Action cited in the two immediately preceding paragraphs which do not mention any time limitation for the Section 8 assistance. The little chart is more properly interpreted as illustrative of the method of <u>beginning</u> the Section 8 funding. It is consistent with HUD's own regulations governing the provision of Section 8 assistance. HUD Section 8

Renewal Policy dated February 15, 2008, Chapter 2, page 3 (attached as an addendum to this brief).

16. Likewise the HUD regulatory scheme governing LIHPHRA plans of action requires Section 8 subsidies with no mention of an expiration date other than during the term of the use agreement.  The operative provisions are found in chapter 11 of HUD Handbook 4350.6 entitled "Servicing a Project after Execution of the Use Agreement."  Section B is entitled "Projects in Which Low-Income Affordability Restrictions Have Been Extended" and  at paragraph 11-5 reads:

> **"Availability of Section 8 Rental Assistance to Tenants.  HUD <u>will</u> ensure that the Section 8 Housing Assistance Payment (HAP) Contract has sufficient funding through Section 8 LMSA to provide Section 8 rental assistance for all tenants designated very low- and low-income families on the tenant profile.  HUD <u>will</u> fund the HAP contract at this level even if the entire amount of the rental assistance is not needed at the project immediately after POA approval."**

(attached as an addendum to this brief).

17. Note in HUD's own regulation there is no mention of a cap on the period when the Section 8 assistance will be provided.  Note the repeated use of the word "will" in the quoted regulation, above.  Not "if."  Not "or."  Not "and."   Not "but."  **"<u>Will</u>."**  This same, mandatory regulatory language is mirrored in the Plan of Action provisions cited above.

18. Plainly, HUD's own regulations contemplate furnishing Section 8 assistance so long as the property is required to maintain the affordability

restrictions on the property, in this case until at least 2045. Lest there be any

question of Fredericksburg's responsibility to comply with HUD Handbook

4350.6 – and therefore HUD's responsibility to comply with it – the Court's

attention is directed to HUD's letter dated July 22, 2010 which says "You must

continue to operate this project in accordance with HUD Handbook 4350.6,

Processing Plans of Action Under Low Income Housing Preservation Act of

1990 ... and the approved Plan of Action dated October 10, 2010."[2] Appendix P.

A00109-A00110.

19. Other portions of the Plan of Action also make clear the intent of the

parties that Section 8 assistance will be provided for the life of the parties'

agreement. See, e.g. Section II B 2, page II-2, section 2 and section 2c (Appendix

P. A00120); Section II C, page II-6 at bottom (table capping Section 8 contract

rents) (Appendix P. A00124); page II-7 (table computing fair market rent)

(Appendix P. A00125); section II C 5, page II-8-9 (contemplating Section 8

assistance up to the fair market rent to compensate owners for the difference

between that number and the rent charged to very low and low income tenants)

(Appendix P. A00126-A00127); Section II, Exhibit A, page II-18 (chart at bottom

showing initial rent phase-in difference between fair market rents and tenant

---

[2] The date "October 10, 2010," which is three months _after_ HUD's letter, is
obviously a typo. The Plan of Action in question was approved June 29, 1995.

portion[3])(Appendix P. A00129); and Appendix E to Plan of Action, undated letter from HUD to predecessor owner of property, at top of page 3 of which referring to Section 8 assistance and in the middle of the page referring to the owner maintaining the required affordability restrictions for the useful life of the property (Appendix P. A00139).

Even if the express obligation of HUD to furnish Section 8 subsidy expired after five years and assuming HUD did not renew the subsidy, Fredericksburg then had, and still retains, the right to terminate the parties' agreement

20. Even though Fredericksburg's claim to recover the money which HUD should have paid to it from 1995 to 2006 may be time barred, that does <u>not</u> mean that Fredericksburg's claim to rescind the contract by reason of HUD's breach is barred. Quite the contrary.

21. Any fair reading of this contract will confirm it meets the definition of a continuing contract, which includes when the agreement is continuous and indivisible. <u>Dell Computer Corporation v. Rodriguez</u>, 390 F.3d 377, 391 (5th Cir. 2004) (attached as an addendum to this brief). On a continuing contract the statute of limitations for rescission does not commence to run until the contract is terminated or fully performed. <u>Id</u>. In the case of continuing contracts limitations begins to run at the earlier of the following: (1) when the work under the contract is complete, (2) when the contract is terminated according to its terms, or (3) when

---

[3] The acronym "HAP" means "Housing Assistance Program" and refers to Section 8 rent assistance.

the contract is anticipatorily repudiated by one party and this repudiation is

adopted by the other party.  Packard v. OCA, Inc., 2009 WL 334645 * (E.D. Tex.

2009) (not reported in F. Supp. 2d) (attached as an addendum to this brief).

22. Clearly, the agreement between HUD and Fredericksburg is indivisible.

That it contemplates running for as long as 50 years or more makes apparent that it

is continuous.  Fredericksburg's obligations under the contract are, according to

HUD, not complete.  The contract term has obviously not expired.  When one

party – in our case HUD – attempts to repudiate a continuing contract despite its

ongoing obligations, the injured party has the option to treat the contract as still in

force and retain its right to sue on the contract; or to treat the breaching party's

repudiation as a complete breach and terminate the contract immediately.  Pagosa

Oil & Gas, LLC v. Marrs & Smith Partnership, 323 S.W.3d 203, 216 (Tex. App. –

El Paso 2010, writ denied) (attached as an addendum to this brief).  Where the non-

breaching party – in our case Fredericksburg – chooses to continue to honor the

contract, that party retains its right to later accept the repudiation and sue on the

contract during that period.  Id.

23. In our case Fredericksburg did not accept the repudiation by HUD which

occurred from 1995 to 2001, but rather continued its performance under the

parties' contract to this day.  Thus, while Fredericksburg may have lost its claim

for money damages it has <u>not</u> lost its right to sue, by reason of HUD's repudiation, to rescind the contract.

24. Concluding this section, there is indeed evidence in the contract documents that HUD was obligated to furnish Section 8 subsidy for the life of the parties' contract. Second, even if the express obligation of HUD to furnish Section 8 subsidy expired after five years and assuming HUD did not renew the subsidy, Fredericksburg then had, and still retains, the right to terminate the parties' agreement.

**The trial court erred in holding that Fredericksburg had not shown that HUD repudiated and anticipatorily repudiated HUD's obligations under the parties' contract.**

**The trial court erred in holding that HUD's July 22, 2010 letter to Fredericksburg did not state an intention to repudiate the parties' contract.**

**The trial court erred in holding that Fredericksburg's February 4, 2010 letter to HUD did not make clear to HUD the facts establishing Appellant's claim for rescission of the parties' contract.**

25. Toward the end of this case in the trial court, that court placed emphasis on the importance of considering if this is an anticipatory repudiation situation. Appendix P. A00099. After the court's ordered briefing on this subject was submitted, the trial court illogically and erroneously ruled that "because plaintiff has not shown that HUD has repudiated any alleged contractual obligations, plaintiff has failed to state a claim for anticipatory breach of contract." Appendix

P. A00003.  In so phrasing her ruling the trial court fused the principles of repudiation and anticipatory repudiation together as if they are one and the same.

26. They are, however, two entirely different principles.  See <u>Danzig v. AEC Corp.</u>, 224 F.3d 1334, 1337-38 (Fed. Cir. 2000).  Anticipatory repudiation contemplates words or actions indicating an intent not to perform a contract in the future, whereas repudiation involves words or actions establishing a past non-performance of a contract.  <u>See</u> <u>Black's Law Dictionary</u> (9th ed. 2009) (attached as an addendum to this brief).

27. In this case HUD clearly repudiated the parties' contract from 1995 to 2001 by failing to pay Section 8 subsidies as required.  As outlined in the preceding section of this brief, the non-breaching party – in our case Fredericksburg – nevertheless chose to continue to honor the contract, and therefore retains its right to later accept the repudiation and sue on the contract during its term period.

28. Additionally, to the extent this Court agrees with Fredericksburg that the four corners of the parties' contract (as clarified by the cited HUD regulations) contemplated Section 8 subsidies for the life of the contract, then the parties' exchange of letters in 2010 established a separate claim by Fredericksburg for anticipatory repudiation by HUD.  Those letters are a February 4, 2010 letter from

Fredericksburg to HUD with follow up e-mails, Appendix P. A00100-A00108; and a July 22, 2010 letter from HUD to Fredericksburg, Appendix P. A00109-A00110.

29. The trial court did not consider these letters to constitute an intention by HUD not to furnish Section 8 subsidies in the future. Fredericksburg begs to differ and believes they clearly do so. The fact that the February 4, 2010 letter from Fredericksburg to HUD also contained a settlement offer is not dispositive of whether or not the two letters, combined, also stated an intention by HUD, in the future, to further repudiate the contract.

30. In its February 4, 2010 letter to HUD Fredericksburg said at page 8 "We do not receive any federal subsidy, yet we are severely restricted in the rents we can charge to residents, such that in effect we are forced to rent apartments for well below the market rate that we could otherwise charge for those units. Appendix A00101. In a follow up e-mail dated March 8, 2010 Fredericksburg pointed out the substantial loss of money the property was experiencing due to HUD's failure to furnish Section 8 subsidies. Appendix A00105. These statements by Fredericksburg to HUD clearly demanded that HUD either furnish subsidies or let Fredericksburg out of the affordable housing rent restrictions so that the property could regain economic viability.

31. In its July 22, 2010 letter HUD said <u>no</u> to both requests: "The Department has reviewed your request and has determined that the Use Agreement

22

is valid and cannot be rescinded or terminated." Appendix P.A00109. "You must

continue to operate this project in accordance with HUD Handbook 4350.6,

Processing Plans of Action Under Low Income Housing Preservation Act of 1990

Title VI and Title II and the approved Plan of Action dated October 10, 2010."[4]

Appendix A00110.

31. Putting aside any effort by Fredericksburg to amicably settle this matter

with HUD, any fair reading of these exchanges between the parties establishes (a)

that Fredericksburg needed to regain economic viability by either receiving the

promised Section 8 subsidy or by release from the onerous LIHPHRA rent

restrictions of the Use Agreement; and (b) that HUD said <u>no</u> to both requests.  <u>That</u>

is the essence of anticipatory repudiation.

32. Concluding this section, the trial court's effort to "fuse" the concepts of

repudiation and anticipatory repudiation into one cause of action was in error.

HUD repudiated – past tense – the contract when from 1995 to 2001 it failed to

provided the required Section 8 subsidies, a repudiation <u>not</u> accepted by

Fredericksburg which has continued to performs its obligations under the parties'

contract.  If as Fredericksburg contends HUD also had an obligation, beyond the

initial five year term, to provide the subsidies, then by its July 22, 2010 letter HUD

anticipatorily repudiated – future tense – that obligation.  Either or both are the

_____

[4] The date "October 10, 2010," which is three months <u>after</u> HUD's letter, is
obviously a typo.  The Plan of Action in question was approved June 29, 1995.

essence of Fredericksburg's right to rescind this unfair, unconscionable and one-sided contract which HUD has never honored but which it expects Fredericksburg to nevertheless honor.

**The trial court erred in requiring that Fredericksburg must seek administrative relief from HUD as to the property's economic non-viability and then wait for HUD's decision on that request, as a precondition to seek judicial relief for rescission of the parties' contract.**

**The trial court erred in holding that there is no basis to assume that an administrative request from Fredericksburg to HUD for relief would be denied.**

33. In her opinion and order, the trial court appears to have stated a requirement that Fredericksburg must seek administrative from HUD as to the property's economic non-viability before seeking judicial relief. Appendix P. A00022 (footnote 18) and Appendix P. A00024. The trial court also said there is no basis to assume that the request will be denied. Appendix P. A00024.

34. The trial court erred in this ruling because as demonstrated above HUD not only repudiated – past tense – the contract but anticipatorily repudiated – future tense – the contract. Additionally, Fredericksburg has already sought administrative relief from HUD in its February 4, 2010 letter (Appendix P. A00100-A00108), which request was unequivocally denied by HUD in its July 22, 2010 reply letter. Appendix P. A00109-A00110. There can be no denying that HUD's letter constituted an administrative decision. As the Supreme Court has held, "only upon a showing of 'clear and convincing evidence' of a contrary

24

legislative intent should the courts restrict access to judicial review" of an administrative decision.  Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S. Ct. 1507, 1511, 18 L. Ed. 2d 681 (1967); accord, Rusk v. Cort, 369 U.S. 367, 379-80, 82 S. Ct. 787, 7 L. Ed. 2d 809 (1962).

35. A court in which a party is seeking judicial relief following denial of an administrative request for relief must look to the complaint's substance, not its form.  Martin v. Donley, 886 F. Supp. 1, 9 (D.D.C. 2012) (attached as an addendum to this brief)  Viewed from this standard the parties' 2010 exchange of letters clearly constituted a request for, and a denial of, administrative relief.

36. Concluding this section, Fredericksburg was under no further duty to seek administrative relief from HUD when in 2010 it tried and the requested relief was denied.

### The trial court erred in holding that Fredericksburg's allegations are purely speculative and will not support its claim for rescission of the parties' contract.

### The trial court erred in holding that Fredericksburg's claim that HUD will hold Fredericksburg to certain low income rental profiles is pure speculation.

37. There is nothing speculative about Fredericksburg's claims and the trial court erred in so holding.  The trial court's "speculation" rulings hinge on the assumption by the trial court that she was correct in her ruling that the parties' 2010 exchange of letters did not constitute a request by Fredericksburg to HUD for administrative relief.

38. HUD's July 22, 2010 letter (Appendix P. A00109-A00110) made it quite

clear that HUD would indeed hold Fredericksburg to certain low income rental

profiles.  There is nothing "speculative" about the following language: "The

Department has reviewed your request and has determined that the Use Agreement

is valid and binding and cannot be rescinded or terminated (Appendix A00109) ...

You must continue to operate this project in accordance with HUD Handbook

4350.6, Processing Plans of Action Under Low Income Housing Preservation Act

of 1990 Title VI and Title II and the approved Plan of Action...".  Appendix P.

A00110.  HUD Handbook 4350.6 (attached as an addendum to this brief) expressly

spells out the low income rental profiles required of LIHPHRA projects – they are

governed by HUD regulations and the Plan of Action.  The Plan of Action

(Appendix P. A00111-A00147), approved by HUD on June 29, 1995 (Appendix P.

A00148-A00150), sets out in great detail what HUD's requirements are as to low

income rental profiles.

39. In Plaintiff's Reply in Support of its Motion for Summary Judgment and

Response to Defendant's Combined Motions (Appendix P. A00093-A00097)

Plaintiff stated the following:

> "99. HUD next says that even if there was a breach of the
> parties' contract by HUD, Plaintiff was not damaged by the failure of
> HUD to furnish Section 8 subsidies.  HUD argues that Plaintiff has
> "only housed moderate and low income tenants, not the very low
> income tenants required under the LIHPHRA Use Agreement," then
> based on his allegation contends that Plaintiff "cannot establish how it

26

has sustained damages – let alone millions of dollars in damages – because of HUD's failure to provide it with Section 8 assistance."

"100. First of all, HUD's unsupported assertion that Plaintiff has not housed very low income tenants (as required under LIHPRA) is false and HUD knows it is false since they have conducted multiple inspections of the property since 1995. Second, the point about the amount, if any, of damages is why Plaintiff's motion is for <u>partial</u> summary judgment. Determination of the amount of damages will require a factual hearing to be conducted later, it is not an issue to be determined now. Third, HUD's implication is that its failure to furnish the contractually required Section 8 subsidies has not harmed the property or the Plaintiff. This argument is manifestly inaccurate.

"101. Contrary to HUD's false assertion in this portion of its motion, the property has housed and houses numerous very low income tenants, along with low income and BMIR limit tenants. HUD's contention that its failure to furnish the contractually required Section 8 subsidies is likewise incorrect. <u>See</u> attached supplemental declaration of Sherry Deeken with attached exhibits.

"102. The fact of the matter is that the income limit restrictions imposed by HUD on BMIR properties, versus those imposed by HUD on LIPHRA properties, are drastically different and are wholly inconsistent with each other such that it is not possible for Plaintiff to operate the property under both sets of regulations. Very low income tenants must have Section 8 subsidies; otherwise there is no way they can afford the amount of rent necessary for the property to remain economically viable.

"103. This is also the case as to low income tenants, just not as drastic. Plaintiff's rents are presently capped by HUD at $395, $517 and $605 per month for one, two and three bedroom units, respectively. The Plan of Action approved by HUD and adopted as part of the parties' contract called for rents of $447.06, $526.02 and $657.25, respectively. <u>See</u> page II-6 of Plan of Action, Exhibit H to Plaintiff's Motion for Partial Summary Judgment, chart at bottom entitled "Calculation of Section 8 Contract Rents."

"104. Remember, those Plan of Action rent caps were set in **1995**. Eighteen years ago. According to the U.S. Department of Labor's Consumer Price Index (CPI) website inflation calculator. The 1995 plan of action rent caps would, as of 2012, by **$673.51, $792.46 and $990.16, respectively**. <u>See</u> U.S. Dept. of Labor CPI web site inflation calculator: http://www.bls.gov/data/inflation_calculator.htm (attached as an addendum to this brief but should be accessed online to perform the calculations the undersigned performed).

"105. HUD currently (2013) requires the property's rents be capped at 88%, 98% and 92% of the Plan of Action rent caps (1995) for one, two and three bedroom units, respectively. If you adjust the 18 year old Plan of Action rent caps for inflation, then HUD currently requires the property's rents be capped at 58%, 65% and 61% of the 18 year old Plan of Action rent as adjusted for inflation to 2012. How in the world can HUD, with a straight face, argue that Plaintiff has not been damaged and the property's tenants have not been harmed?

"106. Let's look at it another way. Assuming HUD had honored the Plan of Action's rent caps and permitted them to be adjusted over the years for inflation, then today's rent caps would be, as noted above, $673.51 for a one bedroom unit, $792.46 for a two bedroom unit, and $990.16 for a three bedroom.

"107. HUD periodically publishes guidelines for all federally regulated property owners as to the income limits they must require as the maximum certain tenants can make to live at the property. <u>See</u> FY 2013 Income Limits published by HUD on its HUD User web site: http://www.huduser.org/portal/datasets/il/il13/index.html (attached as an addendum to this brief but should be accessed online to perform the calculations the undersigned performed. Clicking this link opens to the first page of the income limits section).[5]

"108. Taking just a one bedroom unit (and one person) as an example, the HUD mandated annual income limit for the San Antonio area for a BMIR property is $40,800. The HUD mandated annual income limits for LIHPHRA regulated properties are, respectively,

---

[5] Note at this page that, <u>three times</u>, HUD refers to "Section 8 income limits."

$12,900 (extremely low income), $21,500 (very low income) and $34,350 (low income).

"109. Let's stick with this numbers scenario a little longer, please. Again assuming HUD had honored the Plan of Action's rent caps and permitted them to be adjusted over the years for inflation. Above we found the adjusted monthly rent amounts. Going with just the one bedroom unit and one person, let's multiple the $673.51 figure times 12 to determine this tenant's annual rent under this scenario: $8,082.12. Assuming our hypothetical tenant made the maximum, but not over, the HUD LIHPHRA income caps, this annual rent would represent 62% of income for an extremely low income tenant and 31% of income for a very low income tenant.

"110. Those percentages of rent as against income both exceed the HUD mandated maximum ratio of 30%. Those numbers are bad enough, but remember, a tenant could be categorized as very low income with income as low as $12,901 ($1 over the extremely low income category), and a tenant could be categorized as low income with income as low as $21,501 ($1 over the very low income category. Seldom, in fact, does a very low income tenant reach the max. Same for the low income tenant.

"111. For example, the current tenant in apartment 1102, a one person, one bedroom household (tenant #1), reports annual income of $8,616, far below the max to be consider very low income and in fact well below the max to be considered extremely low income. In apartment 1502, another one person, one bedroom situation, another tenant reports annual income of $9,192. These are actual tenants, not hypothetical. Let's consider their plight.

"112. Again assuming HUD had honored the Plan of Action's rent caps and permitted them to be adjusted for inflation all these years. Annual rent of $8,082.12 would represent **94%** of the tenant #1's income and **88%** of tenant #2's income. These are not hypothetical numbers –not if HUD had honored the Plan of Action's rent caps and adjusted them over the years for inflation.

"113. The Plan of Action – which you will recall HUD insists Plaintiff comply with – requires Plaintiff to reserve 91 of its 140 units

29

for tenants in the very low income bracket. This requirement (91/140) is, by the way, also found in the LIHPHRA Use Agreement of which HUD is so proud and which HUD insists is a binding contract. HUD's own regulations, **as to very low income tenants, specify that all such tenants should receive Section 8 subsidies**. See "Income Limits by Program" chart found in HUD Handbook 4350.3, page 3-8, figure 3-3 (Very low income tenants are limited to three types of programs, Section 8 (pre-1981), Section 8 (post-1981) and Section 202/811 PRACs except those funded in FY 1995 (attached as an addendum to this brief). **All three of these programs require Section 8 subsidies**. How can HUD contend Plaintiff is not damaged or the tenants not harmed when confronted with these sort of numbers?"

40. There is nothing wrong with a court exercising common sense along with evaluating evidence and legal arguments. See Newport News Shipbuilding and Dry Dock Company v. Garrett, 6 F.3d 1547, 1572 (Fed. Cir. 1993). Remember, at this point Fredericksburg is no longer seeking money damages, just rescission, so exact calculations of damages are no longer necessary. Plainly, the rent restrictions imposed by HUD on Fredericksburg have rendered the property economically nonviable, a problem that will only increase in the future as the government mandated below market rents continue to be outstripped by the property's needed income base to make ends meet.

<u>But What If...?</u>

41. But what if – as HUD wishes – the Court rules that the Capital Grant Agreement is binding. The Use Agreement is binding. But that the Plan of Action is <u>not binding</u>? What then?

42. Well, we lose. We are bound to HUD for another, maybe, 50 years (the "useful life" rule in the Use Agreement). Tenant rents will have to be <u>cut</u>, rather than be increased, as the new tenant base (very low and low income) won't have the income to afford the current rents. But what then?

43. Fredericksburg has demonstrated that even under current circumstances the property's financial condition is precarious without the required Section 8 subsidies. Fredericksburg has demonstrated that this situation will worsen, dramatically, if Fredericksburg is forced to dedicate 123 of its 140 units to very low and low income tenants.

44. First, most of Fredericksburg's current tenant base will no longer qualify and will end up having to move. Second, the property's budget will suffer even more severely than at present. Expensive and long term maintenance, repairs and improvements to this already 47 year old property, such as roof work, parking lot work, plumbing and sewer work, HVAC work and electrical work will have to be deferred still more, to the point the condition of the property will not meet HUD's Housing Quality Standards (HQS).

45. The simple fact is the property won't be able to afford the needed maintenance and repairs to keep it habitable. The property is already teetering on no longer being economically viable by reason of HUD's failure to implement the Plan of Action and failure to pay the required subsidy for the past 18 years. If this

Court tells Fredericksburg it gets no rescission, the property will inevitability reach the point of no return financially. Bankruptcy and liquidation may be the only remaining alternative.

Conclusion and Prayer

1. This is a continuing contract. It is beyond dispute that HUD breached the contract by failing to pay Section 8 rent subsidies from the very beginning. HUD has clearly repudiated the contract by doing so and, by its July 22, 2010 letter to Fredericksburg, anticipatorily repudiated the contract as well.

2. Fredericksburg lost its opportunity to recover money damages for the unpaid rent subsidies due to the passage of time, but has not lost its right to rescind the parties' contract. HUD should not be permitted to continue harming Fredericksburg's economic viability by insisting it charge well below market rents while continuing to refuse to subsidize.

3. That is a denial of Fredericksburg's rights, a denial of the rights of the very low and low income residents of the property, and a denial of due process according to law. Fredericksburg prays that this Court will reverse in part the trial court's judgment and order that the contract be rescinded.

<u>Opinion and Order the Subject of the Appeal</u>

The Court of Federal Claims' Opinion dated October 23, 2013 is at

Appendix P. A00001-A00025, and that Court's Judgment dated October 25, 2013

is at Appendix P. A00026.

Respectfully submitted,

/s/ Edward M. Lavin
EDWARD M. LAVIN
LAW OFFICE OF EDWARD M. LAVIN
8918 Tesoro Dr. #418
San Antonio Tx 78217
Phone (210) 829-1938
Fax (210) 829-5244
E-Mail elavin@satx.rr.com
State Bar No. 12000250
Attorney for Appellant

# <u>Addendum</u>

Table of Contents

Addendum Page

Opinion of
The Honorable Nancy B. Firestone
Re:  Granting Government's Motion to Dismiss
     filed October 23, 2013 ..........................................................................Add. 1

Order of
The Honorable Nancy B. Firestone
Re:  Granting Government's Motion to Dismiss
     filed October 25, 2013 ........................................................................Add. 26

HUD Section 8 Renewal Policy dated February 15, 2008,
Chapter 2, page 3 ....................................................................................Add.27

HUD Handbook 4350.6, Section B, paragraph 11-5 .....................................Add. 31

Dell Computer Corporation v. Rodriguez,
     390 F.3d 377, 391 (5th Cir. 2004) ...........................................................Add. 34

Packard v. OCA, Inc.,
     2009 WL 334645 * (E.D. Tex. 2009)........................................................Add. 53

Pagosa Oil & Gas, LLC v. Marrs & Smith Partnership,
     323 S.W.3d 203, 216 (Tex. App.– El Paso 2010, writ denied)............Add. 61

Black's Law Dictionary (9th ed. 2009) .........................................................Add. 82

Martin v. Donley,
     886 F. Supp. 1 (D. D.C. 2012).............................................................Add. 83

U.S. Dept. of Labor CPI web site inflation calculator:
http://www.bls.gov/data/inflation_calculator.htm ...........................................Add. 98

FY 2013 Income Limits published by HUD on its HUD User web site:
http://www.huduser.org/portal/datasets/il/il13/index.html...............................Add. 99

"Income Limits by Program" chart found in HUD Handbook 4350.3, page 3-8,
figure 3-3 ....................................................................................................Add. 101

# In the United States Court of Federal Claims

No.  10-885C
(Filed: October 23, 2013)

|  |  |
|---|---|
| ————————————————— ) | |
| FREDERICKSBURG NON-PROFIT ) | |
| HOUSING CORP., ) | |
| ) | Lack of Subject Matter Jurisdiction |
| Plaintiff, ) | Under 28 U.S.C. § 2501; Statute of |
| ) | Limitations; Failure to State a Claim |
| v. ) | for Anticipatory Breach of Contract; |
| ) | Anticipatory Repudiation; Low- |
| THE UNITED STATES, ) | Income housing; LIHPHRA; Plan of |
| ) | Action; Section 8 Subsidies. |
| Defendant. ) | |
| ————————————————— ) | |

*Edward M. Lavin*, San Antonio, TX, counsel for plaintiff.

*Antonia R. Soares*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, and *Jeanne E. Davidson*, Director, Commercial Litigation Branch, for defendant.

## O P I N I O N

This case involves a 1995 agreement between the Department of Housing and

Urban Development ("HUD") and Fredericksburg Non-Profit Housing Corp. ("plaintiff"

or "Fredericksburg") to provide low-income housing at the Apartments Northwest

apartment complex ("Apartments Northwest") in San Antonio, Texas.  Fredericksburg

claims that HUD breached the 1995 agreement when it failed to provide certain rent

subsidies and rent increases for low-income housing allegedly promised to plaintiff in the

1995 agreement.  Plaintiff seeks $6,270,030 in unpaid rent subsidies and unspecified

damages related to the maximum allowable rental rates.[1]  Plaintiff also seeks rescission on the grounds that HUD repudiated its obligation to either (1) provide Fredericksburg with sufficient assistance to ensure the financial viability of Apartments Northwest as low-income housing or (2) relax or remove the affordability requirements contained in the 1995 agreement.

The United States ("the government" or "defendant") has moved to dismiss the complaint pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1) for lack of jurisdiction and RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  The government argues in its RCFC 12(b)(1) motion that plaintiff's claims for damages stemming from HUD's failure to provide Section 8 subsidies or rent increases under the 1995 agreement are barred by the six-year statute of limitations found at 28 U.S.C. § 2501 (2012).  The government argues in its RCFC 12(b)(6) motion that plaintiff cannot state a claim for anticipatory breach of contract because plaintiff has not properly alleged that HUD repudiated any of the duties contained in the 1995 agreement.  The parties have also cross-moved for summary judgment on the government's liability for breach.[2]

Because the court finds that plaintiff's claims for unpaid subsidies and rent increases are time-barred under 28 U.S.C. § 2501, the government's motion to dismiss

---

[1] Plaintiff has abandoned a claim for $1,871,145 in connection with HUD's alleged failure to provide annual owner distributions.  These distributions were not available to Fredericksburg because it is a non-profit.  Pl.'s Sur-Reply 1 n.l, ECF No. 26,  July 20, 2011.

[2] Plaintiff has also moved to strike the declaration of Deborah Talamantes that was attached to the government's November 13, 2012 renewed motion to dismiss and cross-motion for summary judgment.

those claims under RCFC 12(b)(1) is **GRANTED**.  Further, because plaintiff has not

shown that HUD has repudiated any alleged contractual obligations, plaintiff has failed to

state a claim for anticipatory breach of contract.  Therefore, the government's request to

dismiss plaintiff's claim for rescission is **GRANTED** pursuant to RCFC 12(b)(6).  As

there are no surviving claims for relief, the parties' cross-motions for partial summary

judgment are **DENIED-AS-MOOT.**

# I. BACKGROUND[3]

Fredericksburg is a Texas non-profit corporation which, since December 1995, has

owned the Apartments Northwest apartment complex located in San Antonio, Texas.

Fredericksburg purchased the complex from Bion Development Corporation ("Bion") in

1995 in connection with HUD's initiative to maintain affordable housing under the Low-

Income Housing Preservation and Resident Homeownership Act.  Pub. L. No. 101-625,

tit. VI, 104 Stat. 4249 (1990) (codified as amended in scattered sections of 12 U.S.C.)

("LIHPRHA").  A brief review of LIHPRHA is helpful in understanding the factual

context of this dispute.

## A.  Statutory and regulatory background

The relevant statutory history begins with the National Housing Act of 1934

("NHA"), Pub. L. No. 73-479, § 1, 48 Stat. 1246 (1934).  Congress enacted the NHA to

address the nation's declining stock of affordable housing.  <u>See generally</u> <u>Cienega</u>

---

[3] These facts are undisputed and are taken from the Amended Complaint, the parties' briefs, and the attachments thereto.  Facts outside of the pleadings are considered solely for the purpose of adjudicating the government's RCFC 12(b)(1) motion to dismiss for lack of jurisdiction.

<u>Gardens v. United States</u>, 503 F.3d 1266, 1270 (Fed. Cir. 2007).  The NHA established the Federal Housing Administration ("FHA"), which was later subsumed into HUD.  <u>Id.</u> at 1270 n.1.  Over the next fifty years, Congress amended the NHA to enable FHA and HUD to provide low-interest or subsidized loans to property owners willing to maintain their properties as affordable housing.  <u>Id.</u> at 1270-71.  In exchange, property owners and HUD would enter into a regulatory agreement through which any important management decisions, including increases in rents, generally had to be approved by HUD until the mortgage was paid off.  <u>Id.</u>  The mortgage contracts were for forty years, but included an option to eliminate HUD's management control by prepaying the mortgage after 20 years.  <u>Id.</u> at 1270.

In the 1980s Congress became concerned that the availability of affordable housing would once again decline as prepayment dates arrived and the restrictions imposed during the mortgage period expired.  <u>Id.</u> at 1272.  To address this

> Congress reacted with a carrot-and-stick approach, first enacting [the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA")] (a temporary measure), and then superseding this statute by LIHPRHA in 1990 (initially planned as a permanent measure).  In enacting these statutes, Congress sought to "balance the public policy need to preserve housing for low income families with the perceived contractual rights of the owners."

<u>Id.</u> (quoting H.R. Rep. No. 101-559, at 75 (1990)).  Under LIHPRHA, owners wishing to prepay their mortgages and exit the low-income housing programs were barred from doing so until after they offered their property for sale to owners who would preserve the rent restrictions of the programs.  <u>Id.</u>  If a sale was approved by HUD, the purchaser was provided with financial assistance.  <u>Id.</u>  Owners willing to stay in the program could also

elect to receive financial incentives by signing a "Use Agreement" with HUD.  Id. at

1273.  In exchange for these incentives, owners had to agree to maintain the remaining

restrictions "for the remaining useful life of such housing." [4]  Id. (citing 12 U.S.C. §

4112(a)(2)(A) (2000)).  It was under this program that Bion conveyed Apartments

Northwest to Fredericksburg.

LIHPRHA established a process to determine the financial incentives associated

with the property transfer.  For parties that intended to extend the affordability

restrictions through sale, LIHPRHA requires that owners submit to HUD a Plan of Action

("POA"), in which the current and prospective owner describe, among other things, (1)

any proposed changes in the status or terms of the prior regulatory or mortgage

agreement; and (2) "incentives requested . . . and analyses of how the owner would

address any physical or financial deficiencies and maintain the low-income affordability

restrictions of the housing."  12 U.S.C. § 4107.

Sections 4109(b) and 4110 of Title 12 define the financial incentives available to

induce an owner to extend low-income use of the property through sale.[5]  These

incentives include, among other things: (1) an increase in the rents on units occupied by

the current tenants as permitted under 12 U.S.C. § 4112; (2) financing of capital

improvements; (3) an increase in the rents permitted under an existing contract under 42

[4] "Remaining useful life" is "the period during which the physical characteristics of the housing remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as become necessary."  12 U.S.C. § 4112(c)(1).  Property owners can petition HUD for a determination that the useful life has expired fifty years after HUD approves the owner's Plan of Action.  See 12 U.S.C. § 4112(c)(3).

[5] Section 4110 supplements the incentives available under section 4109.

U.S.C § 1437f, which codifies the Section 8 Housing Program;[6] and (4) additional assistance

under 42 U.S.C. § 1437f for an extension of any project-based assistance attached to the

housing.  12 U.S.C. §§ 4109(b), 4110.  The latter two incentives are permitted subject to

the availability of funds.  12 U.S.C. § 4109(b).

Although LIHPRHA was designed to bind subsequent owners to the affordability

restrictions, owners are allowed to terminate the restrictions in certain circumstances.  In

particular, the act permits voluntary termination, subject to 12 U.S.C. § 4113 (Assistance

for displaced tenants), in the event that HUD approves a POA but fails "to provide the

assistance approved in such plan during the 15-month period beginning on the date of

[POA] approval."  12 U.S.C. § 4114(a)(1)(A).  Similarly, 12 U.S.C. § 4114(b) provides

that, when providing Section 8 assistance under 42 U.S.C. § 1437f:

> [T]he Secretary may enter into a contract with an owner, contingent upon
> the future availability of appropriations for the purpose of renewing
> expiring contracts for rental assistance as provided in appropriations Acts,
> to extend the term of such rental assistance for such additional period or
> periods necessary to carry out an approved plan of action.  The contract and
> the approved plan of action shall provide that, if the Secretary is unable to
> extend the term of such rental assistance or is unable to develop a revised
> package of incentives providing benefits to the owner comparable to those
> received under the original approved plan of action, the Secretary, upon the
> request of the owner, shall (1) . . . modify the binding commitments . . . that
> are dependent on such rental assistance[, or] (2) permit the owner to prepay
> the mortgage and terminate the plan of action and any implementing use
> agreements or restrictions . . . .

12 U.S.C. § 4114(b).

---

[6] Under the Section 8 program, HUD provides assistance payments to private landlords who
operate low-income housing projects.  These payments are meant to cover the difference
between tenant rent payments and the contract rent agreed upon by HUD and the landlord.  See
Normandy Apartments, Ltd. v. United States, 100 Fed. Cl. 247, 249 (2011).

**B.  Prior ownership of Apartments Northwest**

Quincy Lee was the original developer and owner of the apartment complex.  In November 1968, Mr. Lee executed a secured note in favor of First Mortgage Company of Texas, Inc.  Mr. Lee also executed a deed of trust, as well as a regulatory agreement with HUD under section 221(d)(3) of the NHA.  Prior to June 9, 1981, J.C. Burch Apartments, Ltd. ("Burch") acquired the apartment complex from Mr. Lee.  Burch assumed and agreed to be bound by the note, deed of trust, and regulatory agreement.  On June 9, 1981, Bion acquired the apartment complex.  Bion assumed and agreed to be bound by the note, deed of trust, and regulatory agreement.

**C.  Development and approval of the Plan of Action for Apartments Northwest**

Sometime after December 8, 1994, Fredericksburg and Bion submitted a POA to HUD that specified various incentives to be provided to enable Fredericksburg to continue operating the property as affordable housing after purchasing the property from Bion.  Among other things, the POA identified (1) a $77,964 grant to facilitate Fredericksburg's purchase of the property, (2) a $2,515,415 equity loan insured under Section 241(f) of the National Housing Act,[7] (3) the right to seek future rent increases, and (4) a five-year contract for $500,000 in annual Section 8 assistance for the building's

---

[7] This loan included a $1,481,325 Acquisition Loan, a $921,016 Rehabilitation Loan to undertake certain repairs and improvements, $146,653 for transaction costs, and $33,579 for loan costs.  See Pl.'s Mot. Partial Summ. J., Plan of Action, Ex. H, at II-3, ECF No. 54-8.

140 units.[8]  Section III of the POA stated that, apart from the $77,964 grant, Fredericksburg had not applied for any additional grant funds in connection with the purchase.

On June 29, 1995, the Chief of HUD's Asset Management Branch, San Antonio Field Office, sent a letter to Bion and stated that HUD had approved certain incentives in the POA.  Among other things, HUD approved 123 units for Section 8 subsidies, "which must be provided to all current very low- and low-income tenants at the project."  See Def.'s Renewed Mot. Dismiss, Ex. A-24, ECF No. 59-1.  In addition, the letter approved certain rental rates according to unit type, and specified that 91 units would be used for Very Low-Income tenants, 32 units would be used for Low-Income tenants, and 16 units would be used for Moderate Income tenants.  The letter further stated that the owner could apply for general project rent increases on an annual basis.

HUD's approval of the POA was conditioned, however, on "the availability of sufficient Preservation/Homeownership Incentives (Section 8 contract budget authority, Gap Grants, Five Percent Equity Grants and/or Homeownership Funds) at the time of the endorsement."  Id.  In addition, HUD stated that it would "request funding from the Preservation Division in HUD Headquarters to enable [the parties to the agreement] to implement the POA."  Id.

---

[8] The POA noted that Apartments Northwest did not then have a Housing Assistance Payment ("HAP") contract for Section 8 Housing assistance.  See Pl.'s Mot. Partial Summ. J., Plan of Action, Ex. H, at I-3, II-1 to II-2, ECF No. 54-8 ("Since the current gross annual contract authority is non-existent it is not sufficient to fund the requested federal incentives without any current contract terms.  Therefore, current term contract authority must be implemented as illustrated . . . A total of 140 units will become eligible to receive assistance under the new contract(s) bringing the total number of assisted units to 140.").

### D. The Capital Grant and Use Agreements between Fredericksburg and HUD

On December 15, 1995, Bion conveyed the property to plaintiff.  On December 28, 1995, Fredericksburg and HUD signed, effective December 15, (1) a Capital Grant Agreement ("Grant Agreement") and (2) a Use Agreement And Amendment Of Existing Regulatory Agreement For Multifamily Projects Insured Or Assisted Under Section 221(D)(3) (Below Market Interest Rate) of The National Housing Act and Subject to the Low Income Housing Preservation and Resident Homeownership Act of 1990 With a Capital Grant and Sale of Property ("Use Agreement").

### 1.  The Use Agreement

The Use Agreement, which was signed by David Stone, Fredericksburg's then-Director/President, and Elva Castillo, the Director of HUD's San Antonio Field Office of Multifamily Housing, acknowledged that incentives would be provided by HUD and that the affordability requirements would apply for the useful life of the project.  The Use Agreement incorporated some and removed other provisions of the original Regulatory Agreement, and specified that Fredericksburg, "to the extent practicable, would maintain the 140 units in Apartments Northwest as affordable in the following proportions:  91 units for Very Low- Income Tenants, 32 units for Low-Income Tenants, and 17 units for Moderate Income Tenants."  See Pl.'s Mot. Partial Summ. J., Use Agreement, Ex. E, at 3, ECF No. 54-5.  The Use Agreement further specified that "[i]n renting vacant units to new tenants, the Owner may deviate from the . . . Tenant Profile to the extent necessary to keep the project financially viable, only with the approval of HUD."  Id.

### 2.  The Grant Agreement

The Grant Agreement was also signed by Fredericksburg's Director/President and

the Director of HUD's San Antonio Field Office of Multifamily Housing.  The Grant

Agreement provided:

> The Grantee agrees to carry out the Grant activities under this Agreement
> with LIHPRHA, the regulations at 24 C.F.R. Parts 84 and 248, the
> Preservation Capital Needs Assessment, the approved Plan of Action,
> which is attached as Exhibit 1, the Use Agreement, which is attached as
> Exhibit 2, and any other applicable laws, regulations and other
> requirements (including recordkeeping requirements).

See Notice, Grant Agreement, Ex. A, ECF No. 31, at 4, August 11, 2011.

HUD and Fredericksburg agreed that HUD would provide Fredericksburg with

$2,099,411 in the form of a grant,[9] which was to be allocated as follows:

> (1)    Deposit to the Reserve for Replacement ($94,279);
> (2)    Repairs or Substantial Rehabilitation Costs ($272,903);
> (3)    Repairs or Substantial Rehab Contingency ($27,290);
> (4)    Repairs or Sub\Rehab Transaction Costs ($44,176);
> (5)    Transfer Preservation Equity ($1,658,034).

Id.  These funds were expressly contingent on (1) transfer and recording of the property

deed; (2) availability of grant funds; (3) execution of the Use Agreement; and (4)

execution of any other document that HUD deemed necessary.[10]  Id. at 5.

---

[9] Although the Grant Agreement recites $2,099,411 as the total grant amount, the sum of the
individual allocations is $2,096,682.  This discrepancy is not relevant to the parties' motions.

[10] The Grant Agreement specified that the funds "are to be used solely for those purposes
specified in the Sources and Uses of Funds Statement which is attached as Exhibit 3, and all
exhibits thereto, all of which are incorporated in and considered a part of this agreement."
Notice, Grant Agreement, Ex. A, ECF No. 31, at 4.

### E. Fredericksburg's requests for rental rate increases and Section 8 subsidies

Beginning in 1996, Fredericksburg periodically sought rental rate increases from HUD, all but one of which were approved.  On June 18, 1996, Fredericksburg's management company sent a letter to HUD requesting a budget-based rent increase, which was denied on August 7, 1996.  <u>See</u> Def.'s Renewed Mot. Dismiss, Ex. A-7, A-9, ECF No. 59-1.  Subsequent rent increases were approved, however, in February 2002, July 2008, and April 2011.[11]  <u>See</u> Def.'s Reply, Exs. D, F, H, ECF No. 17, May 20, 2011. Although plaintiff never received any Section 8 subsidies during the five-year period beginning in 1995, there is no evidence that Fredericksburg ever sought to rescind the Use Agreement by invoking the voluntary termination procedures found in 12 U.S.C. § 4113.

### F. Fredericksburg's attempt to terminate the Use Agreement

On February 4, 2010, Sherry Deeken, Fredericksburg's President, faxed a letter ("February letter") to HUD in which Fredericksburg offered to pay $250,000 to HUD in exchange for the mutual rescission of the Use Agreement.  Ms. Deeken claimed that Fredericksburg had always managed the property in accordance with the Below Market Interest Rate ("BMIR") program, rather than under the more onerous affordability restrictions contained in the Use Agreement.  She further claimed that HUD had inspected and approved Fredericksburg's management of the property under the BMIR regulations for years, and that Fredericksburg had not been aware of the Use Agreement

---

[11] Plaintiff did not present any evidence or argument suggesting that Fredericksburg had ever requested and been denied a rental rate increase since 1996.

until after Fredericksburg paid off the mortgage in 2008.  Ms. Deeken stated that Fredericksburg had only received $250,000 worth of benefits under the Grant Agreement and had not received any federal rent subsidies.  She also opined that enforcement of the Use Agreement would lead to several residents being forced to move out of the apartment complex.

Priscilla Rocha, the Supervisory Project Manager in the San Antonio Field Office of HUD's Multifamily Program Center, rejected Ms. Deeken's offer in a letter dated July 22, 2010 ("July letter").  See Def.'s Renewed Mot. Dismiss, Ex. A-22, ECF No. 59-1.  In that letter, Ms. Rocha stated that the $2,099,411 Capital Grant was used to fund equity, closing and transaction costs, and rehabilitation of the property.  Id.  She stated that "[t]he Department may not waive or terminate the Use Agreement as this is a statutory requirement.  Statutory requirements can not [sic] be waived.  The Department has reviewed your request and has determined that the Use Agreement is valid and binding and can not [sic] be rescinded or terminated."  Id.  The letter further stated that Fredericksburg was required to operate the project "in accordance with HUD Handbook 4350.5, Processing Plans of Action under Low Income Housing Preservation Act of 1990 Title VI and Title II and the approved Plan of Action dated October 10, 2010."  Id.  The letter concluded by providing contact information for a HUD representative to answer further questions from Ms. Deeken.  Id.

### G. The instant litigation

On October 18, 2010, plaintiff filed suit in Texas state court.  See Petition, Fredericksburg Non-Profit Housing Corp. v. Donovan, No. 2010-CI-17230 (Bexar Cnty.

Dist. Ct. filed October 14, 2010).  The action was removed to the United States District

Court for the Western District of Texas on November 19, 2010, and subsequently

transferred to this court on December 21, 2010.  See Case Transfer, ECF No. 1.  Plaintiff

filed an amended complaint on January 19, 2011.

In its amended complaint, plaintiff makes several allegations consistent with those

contained in Fredericksburg's February letter to HUD.  Plaintiff alleges that

> at no time was the property ever operated in accordance with the . . . Use
> Agreement, but rather was and continues to be operated as a HUD BIMR
> Property.  HUD was at all times and is aware of this fact and HUD
> representatives have over the years treated the property as a BIMR property
> and subject to those regulations.

Am. Compl. ¶ 7.[12]  Plaintiff further asserts that under the POA, "substantial monetary

concessions . . . should have been provided by HUD to [Fredericksburg], but were not."

Id. ¶ 12.  The amended complaint also describes Fredericksburg's unsuccessful attempt,

in 2010, to convince HUD to rescind the Use Agreement.[13]  See Id. ¶¶ 11, 15.  Although

plaintiff alleges that being forced to comply with the Use Agreement would cause

---

[12] Similarly, plaintiff alleges that "[n]either the owner nor HUD has paid any attention to the
LIPHRA [sic] program or the Use Agreement, nor the unimplemented Plan of Action.  Both
parties have throughout this time assumed the property was regulated under the [BMIR]
program, and . . . the property passed all required HUD inspections."  Am. Compl. ¶13.

[13] Paragraph 15 of the complaint states:

> Since early 2010 Plaintiff has attempted to convince HUD of the obvious mutual
> mistakes and breaches . . . and of the resulting need for HUD to cancel the
> LIPHRA [sic] Use Agreement.  However, on July 22, 2010 in writing HUD
> refused to do so and demanded that Plaintiff . . . continue to comply with a
> canceled and obsolete federal program while continuing to refuse to perform its
> own obligations under the parties' agreement.

Am. Compl. ¶15.

Fredericksburg "to rent apartments for well below the market rate, with no subsidy," the amended complaint does not address the Apartment Complex's present financial viability. Id. ¶ 20.

On August 12, 2011, the court stayed consideration of the government's motion to dismiss to allow for jurisdictional discovery. Following discovery, the government renewed its motion to dismiss and moved, in the alternative, for summary judgment. Plaintiff filed a response and moved for partial summary judgment on liability for breach of contract. Plaintiff also moved to strike portions of the declaration of a HUD Employee, Deborah Talamantes, which was attached to the government's renewed motions. Briefing was completed on April 22, 2013, and argument was held on June 21, 2013. The court ordered supplemental briefing as to whether plaintiff had stated a valid claim as to anticipatory breach of contract, which was completed on August 30, 2013. The government has moved to dismiss the anticipatory breach claim pursuant to RCFC 12(b)(6).

## II. DISCUSSION

### B. The government's RCFC 12(b)(1) motion to dismiss for lack of jurisdiction

#### 1. Standard of review for RCFC 12(b)(1) motions to dismiss

The Tucker Act establishes this court's jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

28 U.S.C. § 1491(a)(1). However, claims under the Tucker Act are subject to the six-year statute of limitations set forth in 28 U.S.C. § 2501. In the absence of a statutory waiver, this six-year limitations period is jurisdictional and is not susceptible to equitable tolling. See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 136 (2008). A claim under the Tucker Act accrues as soon as all events have occurred that are necessary to enable plaintiff to bring suit. See Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006).

Under the "continuing claims" doctrine, there are circumstances when later arising claims may be heard "even if the statute of limitations has lapsed for earlier events." Tamerlane, Ltd. v. United States, 550 F.3d 1135, 1145 (Fed. Cir. 2008); Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998). However, "[i]n order for the continuing claims doctrine to apply, plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." Brown Park Estates v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997); Ariadne, 133 F.3d at 879 ("The continuing claims doctrine often operates to save parties who have pled a series of distinct events—each of which gives rise to a separate cause of action—as a single continuing event."). "The continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time." Ariadne, 133 F.3d at 879.

Where, as here, the government has moved to dismiss on jurisdictional grounds, including that the case is barred by the statute of limitations, "the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted

as true." Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012). The court may look beyond the pleadings and inquire into jurisdictional facts to determine whether jurisdiction exists. See Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). Ultimately, plaintiff bears the burden of establishing, by a preponderance of the evidence, facts sufficient to invoke the court's jurisdiction. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

### 2. Fredericksburg's claims for breach of contract damages and rescission stemming from HUD's alleged failures to provide Section 8 subsidies and rent increases are time-barred

The government argues that any claim that plaintiff might have had for damages related to HUD's failure to provide Section 8 rent subsidies accrued in December 1995, once Fredericksburg became a party to the Use Agreement and knew or should have known that it would not be given the allegedly-promised Section 8 subsidies. The government also argues that plaintiff's claims for unpaid subsidies would not be salvaged by the continuing claims doctrine because  (1) Fredericksburg did not possess a statutory or contractual right to periodic payments from the government beyond 5 years, (2) all of the events necessary to fix liability occurred outside the statute of limitations, and (3) plaintiff's claims stem from a single distinct event:  the failure to provide Fredericksburg with a contract for subsidies for the limited period promised. The government therefore contends that plaintiff's claims are time-barred under 28 U.S.C. § 2501 and must be dismissed.

In response, plaintiff argues that the language of the POA and the Use and Grant Agreements contractually obligate the government to provide Fredericksburg with Section 8 subsidies for the duration of the apartment complex's useful life.  As such, plaintiff contends that each month that the government failed to provide Section 8 subsidies to Fredericksburg breached the agreement, and thus plaintiff has alleged a continuing claim.

The court agrees with the government and finds that any of plaintiff's claims for damages based on HUD's alleged failure to provide plaintiff with Section 8 subsidies are barred by the statute of limitations.  To begin, regardless of whether the government breached the agreement by failing to provide Section 8 subsidies, the POA makes clear that any Section 8 subsidy contract was limited to $500,000 per year for only five years.[14] Thus, even assuming that the POA obligated the government to provide Section 8 subsidies for five years, which the government disputes, the alleged breach would have accrued, at the latest, in December 2000—at the end of the 5-year period beginning in December 1995.  Plaintiff has not identified any language in the Use Agreement, Grant Agreement, or the POA to suggest that HUD had agreed to provide Fredericksburg with Section 8 subsidies beyond 5 years.  Thus, the statute of limitations on the last of Fredericksburg's Section 8-based claims would have run on December 15, 2006.

---

[14] The POA states that "current term contract authority must be implemented as illustrated below," and then lists the following:

| # of Units | Contract # | Term | Annual Authority |
|---|---|---|---|
| 140 Units | TX??-M000-??? | 5 years | $500,000.00 |

Because plaintiff filed its complaint, at the earliest, [15] on October 18, 2010,

Fredericksburg's claim for damages related to receipt of Section 8 subsidies is time-

barred under 28 U.S.C. § 2501.  For this reason, the government's motion to dismiss

those claims under RCFC 12(b)(1) is **GRANTED**.

In addition, the court finds that plaintiff's claim for breach based on HUD's failure

to approve rent requests is similarly time-barred.  The only request for a rental rate

increase that HUD rejected occurred in 1996.  That claim accrued more than six years

ago, and is therefore time-barred under 28 U.S.C. § 2501.  As a result, the government's

motion to dismiss that claim under RCFC 12(b)(1) also must be **GRANTED**.

### C. The government's RCFC 12(b)(6) motion to dismiss for failure to state a claim

#### 1. Standard of review for RCFC 12(b)(6) motions to dismiss

In addition to its claims for damages based on HUD's refusal to provide plaintiff

with Section 8 subsidies and rent increases in the past, plaintiff also argues that HUD

should be deemed in breach of its agreement with plaintiff because HUD's July letter

---

[15] Section 1631 of Title 28 operates to preserve the time of filing in a transferred case before this court.  The Federal Circuit has not squarely addressed whether, for the purposes of 28 U.S.C. § 2501, the date of filing should relate back to the date when the plaintiff originally filed in state court or the date when the action was removed to federal court.  See 28 U.S.C. § 1631. Fredericksburg argues that the six-year time period should measure backwards from its October 18, 2010 filing in state court.  In at least one opinion, this court has held that the date of filing relates back to the date when the action was filed in state court.  See Arakaki v. United States, 62 Fed. Cl. 244, 248-54 (2004) (relation back to state court filing date appropriate where "the transferor district court has analyzed the issue and found the state court filing date to be the proper filing date in federal court for statute of limitations purposes").  Because the court concludes that Fredericksburg's claims would be time-barred regardless of whether the date of filing relates back to state court proceeding or the removal date, the court does not reach this question.

constituted a refusal to either (1) provide Fredericksburg with sufficient assistance to

ensure the financial viability of Apartments Northwest as low-income housing or (2)

relax or remove the affordability requirements contained in the 1995 agreement.[16]  Under

the well-settled standard of review for motions under RCFC 12(b)(6), Fredericksburg

"must allege facts plausibly suggesting (not merely consistent with) a showing of

entitlement to relief."  Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir.

2012) (quotations omitted).  The court may deny the government's motion even where

plaintiff's factual allegations are doubtful in fact, provided that they move beyond the

speculative level.  Id. at 1367-68 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557

(2007)).  The court is not, however, required to accept a plaintiff's legal conclusions,

even when couched as factual allegations.  Twombly, 550 U.S. at 564.

### 2.  Fredericksburg has failed to state a claim for anticipatory breach of contract

A party anticipatorily repudiates a contract by renouncing a contractual duty

before the designated time for performance.  See Indiana Michigan Power Co. v. United

States, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (quoting Franconia Assocs. v. United States,

536 U.S. 129, 143 (2002)).  Repudiation can be effected either by a voluntary affirmative

act indicating that the promisor will breach, Franconia Assocs., 536 U.S. at 143 (citing

---

[16] The court allowed for briefing on plaintiff's anticipatory breach claim following argument, once it was made clear that plaintiff believed HUD's response to its 2010 request for rescission amounted to a breach of contract.  The scope of the court's June 26, 2013 Order calling for supplemental briefing was plainly limited to the question of whether the plaintiff had stated a valid claim for anticipatory breach of contract.  The court will disregard those arguments in the plaintiff's supplemental brief that fall outside the scope of the order, including whether the POA was incorporated into the Grant and/or Use Agreements.

Restatement (Second) of Contracts § 252 (1981)), or by "a 'statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach,'" Amber Res. Co. v. United States, 538 F.3d 1358, 1368 (Fed. Cir. 2008) (quoting Restatement (Second) of Contracts § 250). Repudiation discharges the other party's remaining duty to render performance. See Restatement (Second) of Contracts § 253. To state a claim for anticipatory breach, however, the aggrieved party must treat the repudiation as a total breach, terminate the contract, and file suit. See Haddon Hous. Associates, Ltd. P'ship v. United States, 711 F.3d 1330, 1339 (Fed. Cir. 2013) (citing 13 Williston on Contracts § 39:32 (4th ed.)).

The Federal Circuit has recognized at least two scenarios by which a party will be treated as having repudiated a contract. First, repudiation may occur where a party "clearly and expressly" communicates its intention not to perform. Dow Chem. Co. v. United States, 226 F.3d 1334, 1345 (Fed. Cir. 2000) (holding agency's letter to plaintiff repudiated licensing agreement by stating agency would refuse to make payments and that requests for reconsideration would be denied). In addition, where an obligee reasonably believes that the obligor will breach by non-performance, the obligor's failure to provide adequate assurances may be treated as repudiation. See Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) (government agency entitled to terminate a contract for default because plaintiff had failed to provide adequate assurances that it could timely perform).[17] The reasonableness of the obligee's belief that the obligor will not perform is

---

[17] In Danzig, the Federal Circuit cited Restatement (Second) of Contracts § 251, which states:

to be determined in light of all the circumstances.  See Restatement (Second) of Contracts § 251.

Fredericksburg argues that under the Use Agreement, HUD is contractually obligated to either (1) provide financial assistance—sufficient to ensure the financial viability of Apartments Northwest as low-income housing or (2) relax or remove the affordability requirements of the Use Agreement.  Plaintiff asserts that without significant financial assistance, Fredericksburg cannot meet the low-income unit requirements set in the POA.  Plaintiff therefore concludes that HUD's July 2010 letter, which stated that Fredericksburg would remain obligated to provide affordable housing, constituted an anticipatory repudiation of HUD's contractual obligations.

The government argues in its 12(b)(6) motion that plaintiff has failed to allege sufficient facts to support an anticipatory breach claim.  Specifically, the government argues that HUD's July letter could not constitute a repudiation of HUD's obligations because the letter (1) never specifically references any alleged contractual obligation to assure Apartments Northwest's financial viability or remove the Use Agreement's

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach . . . the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
>
> (2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Danzig, 224 F.3d at 1337.

affordability requirements; (2) never distinctly and unequivocally indicates HUD's

refusal to perform any alleged contractual obligation; and (3) represents only a rejection

of Fredericksburg's offer, rather than an affirmative act indicating an unwillingness to

perform. Moreover, according to the government, the letter does not provide the

"reasonable grounds" necessary to support Fredericksburg's belief that HUD intended to

breach the agreement.[18]

     The court concludes that even taking plaintiff's allegations as true, Fredericksburg

has not stated a claim for anticipatory breach. Plaintiff's repudiation theory is premised

on the legal effect of HUD's July letter, which responded to Fredericksburg's February

2010 letter asking HUD to rescind the Use Agreement in exchange for $250,000.[19] Yet

---

[18] According to the government, plaintiff must petition HUD for an administrative remedy—namely, a determination as to whether deviation from the tenant profile is appropriate. The government asserts that Fredericksburg has not sought such a remedy. The government further contends that even if HUD had issued a final decision, a United States district court—rather than the Court of Federal Claims—would possess exclusive jurisdiction pursuant to the Administrative Procedures Act.

[19] For the purpose of ruling on the government's RCFC 12(b)(6) motion, the court will consider the Use Agreement, POA, Fredericksburg's February letter, and HUD's July Letter. All other exhibits and evidence submitted by the parties has not been considered by the court in ruling on the government's RCFC 12(b)(6) motion.

The Use Agreement, POA, and HUD's July letter are each integral to plaintiff's claims and expressly referenced by the amended complaint. The plaintiff's February letter is integral to plaintiff's claim and indirectly referenced by the complaint. The authenticity of these documents, which have been provided by the parties, has not been questioned. The ability of the court to consider documents integral to the claim under Rule 12(b)(6) has been recognized by several circuits (although it has not been addressed by the Federal Circuit), and the court does so here without converting the motion to one for summary judgment. See Normandy Apartments, 100 Fed. Cl. at 255 n.10 (citing cases); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2013) (when considering a motion to dismiss under Rule 12(b)(6), trial courts may consider matters outside the complaint that are "incorporated by reference or integral to the claim . . . and exhibits attached to the complaint whose authenticity is unquestioned . . . without converting the motion into one for summary judgment").

HUD's July letter plainly constituted a rejection of this offer, rather than a repudiation of

HUD's alleged contractual obligations.  This conclusion is due to the fact that neither the

plaintiff's February letter nor HUD's July letter address whether Apartments Northwest

had become financially non-viable, which would be the basis for obligating HUD to

either provide additional financial assistance or relax the Use Agreement's affordability

requirements.[20]  Moreover, neither letter refer to any of HUD's alleged contractual duties

to either (1) provide financial assistance, (2) relax or remove the affordability

requirements of the Use Agreement, or (3) consider plaintiff's future requests to relax or

waive the affordability requirements.  As such, plaintiff has not raised a non-speculative

allegation that HUD's July letter communicated a refusal to perform any of HUD's

alleged contractual duties, or that HUD would refuse to grant relief to plaintiff in the

event that Fredericksburg demonstrated that compliance with the Use Agreement's tenant

profile would destroy Apartments Northwest's financial viability.[21]  See Danzig v. AEC

Corp., 224 F.3d at 1337; Dow Chem. Co., 226 F.3d at 1345.

Plaintiff's contention that, in the future,  the government will hold it to certain

low-income rental profiles in the face of evidence of financial non-viability is pure

---

[20] Although Fredericksburg's February letter describes the Use Agreement's affordability
restrictions as "patently unconscionable and unfair," the letter never asserts that the Apartments
Northwest had become financially non-viable.

[21] Even if this court concluded that plaintiff had reasonable grounds to believe that HUD would
not satisfy its contractual obligations, plaintiff's reliance on Danzig is misplaced.  In Danzig, the
court held that the government was entitled to terminate a contract for default after the
government sought—and did not receive—assurances from the plaintiff.  Danzig, 224 F.3d at
1337.  Unlike the defendant in Danzig, Fredericksburg never sought assurances from HUD.
Therefore, the court rejects plaintiff's argument that Fredericksburg's duty to comply with the
Use Agreement's tenant profile should be discharged.

speculation.[22]  Until such time as plaintiff asks HUD for relief from Apartments

Northwest's income profiles, there is no basis to assume that the request will be denied.

In sum, plaintiff's allegations concerning anticipatory repudiation do not go beyond

speculative level.  As a result, the government's motion to dismiss those allegations

under RCFC 12(b)(6) is **GRANTED**.

## III. CONCLUSION

Because plaintiff's claims for unpaid subsidies or rent increases are time-barred,

the government's RCFC 12(b)(1) motion to dismiss those claims for lack of jurisdiction

is **GRANTED**.  Further, because plaintiff has failed to allege that the government would

not or could not perform under the Use Agreement, the government's RCFC 12(b)(6)

motion to dismiss for failure to state a claim is **GRANTED**.  In the absence of any

remaining claims, the parties' cross-motions for summary judgment as to breach are

---

[22] The court notes that although plaintiff describes Fredericksburg's current financial state as "precarious" and "teetering on no longer being economically viable," Pl.'s Resp. Mot. Dismiss 7, August 29, 2013, plaintiff has not alleged a present inability to maintain and repair the property or an immediate need to evict higher income tenants.  Tellingly, plaintiff argues that HUD has tacitly agreed to allow Fredericksburg to deviate from the tenant profile listed in the Use Agreement.  See Pl.'s Resp. & Reply 16, ECF No. 64, January 21, 2013 ("after 18 years of HUD inspecting, and passing, the property based solely on BMIR criteria; and after 18 years of HUD making no mention of the property failing to comply with LIPHRA [sic] requirements; now all of a sudden the property 'may be in violation of the LIPHRA [sic] Use Agreement.'").  Thus, even assuming that HUD was required to ensure the continued financial viability of Apartments Northwest, Fredericksburg has failed to identify any action or inaction on the part of the government that has actually rendered the apartment complex financially non-viable.

**DENIED-AS-MOOT**.[23]  The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

      **IT IS SO ORDERED.**

                                        s/Nancy B. Firestone
                                        NANCY B. FIRESTONE
                                        Judge

---

[23] For the same reason, the plaintiff's motion to strike the declaration of Deborah Talamantes is **DENIED-AS-MOOT**.  As discussed above, supra note 19, Ms. Talamantes' declaration was not considered by the court.

# In the United States Court of Federal Claims

## No. 10-885 C

**FREDERICKSBURG NON-PROFIT
HOUSING CORP.**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Opinion, filed October 23, 2013, granting defendant's motions to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed. Each party shall bear its own costs.

Hazel C. Keahey
Clerk of Court

**October 25, 2013**          By:     s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $455.00.

# Section 8 Renewal Policy

## *Guidance for the Renewal of*

## *Project-Based Section 8 Contracts*



*Office of Multifamily Housing*

Brian D. Montgomery, Assistant Secretary for Housing-Federal Housing Commissioner

2/15/08

Date

# Table of Contents

| | |
|---|---|
| Chapter One - | Introduction |
| Chapter Two - | Contract Renewals |
| Chapter Three - | Owner Option One |
| Chapter Four - | Owner Option Two |
| Chapter Five - | Owner Option Three |
| Chapter Six - | Owner Option Four |
| Chapter Seven- | Owner Option Five |
| Chapter Eight - | Owner Option Six |
| Chapter Nine - | Rent Comparability Studies |
| Chapter Ten - | Residual Receipts |
| Chapter Eleven - | Tenant Issues |
| Chapter Twelve - | Physical Condition of the Property |
| Chapter Thirteen - | HUD's Refusal to Renew Section 8 Contracts |
| Chapter Fourteen - | RHS 515/8 Projects |
| Chapter Fifteen- | Nonprofit Rent Increases |
| Chapter Sixteen- | Other Issues |

01/15/08

# Chapter Two

# Section 8 Renewals

The passage of MAHRA by Congress signaled an important shift in the Section 8 program: Section 8 rents, to the extent possible, must be comparable to unsubsidized rents in the area where the project is located. In some cases, this meant the rents can be adjusted upward. With the establishment of OAHP, formerly known as OMHAR, Congress also clearly recognized that the rents at some Section 8 projects needed to be reduced. To ascertain where a project's Section 8 rents are relative to market rent levels, for most projects MAHRA requires the preparation of a rent comparability study, (RCS).

In order to reduce administrative burden, MAHRA does not require an RCS every year. Instead, beginning with the date of the initial renewal of the expiring Section 8 project-based contract, the RCS will start a maximum five-year "life cycle" before a new RCS is required (see Chapter Nine for details on the RCS).

## Types of Renewals

### Section 2-1

A. <u>Initial Renewals</u>. The first renewal of a project's contract or stage that is processed under the rules established by MAHRA is considered the initial renewal of the contract.

B. <u>Subsequent Renewals</u>. A subsequent renewal is the renewal of an expiring Section 524 contract at the end of its term. A contract that received its initial renewal under MAHRA, will, at subsequent renewal, be renewed under any option that the contract is eligible for at the time of renewal. The Owner should follow procedures in place at time of renewal and submit the contract Renewal Request Form and OCAF Rent Adjustment Worksheet, Form HUD 9625, found at Attachment 3 of this guide to the PM/CA for processing.

C. <u>Rent Adjustments</u>. Annual adjustments to contract rents that occur during the term of a multi-year Section 524 contract are called rent adjustments. These adjustments may be

Add. 29

least 120 days prior to the expiration of the contract. Owners should be aware that failure to submit their option election to HUD/CA at least 120 days before contract expiration may result in an interruption of subsidy to the project.

If at any time the PM feels that the contract should not be renewed, they should refer to Chapter 13, of this Guidebook. If the Performance Based Contract Administrator (PBCA) feels that the contract should not be renewed, the procedures in Section 2-4 of the Section 8 Contract Administrators Guide book should be followed.

D. Option Descriptions. The Owner options are outlined in Chapters Three through Eight of this Guide. As statutory and administrative requirements for each option evolve, these Chapters will be revised.

## Contract Terms

### Section 2-3

A. General Contract Terms. Generally, contract terms shall be for one year or five years subject to appropriations. The Department believes contracts with terms greater than five years can assist in preserving affordable housing in certain situations. Where an owner is required by HUD to accept renewal for more than five years, use longer terms, such as with the non-profit options in chapter Fifteen. OAHP Full Restructurings may also have longer term contracts, but in no case can the term of the contract exceed the remaining life of the mortgage. Requests for longer term contracts on OAHP "Fulls" or where owners are required to accept renewals for more than five years do not require HUB approval. For other situations, Program Centers should submit these requests to the HUB Director. The HUB Director should review these requests to ensure that approval will assist in furthering the Departments goal of preserving affordable housing.

1. If an Owner chooses a contract term of more than one year, the contract will be funded for one year with the balance of years selected by the Owner being subject to annual appropriations.

2. The effective date of the new contract is the day following the expiration date of the previous contract. For renewals of OAHP-lites, the original contract is terminated at the end of the month following the month in which the Owner is offered a new contract at the market rents. For renewals in conjunction with a Full debt restructuring, the new contract will become effective on the earlier of the expiration of the interim contract or the first day of the month following closing.

B. Aligning Contracts. HUD/CA's should make every effort to align contract renewal terms with the five-year life cycle of the RCS. For example, if an Owner renewed the contract in FY 2000 under Option Two for a one-year term, and in FY 2001 the Owner wishes to renew the contract for a five-year term, the Owner has several options:

## Homes & Communities
U.S. Department of Housing and Urban Development

Chief Human Capital Officer

En español | Contact Us | Text only | Search/Index

**Chief Human Capital Officer**
About Us
Freedom of Information Act (FOIA)
Grants Management
Handbooks, Forms and Publications

**HUD news**

**Homes**

**Resources**

**Communities**

**Working with HUD**
Webcasts
Mailing lists
RSS Feeds



# Processing Plans of Action Under the Low-Income Housing (4350.6)

### Instructions

⌨ **Information by State**
🖳 **Print version**

For each handbook document, you may download the PDF Version and/or the Word fillable form.

| | | |
|---|---|---|
| Transmittal: Processing Plans of Action Under the Low-Income Housing | **PDF** | **WORD** |
| Table of Contents | **PDF** | **WORD** |
| CHAPTER 1: General | **PDF** | **WORD** |
| CHAPTER 2: Eligibility | **PDF** | **WORD** |
| CHAPTER 3: Initial Notice of Intent | **PDF** | **WORD** |
| CHAPTER 4: Processing Initial Notices of Intent (NOIs) to | **PDF** | **WORD** |
| CHAPTER 5: Processing Initial Notices of Intent (NOIs) to | **PDF** | **WORD** |
| CHAPTER 6: Owner's Options | **PDF** | **WORD** |
| CHAPTER 7: Second Notice of Intent: Voluntary and Mandatory | **PDF** | **WORD** |
| CHAPTER 8: PLANS OF ACTION | **PDF** | **WORD** |
| CHAPTER 9: Resident Homeownership Program | **PDF** | **WORD** |
| CHAPTER 10: PREPAID PROJECTS | **PDF** | **WORD** |
| CHAPTER 11: SERVICING A PROJECT AFTER EXECUTION | **PDF** | **WORD** |
| CHAPTER 12: Emergency Low-Income Housing and Preservation Act | **PDF** | **WORD** |
| APPENDIX 1: OWNER REQUESTS EXTENSION OF AFFORDABILITY | **PDF** | **WORD** |
| APPENDIX 2: Notice H 91-57 (HUD) | **PDF** | **WORD** |
| APPENDIX 3: Initial Notice of Intent To Terminate or Extend | **PDF** | **WORD** |
| APPENDIX 4: LETTER TO OWNER TRANSMITTING INFORMATION FOR | **PDF** | **WORD** |
| APPENDIX 5: LETTER TO OWNER TRANSMITTING APPRAISAL GUIDELINES | **PDF** | **WORD** |
| APPENDIX 6: Second Notice of Intent To Sell Rental Housing or | **PDF** | **WORD** |
| APPENDIX 7: EARNEST MONEY DEPOSIT WORKSHEET | **PDF** | **WORD** |
| APPENDIX 8: Evaluation of Plan of Action for Incentives to Extend | **PDF** | **WORD** |
| APPENDIX 9: Resident Homeownership Plan Checklist | **PDF** | **WORD** |
| APPENDIX 10: NOTIFICATION TO TENANTS OF ACCEPTANCE OF PREPAYMENT | **PDF** | **WORD** |
| APPENDIX 11: Owner's Calculation of Tenant Rent Phase-In | **PDF** | **WORD** |
| APPENDIX 12: CONTAINS FROM HUD-9808-B | **PDF** | **WORD** |

Content current as of 26 April 2007

🌐 Back to top



**FOIA    Privacy    Web Policies and Important Links    Home**

U.S. Department of Housing and Urban Development
451 7th Street S.W., Washington, DC 20410
Telephone: (202) 708-1112   TTY: (202) 708-1455
Find the address of a HUD office near you

CHAPTER 11.  SERVICING A PROJECT AFTER EXECUTION
OF THE USE AGREEMENT

Section A.

Introduction and Actions Required After Approval
of a Plan of Action to Prepay

11-1.    Introduction.  Loan Management Staff has the
responsibility for monitoring the implementation of
approved Plans of Action (POAs).  This
responsibility includes monitoring the Use
Agreement, the Regulatory Agreement, the Grant
Agreement, the Section 8 Contract and any other
regulatory obligations.  This Chapter contains
guidelines for carrying out these responsibilities.
In most cases, the servicing and monitoring
requirements of this Chapter are in addition to the
servicing requirements which would have been
required if a POA to extend low-income
affordability restrictions had not been
implemented.  Where the requirements of this
Chapter conflict with other servicing requirements,
the requirements stated in this Chapter will
prevail.

11-2.    Actions After Prepayment Approval.

A.    When a Plan of Action (POA) has been approved
to terminate low-income affordability
restrictions through prepayment:

1.    The owner must:

a.    Execute a Use Agreement with HUD to
maintain the rent levels for tenants
living at the project at POA
approval.  Despite the lack of
Section 8 funding, the owner must
comply with the Use Agreement until
the earlier of the maturity date of
the initial mortgage or until all
tenants living in the project at POA
approval voluntarily move.  Both HUD
and the tenants have the right to
enforce compliance with the
occupancy requirements contained in

4350.6-CHG.2

    2.    Within each income category, other preferences and priorities in effect prior to the preservation process, will be maintained.

        a.    Unit Size.  Within each income category, tenant selection should be made to meet appropriate unit-size requirements.

        b.    Military and other Federal and Local Preferences.  Other preferences will continue to be used, within the appropriate income category and unit size.

    3.    If a Section 8 unit becomes available (e.g., due to increase in a low-income tenant's income) and is not needed for a tenant designated as very low- or low-income on the tenant profile, it must be assigned in accordance with the occupancy policies established in HUD Handbook 4350.3, Occupancy Requirements.

    4.    Tenant selection must be done in accordance with established occupancy policy so long as the tenant profile is not violated.

    5.    Tenant profile waivers, and waivers to admit above moderate-income tenants to the project, will be handled as all other waivers for occupancy.

11-5.    Availability of Section 8 Rental Assistance to Tenants.  HUD will ensure that the Section 8 Housing Assistance Payment (HAP) Contract has sufficient funding through Section 8 LMSA to provide Section 8 rental assistance for all tenants designated as very low- or low-income on the tenant profile list and for the number designated very low- and low-income families on the tenant profile.  HUD will fund the HAP contract at this level even if the entire amount of the rental assistance is not needed at the project immediately after POA approval for reasons such as:  (1) the existence of vacant units in the project at POA approval; (2) some of the eligible tenants hold Section 8 vouchers or certificates; (3) the Section 8 gross rent for the unit does not exceed 30



390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

C

United States Court of Appeals,
Fifth Circuit.
DELL COMPUTER CORPORATION, Plaintiff-
Counter Defendant-Appellee,
v.
Sixto RODRIGUEZ, Defendant-Counter Claimant-
Appellant.

No. 03-50866.
Nov. 8, 2004.

**Background:** Employer sued a former managing director of employer's operations in state court, asserting various causes of action based on several contracts between the parties. Director removed and counter-claimed, also seeking damages for breach of the agreements. Following a jury verdict, the United States District Court for the Western District of Texas, Harry Lee Hudspeth, J., entered judgment for employer, and director appealed.

**Holdings:** The Court of Appeals, Wiener, Circuit Judge, held that:
(1) former director properly preserved for appellate review issue of whether sole discretion clause included in separation agreement was ambiguous;
(2) sole discretion clause included in separation agreement was ambiguous;
(3) employer's claims for breach of contract under separation agreement accrued when director refused to accept his termination and proceeded to exercise stock options in breach of separation agreement; and
(4) employer's claim for breach of penny share agreement accrued when director breached employment agreement by allegedly backdating a contract and engaging in other questionable vendor transac-

tions in violation of employment agreement.

Affirmed in part, vacated in part, and reversed and remanded in part.

West Headnotes

**[1] Federal Courts 170B ⟵776**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk776 k. Trial De Novo. Most Cited Cases

The interpretation of a contract and the determination of ambiguity are questions of law, which an appellate court reviews de novo.

**[2] Federal Courts 170B ⟵823**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk823 k. Reception of Evidence. Most Cited Cases

An appellate court reviews a district court's evidentiary rulings for abuse of discretion, and will reverse a judgment for an erroneous evidentiary rulings only when the challenged ruling affects a party's substantial rights.

**[3] Federal Courts 170B ⟵776**

170B Federal Courts

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

170BVIII Courts of Appeals
   170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
         170Bk776 k. Trial De Novo. Most Cited Cases

    An appellate court reviews *de novo* a district court's determination of the applicable limitations period.

**[4] Federal Courts 170B** ☜170B812

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)4 Discretion of Lower Court
           170Bk812 k. Abuse of Discretion. Most Cited Cases

    When judicial action is taken in a discretionary matter, that action may be set aside by a reviewing court if it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.

**[5] Federal Courts 170B** ☜170B642

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
         170BVIII(D)2 Objections and Exceptions
           170Bk639 Motions Presenting Objections
              170Bk642 k. As to Judgment, or Modification or Vacation of Judgment. Most Cited Cases

    In action arising from contract dispute between employer and employee, fact that trial court's ruling that separation agreement between parties was not ambiguous came in context of denial of employer's partial summary judgment motion did not mean that such ruling did not bar admission of parol evidence, for purpose of employer's claim on appeal that employee did not preserve for review employee's claim that he should have been permitted to introduce parol evidence; court later granted motion in limine, excluding parol evidence, based on determination that agreement was unambiguous.

**[6] Federal Courts 170B** ☜170B628

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
         170BVIII(D)2 Objections and Exceptions
           170Bk627 Evidence and Witnesses
              170Bk628 k. Admission or Exclusion of Evidence. Most Cited Cases

    In action arising from contract dispute between employer and employee, district court's grant of motion in limine clearly prohibited admission of parol evidence on issue of whether sole discretion clause included in parties' separation agreement was ambiguous, even if court permitted introduction of extrinsic evidence on other issues, for purpose of employer's claim on appeal that employee did not preserve for review employee's claim that he should have been permitted to introduce parol evidence as to that particular clause.

**[7] Federal Courts 170B** ☜170B628

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
         170BVIII(D)2 Objections and Exceptions
           170Bk627 Evidence and Witnesses
              170Bk628 k. Admission or Exclusion

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

of Evidence. Most Cited Cases

Employee's failure to make offer of proof regarding the parol evidence that he sought to introduce concerning ambiguity of separation agreement with employer, in action arising from contract dispute, did not preclude finding on appeal that employee adequately preserved for review his claim that such evidence was improperly excluded, where employee explained his argument concerning agreement in his opposition to summary judgment, and he attached excerpts of the testimonial evidence that he proposed to introduce.

**[8] Federal Courts 170B ☜628**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
       170BVIII(D)2 Objections and Exceptions
       170Bk627 Evidence and Witnesses
       170Bk628 k. Admission or Exclusion of Evidence. Most Cited Cases

A pre-trial objection is sufficient to preserve an evidentiary error for appellate review, and a renewed objection at trial is no longer required to preserve error.

**[9] Federal Courts 170B ☜628**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
       170BVIII(D)2 Objections and Exceptions
       170Bk627 Evidence and Witnesses
       170Bk628 k. Admission or Exclusion of Evidence. Most Cited Cases

Employee's failure to seek jury instruction asking the jury to interpret termination provision of his separation agreement with employer, in action arising from contract dispute, did not preclude finding on appeal that employee adequately preserved for review his claim that such evidence was improperly excluded, since issue of whether contract was ambiguous was question of law for court to decide.

**[10] Evidence 157 ☜450(6)**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(D) Construction or Application of Language of Written Instrument
       157k449 Nature of Ambiguity or Uncertainty in Instrument
       157k450 In General
       157k450(6) k. Contracts of Employment. Most Cited Cases

Under Texas law, sole discretion clause included in separation agreement, which provided that employer retained discretion to terminate employee's severance rights if employer determined, in employer's sole discretion, that employee's conduct was creating, or had created, a negative impact on employer, was ambiguous as to whether the agreement allowed employer to terminate employee's rights based on conduct that occurred either before the execution of the separation agreement or after its execution, and thus employee should have been allowed to submit parol evidence to the jury, in action arising from parties' contract dispute, in an effort to convince it that his interpretation of this ambiguous clause of the contract was correct.

**[11] Federal Courts 170B ☜901.1**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

170BVIII(K)6 Harmless Error

170Bk901 Exclusion of Evidence

170Bk901.1 k. In General. Most Cited Cases

District court's determination that sole discretion clause included in separation agreement was unambiguous and the court's subsequent grant of employer's motion in limine preventing employee from submitting any parol evidence to interpret the separation agreement for purposes of employee's breach of contract claim was reversible error.

**[12] Limitation of Actions 241 ⚷46(6)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k46 Contracts in General

241k46(6) k. Breach of Contract in General. Most Cited Cases

Under Texas law, a breach of contract claim accrues when the contract is breached.

**[13] Limitation of Actions 241 ⚷46(7)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k46 Contracts in General

241k46(7) k. Contract of Employment. Most Cited Cases

Under Texas law, employer's claims against employee for breach of contract under separation agreement accrued when employee refused to accept his termination and proceeded to exercise stock options in breach of separation agreement, and not when employee allegedly engaged in improper pre-termination conduct in violation of employment agreement. V.T.C.A., Civil Practice & Remedies Code § 16.004.

**[14] Limitation of Actions 241 ⚷46(7)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k46 Contracts in General

241k46(7) k. Contract of Employment. Most Cited Cases

Under Texas law, employer's claim against employee for breach of "penny share agreement" accrued when employee breached employment agreement by allegedly backdating a contract and engaging in other questionable vendor transactions in violation of employment agreement, rather than when employee refused to return past penny share profits following employer's determination that employee had breached his employment agreement and demanded that he disgorge those profits. V.T.C.A., Civil Practice & Remedies Code § 16.004.

**[15] Federal Courts 170B ⚷617**

170B Federal Courts

170BVIII Courts of Appeals

170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review

170BVIII(D)1 Issues and Questions in Lower Court

170Bk617 k. Sufficiency of Presentation of Questions. Most Cited Cases

Under Texas law, employee's failure to seek a jury instruction with respect to the accrual of employer's cause of action for breach of penny share agreement did not bar employee's argument on appeal that employer's claim was time-barred, given that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

facts as to when the cause of action accrued were undisputed.

**[16] Limitation of Actions 241 🔑199(1)**

241 Limitation of Actions
    241V Pleading, Evidence, Trial, and Review
        241k199 Questions for Jury
            241k199(1) k. In General. Most Cited Cases

Under Texas law, if the facts as to when a cause of action accrued were undisputed, it was not necessary to obtain jury findings as to that fact.

**[17] Limitation of Actions 241 🔑50(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k50 Continuing Contracts
                241k50(1) k. In General. Most Cited Cases

Under Texas law, on a continuing contract, the statute of limitations does not commence to run until the contract is terminated or fully performed.

**[18] Contracts 95 🔑216**

95 Contracts
    95II Construction and Operation
        95II(D) Place and Time
            95k216 k. Continuing Contracts. Most Cited Cases

Under Texas law, a "continuing contract" is an agreement where the contemplated performance and payment are divided into several parts or, where the work is continuous and indivisible, the payment for

work is made in installments as the work is completed.

**[19] Limitation of Actions 241 🔑51(2)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k51 Severable Contracts and Installments
                241k51(2) k. Installments in General. Most Cited Cases

Under Texas law, if a continuing contract calls for fixed, periodic payments, a separate cause of action accrues at each missed payment.

**[20] Limitation of Actions 241 🔑50(2)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k50 Continuing Contracts
                241k50(2) k. Contract of Employment or Agency in General. Most Cited Cases

Under Texas law, "penny share agreement" issued by employer, which specified the regular issuance of shares to employee, contingent on employee's continued employment with employer, and containing clawback provision requiring employee to return any profits realized from the agreement if he breached his separate employment agreement, was not a "continuing contract," and thus employer's claim that employee breached "penny share agreement" accrued, for limitations purposes, when employee breached employment agreement, not when employee later refused to return past profits following employer's determination that employee had breached employment agreement and demanded the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

return of profits.

**[21] Limitation of Actions 241 🔑95(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
          241k95 Ignorance of Cause of Action
            241k95(1) k. In General; What Constitutes Discovery. Most Cited Cases

Under Texas law, although limitations usually begin to run when facts have come into existence that authorize a claimant to seek a judicial remedy, the discovery rule, when applicable, provides that limitations run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury.

**[22] Limitation of Actions 241 🔑95(14)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
          241k95 Ignorance of Cause of Action
            241k95(14) k. Labor and Employment. Most Cited Cases

Under Texas law, even if discovery rule tolled the statute of limitations in employer's breach of "penny share agreement" claim against employee until employer learned of employee's breach of employment agreement, statute of limitations began to run no later than the date when employer's attorney received contract which employee allegedly backdated, and thus the claim would still be time-barred.

**\*380** Christopher Herbert Hahn (argued), Vinson & Elkins, Austin, TX, Christopher Velle Bacon, Vinson & Elkins, Houston, TX, for Dell Computer Corp.

Nicholas H. Hantzes (argued), Hantzes & Associates, Vienna, VA, Walter Andrew Reiter, Jr., Law Offices of Walter A. Reiter, II, Annapolis, MD, for Rodriguez.

Appeal from the United States District Court for the Western District of Texas.

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

In this diversity action, Dell Computer Corporation ("Dell") sued Sixto Rodriguez, the former managing director and chief executive officer of Dell's operations in Spain, asserting various causes of action based on several contracts between the parties. Rodriguez counter-claimed, also seeking damages for breach of the agreements. After a jury returned a verdict in favor of Dell for approximately $3.5 million, the district court entered judgment for Dell in that amount. Rodriguez timely appealed, asserting several points of error. We affirm in part, vacate in part, and reverse and remand in part.

### I. FACTS & PROCEEDINGS
#### A. BACKGROUND

1. *The Dell-Rodriguez Relationship and the Underlying Contracts*

In 1991, Dell hired Rodriguez as the managing director and chief executive officer of Dell's operations in Spain. The parties executed an employment contract that entitled Rodriguez to severance benefits if Dell should terminate his employment without cause.[FN1] During the course of **\*381** Rodriguez's employment, Dell issued stock options to him under various stock option agreements ("SOAs").

    FN1. If Rodriguez was terminated *with*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

cause, though, he would not be entitled to receive any severance benefits. The employment agreement specifically permitted Dell to terminate Rodriguez for lack of honesty, neglect of the business, or conviction of a criminal offense that would damage Dell's image. The employment agreement further stated that if the basis for Rodriguez's disciplinary termination was "prove[d] unlawful or invalid," he would be entitled to his severance.

In 1992, Dell granted Rodriguez a special restricted SOA, called the "Penny Share Agreement" ("PSA"). Unlike other traditional fair-market-value SOAs that Dell granted to Rodriguez, the PSA entitled Rodriguez to purchase Dell stock for 1¢ per share, regardless of the market price of the stock at the time he exercised the option. The PSA specified that after Rodriguez's options vested and he exercised them, Dell would withhold 60% of the exercised shares for a period of two years; only at the end of this two year period would Rodriguez receive the stock certificates for those shares. Further, a "clawback" termination provision required Rodriguez to return any profits realized from the PSA if he breached his employment agreement or violated specified provisions of the PSA.[FN2]

> [FN2]. In contrast, the traditional fair market value SOAs specified that on termination of his employment, Rodriguez would be entitled to no further stock, but that he could retain any profits already realized.

On February 12, 1998, Rodriguez and Dell executed a four-page "Separation Agreement" that specified the terms and conditions of Rodriguez's termination and severance from employment by Dell. Part A of the Separation Agreement, titled "Stock Option Agreements," set out Rodriguez's "amended rights" regarding (1) the Penny Share Agreement, (2) a June 1994 SOA, and (3) his deferred bonus stock. In Part

B of the Separation Agreement, titled "Transition Arrangements," Dell agreed to retain Rodriguez as an unpaid honorary consultant through June 30, 1999. Although the Separation Agreement immediately relieved Rodriguez of his management duties, his formal resignation was not to become effective until June 30, 1998, at which time his one-year role as honorary consultant would commence. This time frame was adopted to allow additional stock options to vest under the PSA and under one of Rodriguez's other fair-market-value SOAs.

As honorary consultant, Rodriguez was to "promote and develop Dell's positive image in the Spanish market; in particular, and as reasonably requested by Dell from time to time, [Rodriguez would] help enhance specific customer relationships." Under the "Sole Discretion Clause," however, Dell retained the discretion to terminate Rodriguez under particular circumstances:

> 3) Dell may terminate these Transition Agreements with immediate effect:-
>
> (i) if you are in breach of any of your obligations hereunder; or
>
> (ii) if Dell has determined, in Dell's sole discretion, that your conduct is creating, or has created, a negative impact on Dell or on Dell's reputation in the Spanish market and Dell has provided you with written notice of such negative impact.

If Dell should terminate the Transition Agreements, it could withhold stock to which Rodriguez would otherwise have been entitled:
> 4) Dell has the right to withhold any stock which would otherwise be released to you as set out in (A) above, in the event of termination pursuant to 3) above.

At the time that the parties executed the Separa-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

tion Agreement, Rodriguez was unaware that Dell had commenced an internal investigation into the operations in Spain.

**\*382** 2. *Dell Investigates Suspicious Deals Involving Rodriguez and Terminates Him*

On May 6, 1998, three months after the parties signed the Separation Agreement but almost two months before its effective date, Dell wrote to Rodriguez informing him that Dell had been conducting a wide-ranging examination of Dell Spain, and that it "revealed specific irregularities which appear to have been within [Rodriguez's] responsibility." The May 6 letter identified eight separate irregularities under investigation.

Dell uncovered these improprieties when it began negotiating the severance of Bienvenido Valero, the finance manager for Dell's operation in Spain. In the course of those negotiations, Valero produced an employment contract dated 1992 (the "Valero Contract"), purportedly signed by Rodriguez, granting Valero a $1.7 million "golden parachute" in the event he was terminated. Dell had not previously seen the 1992 Valero Contract. Before Valero produced a copy of that agreement, Dell was aware of only a standard employment agreement of indefinite duration dated June 1991, which entitled Valero to only a limited severance as required under Spanish law.[FN3] When Dell became suspicious of the authenticity of the Valero Contract and asked Rodriguez to authenticate his signature on it, Rodriguez responded by stating only, "I don't know. It's a photocopy." Dell commissioned two handwriting experts to analyze the signatures on the Valero Contract; they concluded that the document was signed in *1997,* not 1992 as indicated by its date.

> FN3. In October 1995, Valero executed an agreement that appears to be an amendment to the June 1991 agreement. This amendment stated that it was an "[a]dditional clause or section to the employment contract

signed in June 199*1* between" (emphasis added) Valero and Dell. The October 1995 amendment made no reference to a contract signed in 199*2.*

Dell then initiated a thorough audit of Rodriguez's activities and learned that he had engaged in several questionable financial transactions with friends and family members in contravention of Dell's policies and practices. Included in these suspect transactions were payments of some $23,000 to an employment agency called Powerline. After further investigation, Dell learned that these payments were supposedly made for the services of Rodriguez's sister-in-law. Dell also discovered that Rodriguez had authorized payments of approximately $2,400 per month to a company called POAS for salary and office rent in the Canary Islands, where Dell did not maintain an office. It turned out that the managing director of POAS was Rodriguez's brother. Similarly, Dell determined that Rodriguez had authorized "installation and maintenance" payments of about $300,000 to "I.B. y Asociados." When Dell questioned Rodriguez about the I.B. y Asociados payments, however, he explained that they were for consultancy and lobbying commissions.

In light of these and other dubious transactions, Dell informed Rodriguez in the May 6 letter that all of his "legal entitlements from Dell" were being suspended pending an evidentiary hearing and review by Dell's Ethics Committee. Rodriguez disputed all of Dell's allegations and met with its representative to explain how the transactions were legitimate and justified.

In June 1998, after reviewing Rodriguez's conduct, Dell's Ethics Committee concluded that he had breached his obligations to Dell. In a letter dated June 26, Dell informed Rodriguez that the Ethics **\*383** Committee had "found unanimously that the evidence presented justified the termination of all legal relationships" between the parties and further "rec-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-5030    CASE-FOR PUBLICANTS ONLY    Document: 84    Page: 14    Filed: 02/11/2014
Case: 14-5030    Document: 14    Page: 84    Filed: 02/11/2014

Page 9

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

ommended the termination of the contractual rela-
tionship between [Rodriguez] and Dell Espana S.A."

3. *Rodriguez Exercises His Stock Options, and Dell
Initiates Criminal and Civil Proceedings in Spain*

Two days after receiving Dell's June 26 letter,
Rodriguez exercised numerous stock options under
various SOAs, with the aggregate value of approxi-
mately $1.08 million. On July 13, July 20, and July
24, Rodriguez called his broker and exercised addi-
tional options worth some $753,000, $114,000, and
$780,000, respectively. In all, Rodriguez realized
profits of $2,728,898.11 on the exercise of these
stock options.

In the fall of 1998, Dell initiated criminal pro-
ceedings against Rodriguez in Spain,[FN4] but the Span-
ish court ruled that there was insufficient evidence to
sustain the criminal charge under Spanish law. Dell
twice appealed that adverse decision in the Spanish
courts without success. Next, Dell brought a civil suit
against Rodriguez in Spain to recover the losses that
Dell sustained as a result of Rodriguez's allegedly
improper exercise of the stock options. In December
2001, though, Dell voluntarily dismissed this Spanish
civil suit; on March 13, 2002, Dell filed the instant
action.

> FN4. As explained by Dell's counsel, Span-
> ish law permits a civilian to initiate criminal
> proceedings against an individual.

B. PROCEEDINGS

After failing in the Spanish courts, Dell sued
Rodriguez in Texas state court. Rodriguez removed
the action to district court on grounds of diversity of
citizenship. Dell's complaint asserted various causes
of action, including fraud, breach of fiduciary duty,
breach of the Separation Agreement, and breach of
the Penny Share Agreement. Rodriguez counter-
claimed, also alleging breach of the Separation
Agreement by virtue of Dell's refusal to release par-

ticular SOAs, as well as claims grounded in replevin,
defamation, abuse of process, and malicious prosecu-
tion.

In February 2003, Dell filed a motion for sum-
mary judgment on Rodriguez's counterclaims. The
district court granted summary judgment against Ro-
driguez on all his counterclaims except those for
breach of contract. Dell also filed a motion in limine
to preclude Rodriguez and his counsel from making
any reference at trial to "parol evidence to interpret
the February 12, 1998 Separation Agreement," which
motion the district court granted.

In March 2003, the parties' remaining claims
were tried to a jury. During the trial, the district court
granted Rodriguez's motion for judgment as a matter
of law on Dell's fraud claim but denied all his and
Dell's other motions for judgment as a matter of law.
The jury returned a verdict in Dell's favor on each of
Dell's contract claims and against Rodriguez on his
breach of contract counterclaim. Dell was awarded
approximately $2.7 million for breach of the Separa-
tion Agreement and almost $800,000 for breach of
the Penny Share Agreement. The following month,
the district court entered judgment on the verdict in
favor of Dell for $3,526,672.71, plus post-judgment
interest and costs. Rodriguez filed a motion for
judgment notwithstanding the verdict and for a new
trial, which was denied.

**\*384** Dell next filed a motion for attorney's fees
under § 38.001 of the Texas Civil Practice and Rem-
edies Code.[FN5] The district court initially denied this
motion, finding inadequate documentary support.
Dell then filed a motion for reconsideration together
with additional documentation supporting its attor-
ney's fees request, which the district court granted.
Rodriguez timely filed his notice of appeal.

> FN5. *See* TEX. CIV. PRAC. & REM.CODE
> ANN. § 38.001(8) (Vernon 2002) ("A per-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

son may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... (8) an oral or written contract.").

## II. ANALYSIS

Rodriguez advances several claims on appeal.[FN6] We must determine whether the "Sole Discretion" clause in the Separation Agreement was ambiguous and whether Dell's claims for breach of the Penny Share and Separation Agreements were time-barred.

> FN6. Both parties have filed "kitchen sink" briefs, advancing numerous points, alternative points, and rebuttal points. Our opinion addresses only those arguments that warrant extended treatment. Any contention not expressly addressed here is either without merit or is immaterial to our decision today.

## A. STANDARD OF REVIEW

[1][2][3] The interpretation of a contract and the determination of ambiguity are questions of law, which we review *de novo*.[FN7] "This broad standard of review includes the initial determination of whether the contract is ambiguous."[FN8] We review a district court's evidentiary rulings for abuse of discretion.[FN9] We will reverse a judgment for an erroneous evidentiary ruling only when the challenged ruling affects a party's substantial rights.[FN10] We review *de novo* a district court's determination of the applicable limitations period.[FN11]

> FN7. *See Reliant Energy Servs., Inc. v. Enron Canada Corp.,* 349 F.3d 816, 821 (5th Cir.2003); *FDIC v. McFarland,* 33 F.3d 532, 539 (5th Cir.1994).

> FN8. *Am. Totalisator Co. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir.1993).

> FN9. *DIJO, Inc. v. Hilton Hotels Corp.,* 351 F.3d 679, 685 (5th Cir.2003).

> FN10. *Id.* at 687.

> FN11. *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 409 (5th Cir.2004).

## B. THE DISTRICT COURT'S EXCLUSION OF PAROL EVIDENCE

[4] In determining whether the district court committed reversible error by prohibiting Rodriguez from introducing parol evidence to explain the meaning of the Sole Discretion Clause of the Separation Agreement, we encounter two separate standards. On the one hand, interpretations of a contract and determinations of ambiguity are questions of law, which we review *de novo*. This includes a review of the district court's determination whether the contract is ambiguous.[FN12] On the other hand, a district court's evidentiary ruling is generally reviewed for abuse of discretion, and we reverse only when the evidentiary ruling affects a party's substantial rights.[FN13] As we here conclude that the district court's evidentiary ruling was predicated on, and a corollary of, its construction of the contract as unambiguous, we review this decision *de novo*. If we conclude *de novo* that the district court erred as a matter of law in ruling that the Sole Discretion**\*385** clause is not ambiguous, it will follow that the district court's subsequent grant of Dell's motion in limine must necessarily be an abuse of discretion.[FN14]

> FN12. *McFarland,* 33 F.3d at 539. Accord *Reliant Energy,* 349 F.3d at 821; *Am. Totalisator Co.,* 3 F.3d at 813.

> FN13. *Mayo,* 354 F.3d at 409; *DIJO, Inc.,* 351 F.3d at 687.

> FN14. " '[A]buse of discretion' is a phrase which sounds worse than it really is; it is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

simply a legal term of art which carries no pejorative connotations...." *United States v. Logan,* 861 F.2d 859, 866 n. 5 (5th Cir.1988)(internal citations omitted). Thus, "when judicial action is taken in a discretionary matter," that action may be set aside by a reviewing court if "it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Walker,* 772 F.2d 1172, 1176 n. 9 (5th Cir.1985).

1. *Sole Discretion clause unambiguous; introduction of parol evidence denied*

Section B(3)(ii) of the Separation Agreement, called the "Sole Discretion Clause" by the parties, allows Dell to "terminate these Transition Agreements with immediate effect if Dell has determined, in Dell's *sole discretion,* that [Rodriguez's] conduct is creating, *or has created,* a negative impact on Dell or on Dell's reputation in the Spanish market and Dell has provided [Rodriguez] with written notice of such negative impact" (emphasis added). In ruling on Dell's motion for partial summary judgment, the district court stated:

> Rodriguez argues that the Separation Agreement's sole discretion clause only applies to his performance as a consultant and not his previous conduct as a Dell employee. Unfortunately for Rodriguez, this theory contradicts the plain language of the agreement. The Separation Agreement covers past behavior when it states that if Rodriguez' conduct "is creating, or has created, a negative impact on Dell," Dell may terminate the agreement and withhold any stock that was going to be released pursuant to the agreement. Rodriguez attempts to overcome the *plain language* of the Separation Agreement by offering parol evidence including deposition testimony and email correspondence. The Court, however, cannot look to parol evidence for the purpose of creating ambiguity.... *The Court,*

> therefore, finds that the plain language of the contract allowed Dell to look to Rodriguez' past conduct as a Dell employee in determining whether he had created a negative impact on Dell.

(emphasis added). The district court subsequently granted Dell's motion in limine, prohibiting Rodriguez from introducing any parol evidence to interpret the Separation Agreement.

On appeal, Rodriguez's first contention is that the district court erred in ruling that the Separation Agreement's Sole Discretion clause *unambiguously* permitted Dell to terminate Rodriguez's severance rights based on conduct that occurred either (1) *before* execution of the Separation Agreement (while Rodriguez was employed as Dell's managing director) or (2) *after* its execution (while Rodriguez would be serving as a consultant to Dell). It is evident from the above-quoted ruling that the district court placed dispositive importance on the presence of the words "has created" in the Sole Discretion clause.

Rodriguez maintains that the Sole Discretion clause only refers to Dell's right to terminate "these Transition Arrangements," which addresses his future role as consultant. Rodriguez further contends that the Separation Agreement provides for the structured, periodic release of stock options, with the release of the shares corresponding to Rodriguez's two different roles. He insists that this further supports his interpretation of the Sole Discretion clause as applicable only to his **\*386** conduct as consultant on a going-forward basis.

Rodriguez thus argues that the district court's ruling-that the Sole Discretion clause was unambiguous as a matter of law-was error. He charges that the term "has created" covers only those circumstances in which Dell learns of prior actionable conduct taken *after* Rodriguez signed the Separation Agreement. Rodriguez insists that, as the subject clause is suscep-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

tible to two reasonable but different interpretations-the one ascribed to it by the district court and the one he advances-the clause is ambiguous, entitling him to introduce parol evidence to support his interpretation. In addition to his own testimony, the key parol evidence that Rodriguez claims was improperly excluded includes (1) deposition testimony of Eric Meurice, the Dell employee who negotiated the Separation Agreement, indicating that the Sole Discretion clause was forward-looking only, and (2) an e-mail written by Nicholas Taylor (the "Taylor Memo"), the lawyer for Dell who drafted the Separation Agreement, noting only "some penny stock as held back on good conduct conditions." [FN15]

> FN15. Rodriguez further complains that he was wrongly precluded from using the Taylor Memo to impeach Taylor on the witness stand.

2. *Preservation of error*

Despite the district court's clear ruling on Dell's summary judgment motion and its grant of Dell's motion in limine, Dell asserts that "[n]o ruling by the trial court prevented Rodriguez from offering evidence regarding the interpretation and termination provision of the Separation Agreement." Dell's contention is constructed on four elements.

[5] First, Dell argues that because the ruling (that "the plain language of the contract allowed Dell to look to Rodriguez' past conduct as a Dell employee in determining whether he had created a negative impact on Dell") was in the context of a *denial* of Dell's motion for partial summary judgment, that ruling was merely dicta and therefore had "no effect on the district court's decision, which was based on other grounds." Thus, argues Dell, the summary judgment ruling did not preclude Rodriguez from introducing parol evidence at trial to explain the Separation Agreement.

This contention is incorrect. The district court granted Dell's motion in limine, which was expressly predicated on the court's earlier determination that the Sole Discretion clause was unambiguous and clearly prevented Rodriguez from introducing the parol evidence in question at trial.

[6] Second, Dell continues to urge that the district court's grant of Dell's motion in limine did not prevent Rodriguez from introducing parol evidence at trial, citing several examples of Rodriguez's purported introduction of extrinsic evidence regarding the interpretation of the Separation Agreement. But these cited instances do not address evidence concerning the Sole Discretion clause. In fact, a pre-trial discussion between the court and counsel confirms that both the court and Rodriguez's counsel understood that parol evidence concerning whether the Separation Agreement was exclusively forward-looking could not be presented at trial: [FN16]

> FN16. Dell stated at oral argument that the trial court modified its motion *in limine* to apply only to opening statements. The trial transcript shows, however, that Dell moved *in limine* to have the prior motion *also* apply to opening statements. The trial court replied, "But that's not admissible," and remarked that it trusted Rodriguez's counsel would not address this evidence in his opening.

**\*387** MR. HANTZES [Rodriguez's counsel]: "We put before the court the proposition that the agreement was exclusively forward-looking and the Court rejected that after announcement [sic] of the contract and found that it was unambiguous in that regard ... There will be other issues in that document that we intend to raise at some point that are ambiguous, so that-I understand that the Court does not want parole evidence on the issue of whether it's forward-looking versus backward-looking. But there are other issues in that document, Your Hon-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

or, which are ambiguous in my analysis of the document."

THE COURT: "Who do you propose to ask about that?"

MR. HANTZES: "Mr. Taylor ..."

THE COURT: "Well, I suppose that the attorneys that represent the plaintiff and counter-defendant have sufficient experience that they know how to jump up and say, 'I object' if you start asking a question that they think is not calling for admissible testimony."

Rodriguez absolutely was prevented from introducing parol evidence during trial regarding whether the contract was exclusively forward-looking. He was *not* permitted to introduce the Taylor Memo: When Rodriguez tried to do so, the district court sustained Dell's objection.

[7] The third element that Dell advances is that Rodriguez made no offer of proof at trial regarding the parol evidence that he sought to introduce. It is true that Rodriguez did not make an offer of proof for Meurice's deposition testimony; Rodriguez is relying on evidence he put forth in opposing Dell's summary judgment motion. Insofar as the Taylor Memo is concerned, though, Rodriguez unmistakably made an offer of proof at trial when he tried unsuccessfully to introduce the memo to impeach Taylor on the stand.

[8] As explained in *Mathis v. Exxon Corp.,* a "pre-trial objection is sufficient to preserve the error for appellate review."[FN17] A renewed objection at trial is no longer required to preserve error.[FN18] Furthermore, we have recognized that "excluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted, and this court has a record upon which we may adequate-

ly examine the propriety and harmfulness of the ruling."[FN19] Rodriguez explained his argument concerning the backward-looking clause in the Separation Agreement in his opposition to summary judgment, and he attached excerpts of the testimonial evidence that he proposed to introduce. His actions were sufficient to inform the trial court of the substance of his evidence and to create an adequate record for our review.

FN17. 302 F.3d 448, 459 (5th Cir.2002).

FN18. *Id.* at 459 n. 16 (observing that the 2000 amendment to Federal Rule of Evidence 103(a) changed the law that had prevailed in this Circuit). *See also* RUTTER PRACTICE GUIDE: FED. CIV. TRIALS & EV. CH. 4-F(6)(c) (2003).

FN19. *United States v. Jimenez,* 256 F.3d 330, 343 (5th Cir.2001) (citations omitted). "The latter rule has particular force when the trial court makes clear that it does not wish to hear further argument on the issue." *Id.*

[9] Dell's last element in support of its contention is that Rodriguez failed to preserve error because he failed to seek a jury instruction regarding the district court's interpretation of the termination provision. Dell contends that if Rodriguez believed that the Sole Discretion clause was ambiguous, he should have objected and requested a jury instruction asking **\*388** the jury to interpret the clause. But the question "[w]hether a contract is ambiguous is *a question of law for the courts to decide* by looking at the contract as a whole in light of the circumstances present at the time the contract was executed."[FN20] "Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extrinsic evidence to determine the true meaning of the instrument." [FN21] As the district court ruled that the Sole Discretion clause was unambiguous as a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

matter of law, Dell's appellate contention that Rodriguez was required to seek a jury instruction on this issue to preserve error is feckless. It was the district court's ruling on Dell's motion in limine that kept the jury from hearing Rodriguez's evidence on this issue. The question whether the Separation Agreement was ambiguous is properly before us on appeal.

> FN20. *Kelly v. Rio Grande Computerland Group,* 128 S.W.3d 759, 768 (Tex.App.-El Paso 2004, no pet.) (emphasis added) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995)).

> FN21. *Id.*

3. *The district court's ruling was reversible error.*
   a. *Standard of Review*

As stated above, if the district court erred as a matter of law in ruling that the Sole Discretion clause is unambiguous, a ruling that we review *de novo,* then of necessity that court's subsequent grant of Dell's motion in limine constitutes an abuse of discretion.[FN22]

> FN22. *Cf. Tapatio Springs Builders, Inc. v. Maryland Cas. Ins. Co.,* 82 F.Supp.2d 633, 643 & n. 78 (W.D.Tex.1999).

b. *The Sole Discretion Clause is Susceptible to Two Different but Reasonable Interpretations*

Texas law on contract construction and the admission of parol evidence is well-settled:

> The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.

If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument.

An ambiguity in a contract may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter.[FN23]

> FN23. *CBI Indus., Inc.,* 907 S.W.2d at 520 (citations omitted). *See also H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.,* 150 F.3d 526, 529 (5th Cir.1998).

[10][11] Applying these principles to the Separation Agreement and the facts of this case, Rodriguez makes a compelling argument that the Sole Discretion clause **389** contains a latent ambiguity.[FN24] It is anything but pellucid whether the "or has created" language in the clause-which permits Dell to terminate Rodriguez if he "is creating, *or has created,* a negative impact on Dell or on Dell's reputation in the Spanish market"-is only prospective or is both retrospective and prospective. It is susceptible of either reading, both of which are reasonable. As this is the very definition of ambiguity, the district court's grant of summary judgment in Dell's favor on this point was reversible error. Rodriguez should have been allowed to submit parol evidence to the jury in an effort to convince it that his interpretation of this ambiguous clause of the contract was correct.[FN25] We therefore reverse the district court's ruling that the Sole Discretion clause was unambiguous and remand

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

for further proceedings on this issue.

> FN24. *See Loaiza v. Loaiza,* 130 S.W.3d 894, 905 (Tex.App.-Fort Worth 2004, no pet. h.) ("Although the determination of whether a contract is ambiguous should be limited to an examination of the language of the agreement, appellate courts may examine extrinsic evidence of 'surrounding circumstances' or 'the subject matter of the contract' to determine if a latent ambiguity exists.").

> FN25. *See Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.,* 226 F.3d 387, 390 (5th Cir.2000) ("If a contract is ambiguous, 'summary judgment is inappropriate because the interpretation of a contract is a question of fact.' " (citations omitted)).

## C. STATUTE OF LIMITATIONS

[12] Rodriguez's second appellate point is that Dell's claims for breach of contract under the Penny Share and the Separation Agreements were time-barred by Texas's four-year statute of limitations for contract claims.[FN26] Dell's claims, Rodriguez contends, accrued when he allegedly back-dated the Valero contract and engaged in other questioned behavior; Dell concedes to having received the "obviously false" Valero Contract on March 6, 1998. In its Texas action, which was not filed until March 13, 2002, Dell asserted claims for two distinct breaches-one of the Separation Agreement and the other of the Penny Share Agreement. Under Texas law, "[g]enerally, a cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy."[FN27] "A breach of contract claim accrues when the contract is breached."[FN28] The time at which a cause of action for breach of contract accrues is a question of law.[FN29]

> FN26. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004; *Willis v. Donnelly,* 118 S.W.3d 10, 28 (Tex.App.-Houston [14 Dist.] 2003, no pet.) ("A breach of contract action is subject to a four-year statute of limitations.").

> FN27. *Willis,* 118 S.W.3d at 28 (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998)).

> FN28. *Id.* (citing *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002)).

> FN29. *Willis,* 118 S.W.3d at 28 (citing *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990)).

### 1. *Separation Agreement*

Rodriguez argues that the trial court erred in not dismissing Dell's Separation Agreement claim because it was filed more than four years after Dell learned of his dubious conduct. Assuming that Rodriguez preserved this claim for appeal, however, Dell's claim for breach of the Separation Agreement was clearly *not* barred by the relevant statute of limitations.[FN30]

> FN30. Dell argues that Rodriguez did not properly preserve for appeal his statute of limitations arguments under the Separation Agreement because he did not raise it in his Rule 50 motions for judgment notwithstanding the verdict. As we find that Dell's Separation Agreement claim is not time-barred, we need not address whether the issue was properly preserved.

**\*390** [13] Rodriguez's pre-termination conduct, which underlies Dell's other claims, does not form the basis of Dell's claim for breach of the Separation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

Agreement.[FN31] Rather, this claim is grounded in Rodriguez's exercise of stock options after Dell terminated that contract. As Dell's counsel pointed out at oral argument, Rodriguez's improper *pre*-termination conduct underlies his counterclaim against Dell, not Dell's claim against him. Whether Dell had sole discretion to terminate Rodriguez for his behavior predating the Separation Agreement is ambiguous and a matter for the court to decide on remand as we have stated above. Assuming, however, that Dell's decision was proper, there was no breach of the Separation Agreement until Rodriguez refused to accept his termination and proceeded to exercise stock options. As it is clear that (1) Dell's Separation Agreement claim is based on Rodriguez's exercise of stock options *after* Dell terminated that Agreement on June 26, 1998, and (2) Dell brought its claim on March 13, 2002-less than four years after such exercise-the trial court did not err in holding that Dell's claim under the Separation Agreement is not time-barred.

> FN31. We address below Dell's contention that its claim for breach of the PSA is founded on Rodriguez's refusal to return his profits from the penny shares.

2. *Penny Share Agreement*

Rodriguez likewise contends that, under Dell's theory of the case, he breached the PSA when the Valero contract was backdated in 1997 and when the irregularities with the vendor transactions occurred. Thus, argues Rodriguez, the claim for breach of the PSA, which was asserted in the suit filed by Dell on March 13, 2002, had prescribed; as a result, he is entitled to judgment as a matter of law on Dell's Penny Share claims.[FN32] Dell counters that the terms of the PSA require Rodriguez to return any gains that he recognized on the penny stocks if he violates or breaches any provision of his employment agreement with Dell. Rodriguez did not violate the PSA, argues Dell, until he refused to return past penny share profits following Dell's determination that he had breached his employment agreement and demanded

that he disgorge those profits. This disagreement thus turns on whether the PSA was breached (1) by Rodriguez's pre-termination misconduct or (2) by his post-termination refusal to return his penny share profits after Dell demanded the return of those profits.

> FN32. *See Lincoln v. Case,* 340 F.3d 283, 289-90 (5th Cir.2003) ( "We review the district court's ruling on a motion for judgment as a matter of law de novo, applying the same legal standard as the district court.").

[14][15][16] Rodriguez's duty to reimburse Dell for his penny stock gains is triggered by a "breach" of any provision of his *employment* agreement. Unlike Dell's claim under the Separation Agreement, its PSA cause of action does not arise from injury to Dell resulting from Rodriguez's post-termination conduct; he merely became liable for the return of his profits when he breached his *employment* agreement. We hold as a matter of law that it was Rodriguez's breach of the employment agreement itself that violated the PSA, so the statute of limitations began to run on this earlier date.[FN33] Dell advances two arguments **\*391** in its defense which we now address.

> FN33. Dell also contends that Rodriguez's failure to seek a jury instruction with respect to the accrual of Dell's cause of action bars his complaint on appeal. This argument fails, however, given the testimony of Nicholas Taylor that he received a copy of the allegedly fraudulent Valero contract on March 6, 1998, and that he immediately knew it was fraudulent because it was "preposterous." Also undisputed is the fact that by March 11, 1998, a formal Dell investigation had determined that the contract was fraudulent. If "the facts as to when the cause of action accrued were undisputed, it was not necessary to obtain jury findings as to that fact." *Sun Medical, Inc. v. Overton,* 864

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

S.W.2d 558, 561 (Tex.App.-Fort Worth 1993, writ denied). As a result, Rodriguez's Rule 50 motions on this ground should have been granted.

### a. *Continuing Contract*

[17][18][19] As noted, the general rule in Texas is that contracts are breached, and the statute of limitations begins to run, when "facts come into existence that authorize a claimant to seek a judicial remedy."[FN34] "A cause of action arising out of contractual relations between the parties accrues as soon as the contract or agreement is breached." [FN35] "A continuing contract is an agreement where the contemplated performance and payment are divided into several parts or, where the work is continuous and indivisible, the payment for work is made in installments as the work is completed."[FN36] On a continuing contract, however, the statute of limitations does not commence to run until the contract is terminated or fully performed.[FN37] Dell urges that the PSA was a "continuing contract" for which limitations could not begin to run until Dell made the determination that Rodriguez's conduct was in breach of his obligations *and* elected to terminate his continuing relationship with Dell, thereby triggering the clawback provision.

FN34. *Willis,* 118 S.W.3d at 28 (citing *Johnson & Higgins,* 962 S.W.2d at 514).

FN35. *Wichita Nat'l Bank v. U.S. Fidelity & Guaranty Co.,* 147 S.W.2d 295, 297 (Tex.Civ.App.-Fort Worth 1941, no writ). *See also Slusser v. Union Bankers Ins. Co.,* 72 S.W.3d 713, 717 (Tex.App.-Eastland 2002, no pet'n) ("A cause of action generally accrues when the wrongful act effects an injury, regardless of when the plaintiff learned of the injury")(citing *Moreno,* 787 S.W.2d at 351).

FN36. *Hubble v. Lone Star Contracting*

*Corp.,* 883 S.W.2d 379, 381 (Tex.App.-Fort Worth 1994, writ denied)(citing *Godde v. Wood,* 509 S.W.2d 435, 441 (Tex.Civ.App.-Corpus Christi 1974, writ ref'd n.r.e.); *City & County of Dallas Levee Improv. Dist. v. Halsey, Stuart & Co.,* 202 S.W.2d 957, 961 (Tex.Civ.App.-Amarillo 1947, no writ)).

FN37. *Kona Tech. Corp. v. Southern Pacific Transp. Co.,* 225 F.3d 595, 606 (5th Cir.2000). If a continuing contract calls for fixed, periodic payments, however, a separate cause of action accrues at each missed payment. *Davis Apparel v. Gale-Sobel,* 117 S.W.3d 15, 18 (Tex.App.-Eastland 2003, no pet. h.).

[20] In Texas, parties typically enter into continuing contracts for projects such as construction, during which performance is made in measurable increments and compensated based on the value of work completed in each period, and for which there is a clear end-point.[FN38] To be sure, **\*392** not every contract that Texas courts have declared to be a "continuing contract" fits this definition.[FN39] Still, Dell has referred us to no authority-and we have found none on our own-supporting the proposition that an employment compensation agreement, payable at fixed intervals, should be treated as a continuing contract. Indeed, Rodriguez points to at least one Texas Court of Appeals case holding that "[t]he cause of action for the breach of an employment contract arises immediately upon the breach of the contract and limitations run from that time."[FN40]

FN38. *See Hubble,* 883 S.W.2d 379, 381-82 (Tex.App.-Fort Worth 1994, writ denied) ("Typically, construction is performed under a continuing contract"); *Thomason v. Freberg,* 588 S.W.2d 821, 828 (Tex.Civ.App.-Corpus Christi 1979, no writ)(finding a continuing contract when the services performed by a contractor were not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

indefinite in nature, but were specific tasks meant to continue until home improvements were completed); *Godde,* 509 S.W.2d at 441 ("[B]oth plaintiff and defendant clearly contemplated a continuing contract, i.e., the contract was to continue until plaintiff had completed the improvements in accordance with the plans and specifications. Where a claim for work, labor, or materials performed or furnished is the outgrowth of an entire contract for continuous work, labor or materials (until the work project has been completed), the claim with [sic] be treated and considered as an entire demand and limitations will not commence to run until the contract has been finished") (citations omitted); *Alexander & Polley Const. Co. v. Spain,* 477 S.W.2d 301, 302-03 (Tex.Civ.App.-Tyler 1972, no writ)(ruling that a plaintiff's agreement to remove dirt from the premises of the defendant at a rate of $.15 per cubic foot was a continuing contract-to continue until the plaintiff had removed all of the dirt-and that the right to demand full payment could not accrue until all of the dirt had been moved and the final amount could be calculated); *Halsey, Stuart & Co.,* 202 S.W.2d at 960-61 (holding that a corporation providing bond exchange services for the city over the course of several years with payment due upon consummation of the plan had entered into a continuing contract which tolled the statute of limitations until the contract had been terminated).

FN39. *See City of Corpus Christi v. Taylor,* 126 S.W.3d 712, 722, 725 (Tex.App.-Corpus Christi 2004, no pet. h.) (holding that a restrictive covenant running with the land was a continuing contract of indefinite duration, for purposes of deciding whether the contract was terminable at will by either party); *Wilson v. Woolf,* 274 S.W.2d 154,

156 (Tex.Civ.App.-Fort Worth 1954, writ ref'd n.r.e) (describing a contract between ex-spouses for the return of funds exchanged during the marriage in the form of lifetime payments to the wife as a "continuing contract" under which the wife would be entitled to sue without voiding the contract).

FN40. *Sun Medical,* 864 S.W.2d at 560 (holding that the statute of limitations began to run immediately on an employer's breach of a commission contract with its employee).

Dell insists that its claim against Rodriguez is for breach of the PSA, not breach of his employment contract. By its terms, however, the PSA specified the regular issuance of shares to Rodriguez, contingent on his continued *employment* with Dell. We decline the invitation to be the first court to expand the definition of "continuing contract" to include such an employment agreement.

### b. *Discovery Rule*

[21] Dell also contends that the so-called discovery rule defeats any limitations defense that might bar its PSA claim against Rodriguez. Although limitations usually begin to run when facts have come into existence that authorize a claimant to seek a judicial remedy, "[t]he discovery rule ..., when applicable, provides that limitations run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury."[FN41] We have ruled that under Texas law, "[t]he discovery rule affords protection in only *limited instances,* applying in (1) cases of fraudulent concealment; and (2) when the nature of the injury is inherently undiscoverable and the injury itself is objectively verifiable." [FN42]

FN41. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988) (citation omitted). *See also*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63
**(Cite as: 390 F.3d 377)**

*Booker v. Real Homes, Inc.,* 103 S.W.3d 487, 492 (Tex.App.-San Antonio 2003, pet. denied) ("[A]ll that is required to commence the running of the limitations period is the discovery of an injury and its general cause, not the exact cause in fact and the specific parties responsible.").

FN42. *Jackson v. West Telemarketing Corp. Outbound,* 245 F.3d 518, 524 (5th Cir.2001) (citations omitted) (emphasis added); *accord Nat'l Western Life Ins. Co. v. Rowe,* 86 S.W.3d 285, 297 (Tex.App.-Austin 2002, pet. filed) (citations omitted).

[22] Even assuming, *arguendo,* that the discovery rule tolled the statute of limitations until Dell learned of Rodriguez's breach, that occurred no later than **\*393** March 6, 1998, when Nicholas Taylor (Dell's attorney who drafted the Separation Agreement) received the Valero contract. Taylor testified that, as soon as he read the Valero contract, he knew that it was a "false contract" because its contents were "preposterous" and "outrageous" and so "totally unusual" as to "beg disbelief." Thus, even under the discovery rule, the statute of limitations would have started to run on March 6, 1998, making Dell's suit, filed on March 13, 2002, (more than four years later), time-barred.

### III. CONCLUSION

Although we conclude that Dell's claim under the Separation Agreement is not time-barred, its claim under the Penny Share Agreement is.[FN43] Accordingly, we reverse the portion of the judgment implementing the jury's verdict in favor of Dell on the Penny Share Agreement, and we remand this action to the district court with instructions to enter judgment in favor of Rodriguez on Dell's breach of the Penny Share Agreement claim.

FN43. As we decide that Dell's claim under

the Penny Share Agreement is time-barred, we need not address Rodriguez's argument that the merger clause in the Separation Agreement caused the PSA's "clawback" provision to be replaced by remedies in the Separation Agreement. Likewise, our disposition of Dell's breach of contract claims makes it unnecessary to address Rodriguez's requests for new trial or judgment notwithstanding the verdict.

We also hold that (1) the trial court ruled incorrectly that the Separation Agreement was unambiguous, and (2) Rodriguez properly preserved this claim for appeal. We further conclude that the trial court's erroneous ruling on the question of ambiguity resulted in the improper exclusion of parol evidence favorable to Rodriguez's proffered interpretation of the Separation Agreement; for this reason we reverse and remand for further proceedings not inconsistent with this opinion. In light of this disposition, the district court's order awarding Dell attorney's fees must be vacated as well, albeit without prejudice.

AFFIRMED in part; VACATED in part; REVERSED in part and REMANDED for further proceedings.

C.A.5 (Tex.),2004.
Dell Computer Corp. v. Rodriguez
390 F.3d 377, 150 Lab.Cas. P 59,924, 22 IER Cases 63

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Sherman Division.
Robert PACKARD, D.M.D., M.S., et al.,
v.
OCA, INC., et al.

No. 4:05CV273.
Feb. 5, 2009.

West KeySummary **Health 198H** 🔑 **168**

**198H** Health
    **198HI** Regulation in General
        **198HI(B)** Professionals
            **198Hk162** Unauthorized Practice
                **198Hk168** k. Dentists and Oral Surgeons. Most Cited Cases

Business service agreement between an orthodontist and his practice and a company which provided business services for the orthodontist violated the Texas Dental Practices Act (TDPA) sections prohibiting the practice of dentistry without a license. The orthodontist practiced orthodontics using equipment that the company owned, maintained and operated in offices that the company owned, maintained and operated. The company provided the business and administrative support necessary for the day-to-day operation of the orthodontic practice, and the dress code for the office staff had to be approved by company, and the company sets minimum requirements for the number of hours and days per week the practice had to remain open. V.T.C.A., Occupations Code §§ 251.003(a)(4), 256.001.

Scott Mark Dewolf, Sean Joseph McCaffity, Dewolf McCaffity LLP, Plano, TX, for Robert Packard, D.M.D., M.S., et al.

Julie Solomon Wolf, Robert J. Clary, William Lloyd Foreman, Owens Clary & Aiken, Dallas, TX, for OCA, Inc., et al.

***MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AS CLARIFIED BY SUBSEQUENT ORDER***

RICHARD A. SCHELL, District Judge.

**\*1** Came on for consideration the report of the United States Magistrate Judge in this action, this matter having been heretofore referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636. On February 26, 2007, the report of the Magistrate Judge was entered containing proposed findings of fact and recommendations regarding Defendants' Motion to Transfer to United States District Court for the Eastern District of Louisiana and Plaintiff's Motion for Summary Judgment (*see* Dkt. 75).

The court has made a *de novo* review of the objections raised by Defendants regarding the wording of a portion of the recommendation. Since the filing of those objections, the Magistrate Judge entered an order clarifying his recommendation (*see* Dkt. 88). Because the clarification directly resolves Defendants' concerns about the wording of the report, the court is of the opinion that the findings and conclusions of the Magistrate Judge, as fully set out in his February 26, 2007 report and as clarified in his January 26, 2009 order, are correct, and the objections of Defendants are now moot or otherwise without merit.

Therefore, the court hereby adopts the findings and conclusions of the Magistrate Judge as the findings and conclusions of this court, Defendants' Mo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

tion to Transfer to United States District Court for the Eastern District of Louisiana (Dkt.50) is DENIED, and Plaintiff's Motion for Summary Judgment (Dkt.33) is GRANTED in part as to the illegality of the agreement and DENIED as to the dismissal of Defendant's counterclaims.

### IT IS SO ORDERED.

### REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE DENYING DEFEND-ANTS' MOTION TO TRANSFER VENUE AND GRANTING PLAINTIFFS' MOTION FOR SUM-MARY JUDGMENT

DON D. BUSH, United States Magistrate Judge.

On this day came on for consideration Defendants' Motion to Transfer to United States District Court for the Eastern District of Louisiana [Dkt. No. 50] and Plaintiffs' Motion for Summary Judgment [Dkt. No. 33]. Having considered the motions, their respective responses, replies, sur-replies and the relevant evidence, the Court is of the opinion that Defendants' Motion to Transfer to United States District Court for the Eastern District of Louisiana should be DENIED, and Plaintiff's Motion for Summary Judgment should be GRANTED.

### Background

Plaintiffs Robert Packard, D.M.D., M.S., ("Packard") and Packard Orthodontics, P.A. d/b/a Apple Orthodontics ("PA") (collectively "Plaintiffs") filed their Original Complaint on July 8, 2005 seeking a declaratory judgment that the OCA Service Agreement ("Agreement") entered into by Packard and Defendants OCA, Inc. f/k/a Orthodontic Centers of America, Inc. And Orthodontic Centers of Texas, Inc. ("OCA") and the restrictive covenants in the Agreement are illegal, void and unenforceable as a matter of law. Plaintiffs also brought claims for breach of contract and breach of fiduciary duty based on Defendants alleged conduct while operating under the Agreement.

**\*2** Packard is licensed to practice dentistry pursuant to the laws of the State of Texas. Packard specializes in the field of orthodontics and is the sole shareholder of Packard Orthodontics, P.A. On July 28, 1997, Packard, his former partner Meredith Packard ("Meredith"), and their professional corporation Robert C. Packard, D.M.D., M.S., P.C. ("Old Packard PC") entered into a long term service agreement with Apple Orthodontix, Inc. ("Apple–Packard Service Agreement").

Apple Orthodontix filed for bankruptcy in 2000. On April 7, 2000, OCA entered into an Asset Purchase Agreement with Apple Orthodontix. According to the terms of this Asset Purchase Agreement, OCA acquired certain service agreements and related assets, including the rights to the Apple–Packard Service Agreement. On September 29, 2000, Orthodontic Centers of Texas, Inc. ("OCS"),[FN1] Packard Orthodontics, P.A., Robert Packard, D.M.D., M.S. and Meredith Packard, D.D.S., entered into a Business Services Agreement ("BSA"). Generally, the BSA provided that, in exchange for a monthly service fee, which was calculated on the basis of Packard's net revenue, OCS would manage the operational part of Dr. Packard's orthodontic practice.

FN1. OCS is a Delaware Corporation and a wholly-owned subsidiary of OCA.

The BSA gave Meredith the option, at the end of the third year of the agreement, to terminate his responsibilities under the BSA and to disassociate Packard PA's office located in McKinney, Texas. On October 10, 2003, Meredith exercised that option, sold his interest in Packard PA, and disassociated himself from the McKinney office and the BSA.

Plaintiffs contend that OCA breached the BSA, and on July 8, 2005, Plaintiffs notified OCA of their intent to **terminate** the BSA and provided OCA 30

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

days to cure its material breaches. Contemporaneous with Plaintiffs providing to OCA their notice of intent to **terminate** the BSA, Plaintiffs filed this lawsuit seeking a declaratory judgment that the BSA is illegal under Texas law and is therefore void and unenforceable. Plaintiffs further allege breach of **contract** and breach of fiduciary duty against Defendants.

On March 14, 2006, Defendants filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana. On March 22, 2006, Defendants filed a Notice of Automatic Stay pursuant to Section 326(a) of the Federal Bankruptcy Code. On April 4, 2006, this Court entered an Order staying the case and directing the Clerk to administratively close the case pending the resolution of the bankruptcy proceedings. On August 8, 2006, Defendants filed their Motion to Transfer to United States District Court for the Eastern District of Louisiana. On August 17, 2006, the Bankruptcy Court lifted the automatic stay to allow this Court to proceed to a determination of whether "the claims regarding the **contracts** between the **parties**, including specifically the Business Service Agreement (as may have been amended), are void *ab initio,* illegal and/or unenforceable under Texas law." Notice of Ord. Lift. Bkcy. Stay at Ex. A.

### Discussion

***Defendants' Motion to Transfer to the Eastern District of Louisiana***

**\*3** Defendants argue that this action should be transferred to the Eastern District of Louisiana for referral to the United States Bankruptcy Court for the Eastern District of Louisiana ("Bankruptcy Court") pursuant to 28 U.S.C. § 1412. Defendants claim that this is a core proceeding to the bankruptcy case *In re OCA, Inc., et al ., Chapter 11 Case No. 06–10179(B),* which is currently pending before the Bankruptcy Court. In support of their motion, Defendants argue that a strong presumption exists in favor of transfer to the federal district in which the bankruptcy is pending. Additionally, Defendants argue that Plaintiffs' claims concern the core assets of the Debtor's estate.

Plaintiffs argue that a transfer of venue is not justified under 28 U.S.C. § 1412 because neither the interests of justice nor the convenience of the parties justifies a transfer to the Bankruptcy Court. Further, Plaintiffs argue that this is not a "core" proceeding under the Bankruptcy Code and that the Bankruptcy Court has already determined that the issue of the illegality of the BSA's under Texas law should be litigated in Texas.

"If a proceeding involves a right created by the federal bankruptcy law, it is a core proceeding...." *In re Wood,* 825 F.2d 90, 97 (5th Cir.1987). Here, Plaintiffs' claims deal with the legality of the BSA under Texas law and do not involve a right created by federal bankruptcy law. Further, the Bankruptcy Court lifted the automatic stay for the sole purpose of allowing this Court to determine whether the BSA was illegal under Texas law. Specifically, the Bankruptcy Court stated:

It IS FURTHER ORDERED that the automatic stay under 11 U.S.C. § 362 shall be, and hereby is, modified to permit the Packards, individually and collectively, to take all steps necessary to prosecute to final judgment in that certain pre-petition action brought by the Packards against OCA, Inc. f/k/a Orthodontic Centers of America, Inc. and Orthodontic Centers of Texas, Inc., pending before the United States District Court for the Eastern District of Texas, **Case** No. 4:05–CV–00273, the claims regarding whether the **contracts** between the **parties**, including specifically the Business Service Agreement (as may have been amended), are void *ab initio,* illegal and/or unenforceable under Texas law ....

Notice of Ord. Lift. Bkcy. Stay at Ex. A. **Ac-**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

cordingly, Defendants' Motion to Transfer to United States District Court for the Eastern District of Louisiana should be Denied.

***Plaintiffs' Motion for Summary Judgment***

Relying on *David Becka, et al. v. OCA, Inc. et al.,* Cause No. **03**–CV–80 (E.D.Tex.2005) (Brown, J.) and *Penny v. Orthalliance,* 255 F.Supp.2d 579 (N.D.Tex.2003) (Godbey, J.), Plaintiffs argue that issue preclusion and collateral estoppel prohibit Defendants from re-litigating the legality of their **contracts**. Plaintiffs further argue that even if the Court declines to apply the doctrine of collateral estoppel, Defendants are engaged in the illegal practice of dentistry and the BSA with Plaintiffs is illegal and therefore void and unenforceable. Specifically, Plaintiffs argue that the BSA allows Defendants to practice dentistry without a license in violation of the Texas Dental Practices Act ("TDPA"), which is codified in Sections 251.001 *et. seq.* of the Texas Occupations Code. As a result, Plaintiffs seek a declaratory judgment that the BSA is illegal and unenforceable.

**\*4** Defendants argue that collateral estoppel and issue preclusion do not apply in this case and that the BSA is not void for illegality. Defendants also contend that Plaintiffs are barred by *res judicata,* collateral estoppel and/or judicial estoppel from asserting that the BSA is void for illegality. Finally, Defendants argue that Plaintiffs' claim of illegality is barred by laches and/or the applicable statue of limitations.

### Summary Judgment Standard

The granting of summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The trial court must resolve all reasonable doubts in favor of the party opposing the motion. *Casey Enters. v. Am. Hardware Mut. Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981) (citations omitted). The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material

fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party satisfies its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.*

Federal Rule of Civil Procedure 56 does not impose a duty on a district court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 463 (5th Cir.1996) (citations omitted). Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant must also articulate the precise manner in which evidence he sets forth supports his claims. *See Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994) (citation omitted). Moreover, in designating specific facts, the nonmovant must " 'go beyond the pleadings' " and use " 'his own affidavits, ... deposition[s], answers to interrogatories, and admissions on file.' " *Jones v. Sheehan & Young Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir.1996) (citation omitted). [FN2]

> [FN2]. The Court also notes that Local Rule CV–56(b) states that a party's response to a summary judgment motion should "be supported by appropriate citations to proper summary judgment evidence...." Local Rule CV–56(c) further states that the Court will not "scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact for trial before entering summary judgment."

If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof, then summary judgment is appropriate. *Celotex,* 106

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

S.Ct. at 2552–53. Even if the nonmovant brings forth evidence in support of its allegations, summary judgment will be appropriate unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

***Whether collateral estoppel bars Defendants from re-litigating the legality of the BSA***

**\*5** Plaintiffs urge the Court to apply offensive collateral estoppel in this case and find that the *Becka* opinion applies here, therefore preventing Defendants from litigating whether the BSA is legal. In order to determine whether collateral estoppel applies, the Court should consider whether:

> (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is [any] special circumstance that would make it unfair to apply the doctrine.

*Baros v. Texas Mexican Ry. Co.,* 400 F.3d 228, 232–33 (5th Cir.2005) (citations omitted). The Fifth Circuit also set out the following additional safeguards to the application of collateral estoppel: (1) the facts and legal standard applied must be the same in both proceedings; (2) whether "differences in the quality of extensiveness of the procedures followed in the two courts" warrants a new determination of the issue; and (3) whether judicial review of the prior proceeding was available. *Id.* The Fifth Circuit has specifically refused to grant preclusive effect to a partial summary judgment order because it was not appealable. *Winters v. Diamond Shamrock Chemical Co.,* 149 F.3d 387, 395 (5th Cir.1998).

Judge Brown's memorandum opinion and order in *Becka* granted only a partial summary judgment to the plaintiffs and was not appealable. The decision was ultimately vacated upon agreement by the parties. Because judicial review of the proceeding was not available, the *Becka* case will not preclude Defendants from litigating the legality of the BSA in this case on the basis of collateral estoppel.

***Whether the BSA violates the Texas Dental Practices Act***

The Court must determine whether the BSA is illegal because it allows Defendants to practice dentistry without a license in violation of the TDPA. The TDPA provides that "[a] person may not practice or offer to practice dentistry or dental surgery or represent that the person practices dentistry unless the person holds a license issued by the board." TEX. OCC.CODE ANN. § 256.001 (Vernon 2004). A person is deemed to be engaged in the practice of dentistry if he "owns, maintains, or operates an office or place of business in which the person employs or engages under any type of contract another person to practice dentistry." *Id.* at § 251.003(a)(4).

Defendants argue that the provisions of the TDPA in question do not apply to corporations, but instead only apply to individuals. The Court is not persuaded by this argument. Section 312.011(10) of the Texas Government Code defines "person" to include a corporation. Accordingly, section 251.003(a)(4) applies to corporations as well as individuals.

In *Penny v. Orthalliance, Inc.,* 255 F.Supp.2d 579 (N.D.Tex.2003), the United States District Court construed section 251.003(a) (4) on facts similar to the present case. The Court agrees with the *Penny* Court's construction and analysis. In applying general rules of statutory construction, the *Penny* Court found the language of the TDPA to be clear and broad and found the terms "owns, maintains, or operates" to be well defined and commonly understood terms. *Id.* at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

581. And "the use of the disjunctive "or" signifies that engaging in any of the three actions violates the provision." *Id.* The word "any" when prohibiting a dentist's employment or engagement under any type of contract at an office owned, maintained, or operated by a non-licensed person is significant. *Id.* This language broadly prohibits relationships between dentists and non-licensed persons. *Id.* at 582.

**\*6** Having considered the plain language of the TDPA, the Court finds that the BSA violates sections 256.001 and 251.003(a)(4); therefore, the BSA is an illegal agreement and is void and unenforceable. First, under the terms of the BSA, Defendants owned, maintained or operated an orthodontic office. "Own" is defined as "to have or hold as property or appurtenance; to have a rightful title to, whether legal or natural," or as "to rightfully have or possess as property; to have legal title to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1612 (1986); BLACK'S LAW DICTIONARY 1137 (8th ed.2004). The BSA provides that OCS will acquire and retain an ownership interest in the furniture and equipment used in the operation of the practice and that OCS maintains a leasehold interest in the office space in which the Practice operates. As a result, OCS owns Dr. Packard's orthodontic office. *See Penny,* 255 F.Supp.2d at 582 & n. 3 (finding that "own" as used in the statutory context does not require a fee simple ownership of the real property and structure).

The Court also finds that OCS operates and maintains Dr. Packard's orthodontic practice. "Operate" is defined as "to cause to occur," "to manage and put or keep in operation," or "to cause to function." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1580–81 (1986). Section 1.1 of the BSA provides that OCS will provide or "arrange for the provision of, the business and administrative support services reasonably required ... for the day to day operations of the Practice...." These services include: providing all non-orthodontist staff reasonably required for the operation of the Practice, billing and

collecting fees and charges, maintaining signatory authority over the Practice's account, having exclusive authority for disbursements from the Practice's account, providing bookkeeping and accounting services, soliciting and negotiating contracts with HMOs and PPOs, providing office space and equipment, and providing marketing and advertising services. Further, OCS exercises control over the computer and management information systems to be utilized by the practice, mandates minimum hours of operation for the practice and set guidelines for the appropriate dress code for staff under the terms of the BSA. OCS clearly "operates" the Dr. Packard's orthodontic practice within the ordinary meaning of the word.

"Maintain" means "to keep in a state of repair, efficiency, or validity," "to keep up," "to provide for; to bear the expense of," or "to care for for purposes of operation of productivity or appearance, or to engage in general repair and upkeep." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1362 (1986); BLACK'S LAW DICTIONARY 973 (8th ed.2004). The BSA requires OCS to provide for the "day-to-day operations" of the practice. Pursuant to the BSA, OCS is responsible for maintaining the equipment used in the Practice and maintaining the offices and the premises of the Practice.

**\*7** Under the BSA, OCS is granted exclusive power of attorney and appointed as the exclusive true and lawful agent and attorney in fact for the preparation of billing statements and for collection from patients and insurance companies. OCS then deposits those funds into an account bearing the PC's name, but can transfer funds from that account to a central account maintained by OCS. OCS has signatory authority over the account and is exclusively responsible for disbursements from the account. In fact, the PC and Dr. Packard are forbidden from making any withdrawals or disbursements from the account without first obtaining written consent from OCS. Funds from the account go first to repay loans and reimburse OCS for expenses and services, which are in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

cluded in a Service Fee to be paid monthly to OCS. The remaining funds are disbursed to Dr. Packard. Finally, OCS exercises control over the dress code of the office staff and the computer systems used in the Practice. **Accordingly,** OCS clearly "maintains" Dr. Packard's orthodontic office under the **terms** of the BSA.

The Court must now determine whether OCS "employees or engages [Dr. Packard] under any type of **contract** ... to practice dentistry." TEX. OCC.CODE ANN. § 251.003(a)(4). The word "employ" means "to provide with a job that pays wages or a salary or with a means of earning a living." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 743 (1986). Dr. Packard practices orthodontics using equipment that OCS owns, maintains and operates in offices that OCS owns, maintains and operates. OCS provides the business and administrative support necessary for the day-to-day operation of the orthodontic practice. The dress code for the office staff must be approved by OCS, and OCS sets minimum requirements for the number of hours and days per week the Practice must remain open. OCS maintains the bank accounts of the Practice and has exclusive control over the funds going into and being disbursed from the account. Dr. Packard must obtain written permission from OCS before he can disburse any funds from the account. OCS also serves as Dr. Packard and the PA's attorney-in-fact for soliciting, negotiating and binding Dr. Packard and the PA to service and provider contracts with HMO's and PPO's. OCS measures Dr. Packard's salary by using a formula tied directly to the Practice's revenue and issues Dr. Packard a payroll check on a bi-weekly basis. Finally, the BSA is to remain in effect for a term of 40 years, and upon the early termination of the BSA, Dr. Packard is restricted from being associated in any manner with an orthodontic practice, which operates at any location extending 2 miles in all directions from any office of the Practice. As a result, the Court finds that OCS "employs" or "engages" Dr. Packard under the terms of the BSA.

The BSA attempts to circumvent the plain meaning of the TDPA by attempting to draft around it. The TDPA prohibits the corporate practice of dentistry, and the terms of the BSA result in the corporate practice of dentistry on the part of OCS. Despite provisions to the contrary, the Court finds the BSA is an attempt to circumvent the TDPA and allow OCS to engage in the corporate practice of dentistry by employing or engaging Dr. Packard and by owning, operating and maintaining Dr. Packard's dental practice.

**\*8** Defendants argue that Plaintiffs are barred from even bringing this declaratory judgment action by the applicable statute of **limitations,** which in a **contract** action is four years. However, when a **contract** contemplates **continuing obligations,** as is the **case** here, the **following** rule applies:

> **Limitations begins** to **run** on a **continuous contract** at the **earlier** of the **following**: ( **1** ) when the work [under the **contract**] is **complete**; ( **2** ) when the **contract** is **terminated** in **accordance** with its **terms**; or ( **3** ) when the **contract** is **anticipatorily repudiated** by **one party** and this **repudiation** is **adopted** by the other **party**.

*City of Corpus Christi v. Taylor,* 126 S.W.3d 712, 725 (Tex.App.-Corpus Christi 2004, pet. withdrawn). In this **case,** Plaintiffs notified Defendants on July 8, 2005 of their intent to **terminate** the BSA; therefore, the **limitations began running** on that date. *Id.* **Accordingly,** Plaintiffs timely filed their suit for declaratory judgment and are not barred by the statute of **limitations.**

Defendants also claim that Plaintiffs' suit is barred by laches. However, "laches should not bar an action on which the statute of **limitations** has not **run** unless allowing the action 'would work a grave injustice.' " *Brewer v. Nationsbank of State,* 28 S.W.3d 801, 804 (Tex.App.-Corpus Christi 2000, no writ)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)
**(Cite as: 2009 WL 334645 (E.D.Tex.))**

(citing *Culver v. Pickens,* 142 Tex. 87, 176 S.W.2d 167, 170–71 (Tex.1943)). Here, the suit is not barred by limitations and the Court finds that Plaintiffs have not unreasonably delayed the filing of this action, Defendants have not made a good faith change to their detriment as a result of the delay, and no extraordinary circumstances exist making it inequitable to allow Plaintiffs' suit after the delay. *See Taylor,* 126 S.W.3d at 726 (identifying the elements Defendants must show in order to succeed on laches).

Finally, Defendants have failed to show that Plaintiffs are barred by *res judicata,* collateral estoppel or judicial estoppel from asserting the BSA is void for illegality. Plaintiffs failure to raise illegality in the Bankruptcy Court does not bar its claims here. Accordingly, the BSA is illegal, void and unenforceable, and Plaintiffs' Motion for Summary Judgment should be granted as to the illegality of the BSA.

Plaintiffs also ask the Court to dismiss Defendants' counterclaims; however, the Bankruptcy Court lifted the automatic stay in this case for the sole purpose of determining the illegality of the BSA. Therefore, the Court declines to dismiss Defendants' counterclaims.

### Recommendation

Based upon the foregoing, it is the Court's recommendation that Defendants' Motion to Transfer to United States District Court for the Eastern District of Louisiana should be DENIED, and Plaintiff's Motion for Summary Judgment should be GRANTED.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

**\*9** Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an

aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988).

E.D.Tex.,2009.
Packard v. OCA, Inc.
Not Reported in F.Supp.2d, 2009 WL 334645 (E.D.Tex.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

H

Court of Appeals of Texas,
El Paso.
PAGOSA OIL AND GAS, L.L.C. and Sombrero Oil
and Gas Company, L.L.C., Appellants,
v.
MARRS AND SMITH PARTNERSHIP, and Rickey
Smith, Appellees.

**Writ denied**
No. 08–07–00090–CV.
Feb. 10, 2010.

**Background:** Oil and gas companies which participated in investment project with mineral lessee, which subsequently assigned breach of lease cause of action to one company, brought action against lessor and its controlling partner for breach of contract, alleging that lessor's rescission of lease constituted a breach and cause damages to investment project. The 143rd Judicial District Court, Loving County, Joseph Connally, J., granted defendants' motion for summary judgment, and companies appealed.

**Holdings:** The Court of Appeals, David Wellington Chew, C.J., held that:
(1) participation in investment project did not confer standing upon companies to bring action;
(2) lease's anti-assignment clause did not prohibit lessee's assignment of cause of action;
(3) assignee's summary judgment response to no evidence motion satisfied assignee's burden;
(4) genuine issues of material fact as to lessee's injury and cause, precluded summary judgment;
(5) res judicata did not bar breach of lease claim;
(6) cause of action accrued on expiration of final lease extension, rather than on earlier date when lessor repudiated the lease; and

(7) election of remedies defense did not bar claim.

Dismissed in part; reversed and remanded.

See also 2002 WL 1445334; 223 S.W.3d 1.

West Headnotes

**[1] Contracts 95 187(1)**

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of Third Person
                    95k187(1) k. In general. Most Cited Cases

**Mines and Minerals 260 78.7(1)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k78 Testing or Working
                    260k78.7 Actions
                        260k78.7(1) k. In general. Most Cited Cases

Oil companies' participation in investment project with mineral lessee did not confer standing upon them to bring breach of lease action against lessor, despite claim that lessor's rescission of lease caused delay in drilling project's first well and resulted in numerous lost leases and damages; companies were not intended to be third-party beneficiaries of lease, and any judicial determination that lease was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

breached would not remedy companies' alleged harm.

**[2] Action 13** 🗝13

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons entitled to sue. Most Cited Cases

"Standing" denotes the presence of a real controversy between the parties, that will actually be determined by the judicial declaration sought.

**[3] Action 13** 🗝13

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons entitled to sue. Most Cited Cases

Standing is a necessary component of subject-matter jurisdiction, without which a court lacks authority to hear a case.

**[4] Appeal and Error 30** 🗝893(1)

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
         30k893 Cases Triable in Appellate Court
            30k893(1) k. In general. Most Cited Cases

Whether a court properly determined it had subject matter jurisdiction over a case is a question of law subject to de novo review.

**[5] Action 13** 🗝13

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons entitled to sue. Most Cited Cases

In making a determination regarding a party's standing, the court takes the pleadings as true and construes them in the pleader's favor, as well as considers evidence relevant to the jurisdictional inquiry.

**[6] Contracts 95** 🗝186(1)

95 Contracts
   95II Construction and Operation
      95II(B) Parties
         95k185 Rights Acquired by Third Persons
         95k186 Privity of Contract in General
            95k186(1) k. In general. Most Cited Cases

**Contracts 95** 🗝187(1)

95 Contracts
   95II Construction and Operation
      95II(B) Parties
         95k185 Rights Acquired by Third Persons
         95k187 Agreement for Benefit of Third Person
            95k187(1) k. In general. Most Cited Cases

To establish its standing to assert a breach of contract cause of action, a party must prove its privity to the agreement, or that it is a third-party beneficiary.

**[7] Contracts 95** 🗝186(1)

95 Contracts
   95II Construction and Operation
      95II(B) Parties

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

95k185 Rights Acquired by Third Persons
95k186 Privity of Contract in General
95k186(1) k. In general. Most Cited Cases

For standing purposes, contract privity is established when the plaintiff proves the defendant was a party to an enforceable contract with either the plaintiff, or a third party who assigned its cause of action to the plaintiff.

**[8] Assignments 38 ☞58**

38 Assignments
38II Mode and Sufficiency of Assignment
38k58 k. Consent of debtor. Most Cited Cases

Mineral lease's anti-assignment clause did not prohibit lessee's assignment of cause of action against lessor arising from breach of the lease, but merely provided that lessor would have the right to notice and pre-approval of any assignments of the lease.

**[9] Assignments 38 ☞31**

38 Assignments
38II Mode and Sufficiency of Assignment
38k31 k. Nature and essentials in general. Most Cited Cases

An "assignment" is simply a transfer of some right or interest.

**[10] Assignments 38 ☞31**

38 Assignments
38II Mode and Sufficiency of Assignment
38k31 k. Nature and essentials in general. Most Cited Cases

An "assignment" is a contract between the as-

signor of a right and an assignee, who receives the authority to assert that right.

**[11] Assignments 38 ☞58**

38 Assignments
38II Mode and Sufficiency of Assignment
38k58 k. Consent of debtor. Most Cited Cases

Parties to a contract can agree their rights in a particular agreement are not assignable; such "anti-assignment" clauses are enforceable unless rendered ineffective by a statute.

**[12] Assignments 38 ☞58**

38 Assignments
38II Mode and Sufficiency of Assignment
38k58 k. Consent of debtor. Most Cited Cases

Texas law recognizes a distinction between a contracting party's ability to assign rights under a contract containing an anti-assignment provision, and that same party's ability to assign a cause of action arising from breach of that contract.

**[13] Contracts 95 ☞176(1)**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k176 Questions for Jury
95k176(1) k. In general. Most Cited Cases

When a written instrument is worded so that it can be given a definite meaning or interpretation, it will be interpreted as a matter of law.

**[14] Contracts 95 ☞1**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

**95** Contracts
    **95I** Requisites and Validity
        **95I(A)** Nature and Essentials in General
            **95k1** k. Nature and grounds of contractual obligation. Most Cited Cases

An "unconscionable" contract is an unenforceable contract.

**[15] Assignments 38 ☞70**

**38** Assignments
    **38III** Validity
        **38k70** k. Right to contest validity. Most Cited Cases

**Contracts 95 ☞187(1)**

**95** Contracts
    **95II** Construction and Operation
        **95II(B)** Parties
            **95k185** Rights Acquired by Third Persons
                **95k187** Agreement for Benefit of Third Person
                    **95k187(1)** k. In general. Most Cited Cases

Lessor lacked standing to allege that mineral lessee's assignment of breach of lease action to oil and gas company was unenforceable on grounds that, because one or more of lessee's former attorneys owned interests in company, assignment constituted an unconscionable fee agreement; lessor was not a party in privity to the contract, and lessor was not a third party beneficiary of the contract.

**[16] Assignments 38 ☞23**

**38** Assignments
    **38I** Property, Estates, and Rights Assignable
        **38k21** Rights of Action

        **38k23** k. On contract. Most Cited Cases

Mineral lessee's assignment to oil and gas company of breach of lease cause of action against lessor was not void as a matter of law on public policy grounds, as effect of the assignment did not distort the parties' positions or create new incentives not generally associated with their positions in the underlying dispute.

**[17] Judgment 228 ☞185.3(14)**

**228** Judgment
    **228V** On Motion or Summary Proceeding
        **228k182** Motion or Other Application
            **228k185.3** Evidence and Affidavits in Particular Cases
                **228k185.3(14)** k. Landlord and tenant. Most Cited Cases

Mineral lessee's assignee's summary judgment response, which included evidence of original lease, evidence of lessee's tender of bonus payments to lessor, and evidence of lessor's attempted repudiation and rescission of the lease, satisfied assignee's burden in response to lessor's no-evidence motion for summary judgment on assignee's breach of contract claim. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

**[18] Judgment 228 ☞181(24)**

**228** Judgment
    **228V** On Motion or Summary Proceeding
        **228k181** Grounds for Summary Judgment
            **228k181(15)** Particular Cases
                **228k181(24)** k. Landlord and tenant cases. Most Cited Cases

Genuine issues of material fact as to whether mineral lessee was injured, and whether injury was caused by lessor's breach of contract, precluded

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

summary judgment for assignee in breach of contract action against lessors.

**[19] Judgment 228** 🔑585(4)

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
        228k585 Identity of Cause of Action in General
          228k585(4) k. Matters for defense in former action as cause of action in second. Most Cited Cases

Mineral lessee's breach of contract claim against lessors was not a compulsory counter-claim at the time of lessors' prior action for rescission of lease, as it was not mature at the time of the litigation, and thus res judicata did not bar assignee's breach of lease claim against lessors; while lessors attempted to repudiate the lease, lessee chose to continue to honor the lease by tendering annual bonus payments and retained its right to accept the repudiation and sue on the contract during that period.

**[20] Judgment 228** 🔑948(1)

228 Judgment
    228XXII Pleading Judgment as Estoppel or Defense
      228k948 Pleading in General
        228k948(1) k. Necessity of pleading former adjudication in general. Most Cited Cases

Res judicata is an affirmative defense. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

**[21] Judgment 228** 🔑540

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
        228k540 k. Nature and requisites of former recovery as bar in general. Most Cited Cases

The party claiming res judicata must prove: (1) a prior final judgment on the merits by a court of competent jurisdiction, (2) the identify of the parties or those in privy with them, and (3) a second action based on the same claims as were or could have been raised in the first action.

**[22] Judgment 228** 🔑584

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
        228k584 k. Nature and elements of bar or estoppel by former adjudication. Most Cited Cases

**Judgment 228** 🔑586(.5)

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
        228k586 Identity of Subject-Matter
          228k586(.5) k. In general. Most Cited Cases

Res judicata precludes both re-litigation of claims that have been fully adjudicated, and subsequent litigation of claims which arise out of the subject matter as the prior litigation, and therefore could have been brought in the prior suit.

**[23] Judgment 228** 🔑585(4)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
         228k585 Identity of Cause of Action in General
            228k585(4) k. Matters for defense in former action as cause of action in second. Most Cited Cases

Res judicata does not bar a former defendant from asserting a claim in a later action that could have been filed as a counter-claim in the first suit, unless the claim was compulsory in the earlier action.

**[24] Set–Off and Counterclaim 352 ☜60**

–Off and Counterclaim352 Set–Off and Counterclaim
   352III Operation and Effect
      352k60 k. Effect of failure to assert or claim; compulsory counterclaim. Most Cited Cases

A counter-claim is compulsory only if: (1) it is within the jurisdiction of the court, (2) the claim is not the subject of another pending action at the time of the filing of the answer, (3) the claim is mature and owned by the defendant at the time of filing the answer, (4) it arose out of the same transaction or occurrence that is the subject matter of the opposing party's claim, (5) it is against an opposing party in the same capacity, and (6) it does not require the presence of third parties over whom the court cannot acquire jurisdiction.

**[25] Judgment 228 ☜185.3(2)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185.3 Evidence and Affidavits in Particular Cases
            228k185.3(2) k. Particular defenses. Most Cited Cases

When res judicata is asserted to bar a claim which could have been asserted by a former defendant in a prior suit, the movant's summary judgment burden includes establishing each element. Vernon's Ann.Texas Rules Civ.Proc., Rule 54.

**[26] Action 13 ☜61**

13 Action
   13IV Commencement, Prosecution, and Termination
      13k61 k. Accrual of cause of action. Most Cited Cases

A claim is mature when it has accrued.

**[27] Limitation of Actions 241 ☜50(1)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(A) Accrual of Right of Action or Defense
         241k50 Continuing Contracts
            241k50(1) k. In general. Most Cited Cases

In the case of a continuing contract, the limitations period begins to run at the earlier of the following events: (1) when the obligations are completed, (2) when the contract is terminated according to its terms, or (3) when the contract is anticipatorily repudiated by one party, and the repudiation is adopted by the other party.

**[28] Contracts 95 ☜313(1)**

95 Contracts

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

95V Performance or Breach
    95k313 Renunciation
        95k313(1) k. In general. Most Cited Cases

When one party attempts to repudiate a continuing contract despite its ongoing obligations, the injured party has the option to treat the contract as still in force and retain its right to sue on the contract; or to treat the breaching party's repudiation as a complete breach and terminate the contract immediately.

**[29] Limitation of Actions 241 🔑50(1)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
        241k50 Continuing Contracts
           241k50(1) k. In general. Most Cited Cases

Cause of action for mineral lessor's breach of contract accrued on expiration of final lease extension, rather than on earlier date when lessor repudiated the lease, even though time was of the essence, as lessee did not treat the repudiation as a breach but rather continued to perform under the lease and waited for lease's termination. V.T.C.A., Civil Practice & Remedies Code § 16.004.

**[30] Limitation of Actions 241 🔑195(3)**

241 Limitation of Actions
    241V Pleading, Evidence, Trial, and Review
        241k194 Evidence
        241k195 Presumptions and Burden of Proof
           241k195(3) k. Burden of proof in general. Most Cited Cases

To establish a limitations defense, a defendant must conclusively prove: (1) when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been plead.

**[31] Limitation of Actions 241 🔑21(1)**

241 Limitation of Actions
    241II Statutes of Limitation
        241II(B) Limitations Applicable to Particular Actions
        241k21 Contracts in General
           241k21(1) k. In general. Most Cited Cases

The limitations period for a breach of contract cause of action is four years. V.T.C.A., Civil Practice & Remedies Code § 16.004.

**[32] Judgment 228 🔑615**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
        228k615 k. Extinguishment by one satisfaction. Most Cited Cases

**Judgment 228 🔑747(.5)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(D) Judgments in Particular Classes of Actions and Proceedings
        228k747 Actions Relating to Real Property
           228k747(.5) k. In general. Most Cited Cases

**Release 331 🔑33**

331 Release
    331II Construction and Operation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

331k33 k. Release of specific indebtedness or liability in general. Most Cited Cases

Mineral lessor's controlling partner's defenses of release, collateral estoppel, and the one satisfaction rule to breach of lease action were ineffective, in light of finding that lessor's prior action against lessee did not preclude assignee's subsequent action against lessor.

**[33] Election of Remedies 143 🔑3(1)**

143 Election of Remedies
   143k3 Inconsistency of Alternative Remedies
     143k3(1) k. In general. Most Cited Cases

Mineral lessee's decision to pursue a tortious interference claim in prior action was not inconsistent with breach of contract claim asserted by lessee's assignee, and thus election of remedies defense did not bar breach of contract claim; lessee, as non-repudiating party, continued to perform under lease and exercised its right to delay assertion of the claim for breach of lease, and, during that delay, events transpired which led to tortious interference claim.

**[34] Election of Remedies 143 🔑1**

143 Election of Remedies
   143k1 k. Nature and grounds in general. Most Cited Cases

The election of remedies defense bars recovery when a party successfully exercises an informed choice between two or more remedies, rights, or states of facts which are so inconsistent as to constitute a manifest injustice.

**[35] Election of Remedies 143 🔑1**

143 Election of Remedies

143k1 k. Nature and grounds in general. Most Cited Cases

Although the "election of remedies" defense continues to be recognized, it is not favored, and should not be extended.

**[36] Torts 379 🔑222**

379 Torts
   379III Tortious Interference
     379III(B) Business or Contractual Relations
       379III(B)1 In General
         379k222 k. Tortfeasor as stranger to contract or relationship, in general. Most Cited Cases

A claim for tortious interference is asserted by a plaintiff whose contractual rights have been interfered with by a stranger to the contract; a third party.

**[37] Contracts 95 🔑324(1)**

95 Contracts
   95VI Actions for Breach
     95k324 Nature and Form of Remedy
       95k324(1) k. In general. Most Cited Cases

A breach of contract cause of action addresses a plaintiff's injury for non-performance by the other party to the agreement.

**[38] Estoppel 156 🔑68(2)**

156 Estoppel
   156III Equitable Estoppel
     156III(B) Grounds of Estoppel
       156k68 Claim or Position in Judicial Proceedings
         156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

Mineral lessee's assignee was not judicially estopped from asserting breach of contract claim against lessors' controlling partner in light of partner's failure to explain how lessee's testimony in prior lawsuit, in which lessee discussed leases he obtained on ranch and how lessor's refusal to consent to any assignment of the lease forced lessee to re-negotiate an independent farmout agreement, was inconsistent with assignee's position that lessor's rescission constituted a breach of the lease.

**[39] Estoppel 156 ☞68(2)**

156 Estoppel
   156III Equitable Estoppel
    156III(B) Grounds of Estoppel
     156k68 Claim or Position in Judicial Proceedings
      156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases

Judicial estoppel precludes a party from adopting a position inconsistent with one that was successfully maintained in an earlier proceeding.

**[40] Estoppel 156 ☞68(2)**

156 Estoppel
   156III Equitable Estoppel
    156III(B) Grounds of Estoppel
     156k68 Claim or Position in Judicial Proceedings
      156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases

The elements of judicial estoppel in Texas are: (1) a sworn, prior inconsistent statement made in a judicial proceeding, (2) which was successfully maintained in the prior proceeding, (3) not made in ad-

vertently or by mistake, or pursuant to duress, and (4) which was deliberate, clear, and unequivocal.

**[41] Mines and Minerals 260 ☞78.1(3)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
    260II(C) Leases, Licenses, and Contracts
     260II(C)3 Construction and Operation of Oil and Gas Leases
      260k78 Testing or Working
       260k78.1 Construction, Breach, and Penalties
        260k78.1(3) k. Payments in lieu; delay rentals, etc. Most Cited Cases

Mineral lessee's tender of bonus payments to lessor constituted consideration that supported lease extensions such that failure of consideration was unavailable as a defense to lessor's controlling partner in breach of lease action by lessee's assignee, although lessor refused and returned the bonus payments.

**[42] Contracts 95 ☞83**

95 Contracts
   95I Requisites and Validity
    95I(D) Consideration
     95k83 k. Failure of consideration. Most Cited Cases

A failure of consideration occurs when the plaintiff fails to perform a condition precedent to the defendant's duty to perform.

**[43] Contracts 95 ☞83**

95 Contracts
   95I Requisites and Validity
    95I(D) Consideration

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

95k83 k. Failure of consideration. Most Cited Cases

The doctrine of failure of consideration assumes the contract is already in existence.

**[44] Contracts 95 ☞51**

95 Contracts
    95I Requisites and Validity
        95I(D) Consideration
            95k49 Nature and Elements
                95k51 k. Benefit to promisor. Most Cited Cases

**Contracts 95 ☞52**

95 Contracts
    95I Requisites and Validity
        95I(D) Consideration
            95k49 Nature and Elements
                95k52 k. Detriment to promisee. Most Cited Cases

Consideration consists of either a benefit to the promisor or a detriment to the promisee.

**[45] Judgment 228 ☞185.1(4)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.1 Affidavits, Form, Requisites and Execution of
                228k185.1(4) k. Matters of fact or conclusions. Most Cited Cases

Conclusory statement by mineral lessor's controlling partner in summary judgment response that lessee's assignee failed to produce any evidence to show it was ready, willing, and able to drill well and that there were other unleased mineral interests at that time failed to establish elements of defense of impossibility of performance to assignee's breach of contract claim after lessor attempted rescissions of the lease.

*208 Steven L. Hughes, Mounce, Green, Myers, Safi, Paxson & Galatzan, El Paso, for Appellants.

Paul M. Terrill, Hazen & Terrill, Austin, Gary M. Bellair, Craig, Terrill & Hale, L.L.P., Lubbock, for Appellee Marrs and Smith Partnership.

Chad Smith, Lubbock, for Appellee Rickey Smith.

Before CHEW, C.J., McCLURE, and RIVERA, JJ.

***OPINION***
DAVID WELLINGTON CHEW, Chief Justice.
    Pagosa Oil and Gas and Sombrero Oil and Gas Company appeal a summary judgment in favor of Marrs and Smith Partnership and Rickey Smith. We find that Pagosa Oil and Gas lacks standing to sue and we dismiss its claim for lack of subject-matter jurisdiction. The remaining summary judgment is reversed and the cause remanded.

    This case marks the third chapter of litigation involving the mineral development of the Frying Pan Ranch, which lies in parts of Loving, Winkler, and Andrews County, Texas, and Lea County, New Mexico. *See Marrs and Smith P'ship v. D.K. Boyd Oil & Gas Company, Inc.,* 223 S.W.3d 1, 8 (Tex.App.-El Paso 2005, pet. denied); *Marrs and Smith P'ship v. D.K. Boyd Oil and Gas Company, Inc.,* No. 08–00–00386–CV, 2002 WL 1445334 (Tex.App.-El Paso 2002, no pet.) (not designated for publication).

    On August 1, 1999, D.K. Boyd Oil and Gas Co. leased mineral rights to property in Loving County from Marrs and Smith Partnership.[FN1] The term of the Boyd–Smith lease was one year, but provided Boyd

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

with the option to extend the term for a second and third year, despite a lack of production, by paying additional bonus consideration to the partnership. Boyd tendered its first bonus payment in the amount of $38,144.58 on August 3, 1999.

> **FN1.** Appellee Rickey Smith, is the general partner of Marrs and Smith Partnership. When it is necessary to refer to Rickey Smith individually in this opinion, we will refer to him as "Mr. Smith." Mr. Smith and the Partnership will be referred to jointly as "Appellees." We will refer to D.K. Boyd Oil and Gas Company and other entities owned or controlled by Mr. D.K. Boyd, collectively as "Boyd." We will refer to the August 1, 1999 mineral lease as the "Boyd–Smith" lease. For a more detailed explanation of the parties and their relationships *see Marrs and Smith P'ship v. D.K. Boyd Oil & Gas Company, Inc., 223 S.W.3d at 1–12 (Tex.App.-El Paso 2005, pet. denied).*

On March 9, 2000, counsel for the Partnership wrote Boyd a letter indicating that the Partnership intended to rescind the lease. On March 16, 2000, Mr. Smith and the Partnership filed suit against Boyd seeking recision of the lease ("the prior lawsuit"). Boyd counter-claimed for tortious interference with a contract alleging, in part that the Partnership's actions had interfered with the development of other mineral interests on the ranch. Boyd did not assert a counter-claim for breach of the lease.

Despite the ongoing lawsuit, Boyd tendered the second bonus payment for extension**\*209** of the lease on July 24, 2000. The Partnership returned the check on August 14, 2000, and again indicated its intent to rescind the lease. Again on July 21, 2001, Boyd tendered the bonus payment for the final extension period. That check was also returned by the Partnership. Final judgment in the prior lawsuit was issued on September 3, 2004.

In 2002, Pagosa Oil and Gas ("Pagosa") and Sombrero Oil and Gas Company ("Sombrero") agreed to participate in an oil and gas investment project, organized by Boyd, called the "Leiman Prospect." In addition, on July 1, 2006, Boyd and Sombrero signed an agreement whereby Boyd assigned its potential breach of contract cause of action against the Partnership to Sombrero. Pagosa was not a party to the assignment.

Sombrero and Pagosa filed their original breach of contract petition against Mr. Smith and the Partnership for breach of the Boyd–Smith lease on July 26, 2006. The petition alleged that the Partnership's recision constituted breach of the lease. The amended petition also included an allegation that the Leiman Prospect participants were injured by the partnership's actions because the recision caused delays in the drilling of an oil well, and the loss of numerous mineral leases for non-production.

Mr. Smith and the Partnership filed a joint motion for summary judgment on October 5, 2006, asserting traditional and no-evidence grounds. On October 31, 2006, Pagosa and Sombrero filed their summary judgment response and a cross-motion for partial summary judgment as to Mr. Smith and the Partnership's liability for breach of the lease. The Partnership filed a response to the cross-motion and a supplement to its original motion on March 2, 2007. This motion included a "jurisdictional plea" in which the Partnership challenged Pagosa and Sombrero's standing to assert a claim for breach as they were not parties to the Boyd–Smith lease.

Mr. Smith filed an independent response to Sombrero and Pagosa's cross-motion, and a reply to Sombrero and Pagosa's response to the original summary judgment motion on March 14, 2007. Mr. Smith's motion incorporated the Partnership's jurisdiction and standing arguments. The trial court en-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

tered an order denying Sombrero and Pagosa's motion for partial summary judgment, and granting summary judgment in favor of Mr. Smith and the Partnership. The order did not specify the grounds relied upon, and did not address Pagosa or Sombrero's standing. Pagosa and Sombrero appeal.

Appellants raise two issues for our review. In Issue One, they challenge the summary judgment in favor of Mr. Smith and the Partnership. In Issue Two, they contend the trial court erred by denying their motion for partial summary judgment as to breach of contract liability.

[1][2][3][4][5] As a preliminary matter, we must address Appellees' assertion that Pagosa and Sombrero lack standing to maintain this lawsuit. In Texas, "standing" denotes the presence of a real controversy between the parties, that will actually be determined by the judicial declaration sought. *Austin Nursing Ctr., Inc. v. Lovato,* 171 S.W.3d 845, 848 (Tex.2005). Standing is a necessary component of subject-matter jurisdiction, without which a court lacks authority to hear a case. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444–45 (Tex.1993). Whether a court properly determined it had subject matter jurisdiction over a case is a question of law subject to *de novo* review. *See Tex. Dept. of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). In making a determination regarding*210 a party's standing, we take the pleadings as true and construe them in the pleader's favor, as well as consider evidence relevant to the jurisdictional inquiry. *Id.* at 226–28.

[6][7] To establish its standing to assert a breach of contract cause of action, a party must prove its privity to the agreement, or that it is a third-party beneficiary. *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.,* 234 S.W.3d 726, 738 (Tex.App.-Dallas 2007, pet. denied). For standing purposes, privity is established when the plaintiff proves the defendant was a party to an enforceable contract with either the plaintiff, or a third party who

assigned its cause of action to the plaintiff. *Stonegate Village, L.P.,* 234 S.W.3d at 738.

The Partnership argues that because Pagosa and Sombrero were not parties to the Smith–Boyd lease, the entities do not have standing to assert the breach of contract cause of action. There is no dispute that Appellants were not parties to the original lease agreement. However, both argue that they have standing to assert the cause of action because they were participants, through Boyd, in an oil and gas exploration project called the "Leiman Prospect." According to Appellants' First Amended Original Petition and their response to the Partnership's motion for summary judgment, the original dispute between Boyd and the Partnership caused a delay in drilling the Leiman Prospect's first well. Because of the delay, the prospect lost numerous leases, which lead to monetary damages to all the participants.

Neither appellant argues that a contract existed between Leiman participants and the Partnership or Mr. Smith.[FN2] There are no allegations that Pagosa and Sombrero were intended to be third-party beneficiaries of the Boyd–Smith lease. Even if we assume that Appellants were harmed by the Partnership and Smith's actions surrounding the Boyd–Smith lease, as is stated in Appellants' pleadings, a judicial determination that the Boyd–Smith lease was breached would have no remedial effect on that harm. Therefore, to the extent Pagosa and Sombrero depend on their status as Leiman participants for standing to sue for breach of contract they fail. Because its participation in the Leiman Prospect was Pagosa's sole basis for standing, the trial court was without jurisdiction and Pagosa's claim must be dismissed.

> FN2. According to Appellants' summary judgment response, the property covered by the Boyd–Smith lease was not originally part of the prospect. The property only became available for drilling when the mineral rights came into the Leiman Prospect after it

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

was re-leased to another company.

[8] Sombrero also asserts a second alternative basis for its standing. In the summer of 2006, Sombrero and Boyd signed the following "Assignment and Transfer of Causes of Action."

D.K. Boyd Oil and Gas Co., Inc. ("Boyd" or "Assignor") for the consideration set forth below does hereby ASSIGN, GRANT, SELL and CONVEY unto SOMBRERO OIL & GAS COMPANY, L.L.C. ("Assignee") the following:

All right title and interest in and to all causes of action that the Assignor has in any way related to the August 1, 1999 lease of minerals from Smith and Marrs Partnership to D.K. Boyd Oil and Gas Co., Inc .... (the "Lease") including, but not limited to, all causes of action for the breach of the Lease by Marrs and Smith Partnership and Rickey Smith.

TO HAVE AND TO HOLD the above described rights and causes of action, together with, all and singular, the **\*211** rights and privileges thereto in any [way] belonging, unto the said Assignee, its successors and assigns forever.

As consideration for this assignment, Assignee shall remit to Assignor, within 30 days of recovery, 1/3 of the Assignor's pro rata interest in any actual damage award, based on the Assignee's pro rata interest in the Lease, minus actual out of pocket expenses incurred prosecuting the assigned causes of action.

Assignor agrees to cooperate and assist as necessary in prosecuting the assigned causes of action, including providing requested documentation and to execute such further documents as necessary to complete the assignment set forth above.

Assignor covenants that the rights, title and interest assigned herein have not been previously assigned or encumbered.

AGREED to be effective the 1st day of July, 2006.

Generally, this assignment would provide Sombrero with a basis for standing in the breach of contract suit. *See Stonegate Village, L.P.,* 234 S.W.3d at 738. However, the Partnership and Smith seek to avoid this assignment on two grounds. First, they argue that the Boyd–Smith lease prohibited assignments by its terms. Second, they argue that even if this assignment was not prohibited by the lease terms, it must be declared void as a matter of public policy because Sombrero, the assignee, is controlled by attorneys. We will address each argument in turn.

[9][10][11] An "assignment" is simply a transfer of some right or interest. *See University of Texas Med. Branch at Galveston v. Allan,* 777 S.W.2d 450, 452 (Tex.App.-Houston [14th Dist.] 1989, no writ). As such, an assignment is a contract between the assignor of a right and an assignee, who receives the authority to assert that right. *See id.* at 453. As with any other contract term, parties to a contract can agree their rights in a particular agreement are not assignable. These "anti-assignment" clauses are enforceable in Texas unless rendered ineffective by a statute. *Johnson v. Structured Asset Services, L.L.C.,* 148 S.W.3d 711, 721 (Tex.App.-Dallas 2004, no pet.), *citing Reef v. Mills Novelty Co.,* 126 Tex. 380, 89 S.W.2d 210, 211 (Tex.Com.App.1936).

The "anti-assignment" clause in the Boyd–Smith lease provided:

Lessor expressly reserves the right of approval of any and all assigning in whole or in part, the covenants hereof shall extend to their heirs, executors, administrators, successors, or assigns, and it is hereby agreed that in the event that this Lease shall

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

be assigned as to a part or as to parts of the above described lands that Lessor shall receive a copy of such assignment, farmout, etc. within thirty (30) days of the effective date of same.

[12] Appellees argue that this provision rendered any attempt by Boyd to assign any rights arising from the contract unenforceable without the Partnership's consent. Therefore, Appellees conclude, Sombrero acquired no actionable interest from Boyd and has no standing to sue. As Sombrero points out however, Texas law recognizes a distinction between a contracting party's ability to assign rights under a contract containing an anti-assignment provision, and that same party's ability to assign a cause of action arising from breach of that contract. *See State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 705–07 (Tex.1996) (absent specific circumstances, causes of action in Texas are freely assignable); *Dearborn Stove Co. v. Caples,* 149 Tex. 563, 236 S.W.2d 486, 490 (1951) ("That the lease **212** itself was not validly assigned or assignable does not prevent a valid assignment of the overcharge claim."); *Lindsay ex rel. Lindsay v. S. San Antonio Indep. Sch. Dist.,* 983 S.W.2d 778, 779–80 (Tex.App.-San Antonio 1998, no pet.) (recognizing assignability of decedent's cause of action for alleged breach of employment contract despite estate's inability to assign contract itself); *see also* TEX.BUS. & COM.CODE ANN. § 2.210(b) (Vernon 2009)(right to damages for breach of contract can be assigned despite agreement otherwise); TEX.PROP.CODE ANN. § 12.014(a)(Vernon Supp.2009)(interest in cause of action is assignable, regardless of assignability of cause of action in law or equity, if the transfer is in writing).

Appellees' argument on this point is limited to the enforce ability and terms of the anti-assignment clause. They conclude that because an anti-assignment clause is generally enforceable, Boyd's attempt to assign its cause of action was ineffective. This argument assumes that the clause is evidence of the parties' intent to prevent both a contractual as-

signment, as well as a cause of action assignment. We do not agree it evidences such an intent.

[13] When a written instrument is worded so that it can be given a definite meaning or interpretation, it will be interpreted as a matter of law. *SAS Institute, Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex.2005). This anti-assignment clause states that the lessor, the Partnership, would have the right to notice and pre-approval of any assignments of the lease. The clause does not indicate an intent to limit the parties' rights to assign a cause of action arising from an alleged breach of the lease. Therefore, Boyd maintained its common law right to assign its cause of action for breach, and Sombrero has stepped into Boyd's position via the assignment.

[14][15][16] However, Appellees argue this particular assignment should still be declared void because Sombrero, the assignee, is "an attorney-controlled entity." In essence, Appellees argues that because one or more of Boyd's former attorneys own interests in Sombrero, the assignment constitutes an unconscionable fee agreement and cannot be enforced. An "unconscionable" contract is an unenforceable contract. *See In re Poly–America, L.P.,* 262 S.W.3d 337, 348 (Tex.2008). As we have discussed above, only parties in privity to the contract or third party beneficiaries are entitled to enforce a contract. *See Stonegate Village, L.P.,* 234 S.W.3d at 738. For the same reasons, we have concluded Pagosa has no standing to sue for breach of the Boyd–Smith lease, Appellees have no basis to argue the assignment agreement between Boyd and Sombrero is unenforceable. Appellees are therefore left to argue that this assignment is void because it falls into one of the categories that the Texas Supreme Court has declared void on public policy grounds.

As discussed above, generally causes of action in Texas are freely assignable. *See Gandy,* 925 S.W.2d at 705–707. However, the Texas Supreme Court has recognized several situations where policy concerns

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

outweigh a party's general right to assign a cause of action because the effect of the assignment is to distort the parties' positions so that they have incentives not generally associated with their positions in the underlying dispute. *See Coronado Paint Co., Inc. v. Global Drywall Sys., Inc.,* 47 S.W.3d 28, 31 (Tex.App.-Corpus Christi 2001, pet. denied); *see also Gandy,* 925 S.W.2d at 714 (an assignment of a cause of action that works to collude against an insurance carrier); *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 318 (Tex.App.-San Antonio 1994, writ ref'd) (an assignment of a legal malpractice claim); ***213** *Elbaor v. Smith,* 845 S.W.2d 240, 250 (Tex.1992) (an assignment that creates a Mary Carter agreement); *International Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988) (an assignment of the plaintiff's cause of action to a joint tortfeasor of the defendant); *Trevino v. Turcotte,* 564 S.W.2d 682 (Tex.1978) (an assignment of interests in an estate that distorts the true positions of the beneficiaries).

Appellees fail to explain how this situation falls within one of these categories. They also fail to explain how the assignment between Boyd and Sombrero has so distorted the parties' positions in the litigation that the circumstances warrant the creation of a new category of void assignments. Accordingly, the assignment is not void as a matter of law, and Sombrero has standing to assert Boyd's breach of contract cause of action.

We now turn to the merits of the parties' summary judgment motions. When both sides move for summary judgment, and the trial court grants one motion and denies the other, the reviewing court considers both sides' summary judgment evidence and determines all issues presented. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). The reviewing court must consider all the grounds presented in both motions, and render the judgment the trial court should have rendered. *Id.*

The cross-motions in this case presented both traditional and no-evidence grounds for summary judgment. *See* TEX.R.CIV.P. 166a(c) and 166a(i). An appellate court reviews summary judgment *de novo. Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). When reviewing a no-evidence motion for summary judgment, we must disregard all contrary evidence and inferences, and review the evidence in the light most favorable to the non-movant. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). Once the moving party specifically states the elements to which there is no evidence, the burden shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding each element challenged. *Gray v. Woodville Health Care Ctr.,* 225 S.W.3d 613, 616 (Tex.App.-El Paso 2006, pet. denied). If the non-movant produces more than a scintilla of evidence regarding the challenged elements, a genuine issue of material fact is raised. *Id.* Less than a scintilla of evidence exists if the evidence is so weak as to create no more than a mere surmise or suspicion. *Chapman,* 118 S.W.3d at 751. When the evidence rises to the level that enables reasonable minds to differ in their conclusions, then more than a scintilla exists. *Id.* If the non-movant does not produce more than a scintilla of evidence, the court "must" grant the motion. *See* Tex.R.Civ.P. 166a(i); *Larned v. Gateway East, Inc.,* 186 S.W.3d 597, 601 (Tex.App.-El Paso 2006, no pet.).

Sombrero sued Appellees for breach of contract based on its position as assignee of Boyd's cause of action for breach of the lease. The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the claimant; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 758 (Tex.App.-El Paso 2000, no pet.). Appellees moved for no-evidence summary judgment on the grounds that there was no evidence of a contract between Sombrero and Appel-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

lees, that there was no evidence that Sombrero performed, or tendered performance, and that there was no evidence of damages suffered by Sombrero as a result of Appellees alleged breach of the lease.

**\*214** [17] In the first half of Issue One, Sombrero challenges Appellees' no-evidence grounds regarding its breach of contract cause of action. All of Appellees' no-evidence arguments are based on Appellees' assertion that Sombrero was not a party to the original lease, and did not acquire anything by the assignment from Boyd. Appellees focus their no-evidence arguments on the premise that Sombrero was a stranger to the lease agreement, and therefore cannot provide evidentiary support for its claim. As we discussed in our analysis of Sombrero's standing, Sombrero stepped into Boyd's position regarding the claim for breach. *See* Allan, 777 S.W.2d at 453. The proper summary judgment inquiry revolves around Boyd's relationship to the lease, and Boyd's performance and damages. Sombrero's summary judgment response included evidence focused precisely on those issues. Specifically, Sombrero produced evidence of the original Boyd–Smith lease, evidence of Boyd's tender of bonus payments to Appellees in 1999, 2000, and 2001, and evidence of Appellees' attempted repudiation and recision.[FN3] We conclude, having reviewed the evidence in a light most favorable to the non-movant, the proffered evidence satisfied Sombrero's burden in response to the no-evidence motion. Therefore, summary judgment was not properly granted on Appellees' no-evidence grounds.

> FN3. We decline to address Appellees' argument that Boyd failed to perform because the bonus payments were paid via check rather than "in the coin of the realm." This argument was not presented to the trial court, and has not been preserved for our review. *See* TEX.R.APP.P. 33.1(a).

The scope of review for a traditional summary

judgment is well established. *See* TEX.R.CIV.P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985). We must determine whether the movant has carried its burden to establish that there is no genuine issue of material fact, so that judgment should be granted as a matter of law. *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005). Summary judgment is proper if the defendant disproves at lease one element of the plaintiff's cause of action, *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002), or establishes all elements of an affirmative defense. *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex.2001). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979). As in the case of a no-evidence motion, when reviewing a traditional summary judgment motion, we take as true all competent evidence favorable to the non-movant, indulge every reasonable inference, and resolve any doubts in the non-movant's favor. *See* Southwestern Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex.2002). Unlike a no-evidence motion, a traditional motion for summary judgment must stand on its own merits, there is no right to a traditional summary judgment by default. *See* City of Houston, 589 S.W.2d at 678.

[18] In Issue Two, Sombrero contends the trial court erred by not granting its partial motion for summary judgment. In its cross-motion, Sombrero argued it was entitled to judgment as a matter of law as to Appellees' liability for breach. To establish liability for breach of contract it was Sombrero's burden to establish as a matter of law: (1) the existence of a valid contract; (2) performance or tendered performance by the claimant; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from **\*215** that breach. *Hornburg,* 20 S.W.3d at 758. Sombrero's motion for partial summary judgment was limited to the issue of Appellees' liability for breach of contract. In the body of its motion,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

Sombrero presented arguments for establishing the first three elements of its claim, but failed to address the final element.

The final element in a breach of contract cause of action includes a causation requirement. *See Prudential Sec., Inc. v. Haugland,* 973 S.W.2d 394, 397 (Tex.App.-El Paso 1998, pet. denied). The plaintiff must show that it suffered a monetary injury, as the result of the defendant's breach. *See Haugland,* 973 S.W.2d at 396–97. Accordingly, to be entitled to partial summary judgment as to Appellees' liability it was Sombrero's burden to establish that Boyd was injured, and that the injury was caused by the breach. Sombrero failed to address this issue in its motion for partial summary judgment, and therefore failed to carry its burden to establish liability. Had summary judgment been granted in this instance, before determining the amount of damages which should be awarded, the fact finder would ultimately be required to determine whether Boyd was injured at all, and whether that injury was the result of Appellees' breach. While these issues may have been proven without difficulty, they are part of the claimant's burden in establishing liability, and so cannot be presumed.[FN4] Because Sombrero failed to demonstrate its right to judgment as a matter of law regarding Appellees' liability for breach, this was not a proper ground for summary judgment. Issue Two is overruled.

> FN4. In addition, the Texas Rules of Civil Procedure 166a(a) specifies that partial summary judgments are to be granted in circumstances where a fact issue remains regarding the "amount of damages." When, as in this case, the summary judgment movant has not addressed whether there was damage as the result of a breach, the remaining issue is not limited to the amount of damage, and partial summary judgement would be improper. In this way, the rule distinguishes between whether an individual is damaged,

for liability purposes, and the amount of monetary damages which should be awarded.

[19] In the second half of Issue One, Sombrero addresses Appellees' affirmative defenses. Appellees jointly moved for summary judgment on the affirmative defenses of *res judicata* and limitations. Smith independently moved for summary judgment on the following additional defenses: release, collateral estoppel, one satisfaction rule, election of remedies, judicial estoppel, impossibility of performance, and failure of consideration.

A defendant is entitled to summary judgment on an affirmative defense when the party conclusively establishes each element of the defense asserted. *See Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996). When the material facts are undisputed, the nonmovant may defeat a motion for summary judgment by establishing that the movant's legal position is unsound. *Hanssen v. Our Redeemer Lutheran Church,* 938 S.W.2d 85, 90 (Tex.App.-Dallas 1996, writ denied).

[20][21][22] We will begin with Appellees' joint defenses; *res judicata* and limitations. *Res judicata* is an affirmative defense. Tex.R.Civ.P. 94. The party claiming the defense must prove: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) the identify of the parties or those in privy with them; and (3) a second action based on the same claims as were or could have been raised in the first action. *In re K.S.,* 76 S.W.3d 36, 43 (Tex.App.-Amarillo 2002, no pet.). *Res judicata* precludes both re-litigation of claims that have been fully adjudicated, and subsequent litigation of claims which arise out of the subject matter as the prior *216 litigation, and therefore could have been brought in the prior suit. *See Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 652–53 (Tex.1996); *McFarland v. Bridges,* 104 S.W.3d 906, 909 (Tex.App.-El Paso 2003, no pet.).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

Sombrero is in privity with Boyd by assignment, and Boyd was party in the prior suit. There is no dispute that a final judgment was rendered in the prior action. Finally, in the face of the Partnership's attempted recision and repudiation, Boyd could have asserted a counter-claim in the prior case for breach of contract. *See Ingersoll–Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 211 (Tex.1999) (anticipatory repudiation gives the nonrepudiating party the option of treating the repudiation as a breach, or ignoring the repudiation and awaiting the agreed time for performance).

[23][24][25] However, as Sombrero argues, *res judicata* does not bar a former defendant from asserting a claim in a later action that could have been filed as a counter-claim in the first suit, unless the claim was compulsory in the earlier action. *See Ingersoll– Rand, Co.,* 997 S.W.2d at 207. A counter-claim is compulsory only if: (1) it is within the jurisdiction of the court; (2) the claim is not the subject of another pending action at the time of the filing of the answer; (3) the claim is mature and owned by the defendant at the time of filing the answer; (4) it arose out of the same transaction or occurrence that is the subject matter of the opposing party's claim; (5) it is against an opposing party in the same capacity; and (6) it does not require the presence of third parties over whom the court cannot acquire jurisdiction. *Ingersoll–Rand,* 997 S.W.2d at 207. When *res judicata* is asserted to bar a claim which could have been asserted by a former defendant in a prior suit, the movant's summary judgment burden includes establishing each of these elements. *See id.* at 207.

[26][27][28] Sombrero argues that this breach of contract claim was not a compulsory counter-claim because it was not mature at the time of the prior litigation. A claim is mature when it has accrued. *Id.* at 208–10. In the case of a continuing contract, the limitations period begins to run at the earlier of the following events: (1) when the obligations are complet-

ed; (2) when the contract is terminated according to its terms; or (3) when the contract is anticipatorily repudiated by one party, and the repudiation is adopted by the other party. *Hubble v. Lone Star Contracting Corp.,* 883 S.W.2d 379, 382 (Tex.App.-Fort Worth 1994, writ denied). In other words, when one party attempts to repudiate the contract despite its ongoing obligations, the injured party has the option to treat the contract as still in force and retain its right to sue on the contract; or to treat the breaching party's repudiation as a complete breach and terminate the contract immediately. *See F.D. Stella Prod. Co. v. Scott,* 875 S.W.2d 462, 464 (Tex.App.-Austin 1994, no writ).

The summary judgment evidence establishes that the Partnership attempted to repudiate the lease in early 2000. In response, Boyd chose to continue to honor the lease by tendering its annual bonus payments over the next two years. Boyd retained its right to accept the repudiation and sue on the contract during that period. *See Scott,* 875 S.W.2d at 464. Because Boyd chose to continue to tender its performance during that period, the contract did not terminate until the expiration of the final lease extension period on August 1, 2002. Only then was the breach of contract cause of action mature. The prior lawsuit was filed prior to the breach of **\*217** contract cause of action becoming mature.[FN5] Accordingly, the cause of action was not a compulsory counter-claim, and Appellees are not entitled to summary judgment on the basis of *res judicata. See Ingersoll–Rand,* 997 S.W.2d at 207.

> FN5. The Partnership filed the prior lawsuit on February 9, 2000. *See Boyd Oil & Gas Co.,* 223 S.W.3d at 11.

[29][30][31] Appellees' limitations defense fails for similar reasons. To establish a limitations defense, a defendant must conclusively prove: (1) when the cause of action accrued; and (2) negate the discovery rule, if it applies and has been plead. *See KPMG Peat*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

*Marwick v. Harrison County Housing Finance Corp.,* 988 S.W.2d 746, 748 (Tex.1999). The limitations period for a breach of contract cause of action is four years. TEX.CIV.PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002).

As we discussed above, this breach of contract cause of action accrued on August 1, 2002. Sombrero filed its original petition in this case on July 26, 2006, within the limitations period. Without addressing Boyd's ability to continue to tender its performance despite the attempted repudiation, Appellees argue that Boyd's breach of contract cause of action accrued no later than August 1, 2000. This date, according to Appellees, was the final deadline for Smith's performance as it was the final opportunity for Smith to retract its repudiation prior to the first lease bonus payment. They argue that Boyd did not have the option to continue its own performance until the lease expired on August 1, 2002, because "time is of the essence" in an oil and gas lease. While we agree generally with this statement of law,[FN6] we are unaware of Texas authority holding that a limitations period is affected by a contract's classification as such. Appellees have failed to cite any authority indicating that Boyd's option to immediately treat the repudiation as a breach, or to wait for the lease's termination, was affected by the fact that time is of the essence in the oil and gas context. Because Appellees failed to establish their right to summary judgment on their limitations defense, the defense was not a proper ground for summary judgment.

> FN6. *See Amber Oil & Gas Co. v. Bratton,* 711 S.W.2d 741, 743 (Tex.App.-Austin 1986, no writ) (recognizing that time is of the essence in an oil and gas lease).

[32] Mr. Smith also raised several additional affirmative defenses in his independent summary motion and response. Three of these defenses; release, collateral estoppel, and the one satisfaction rule are all dependant on the success of Appellees' argument

that the prior lawsuit necessarily included litigation of all issues surrounding the Partnership's attempted repudiation, including any claims for breach of contract. Given our conclusion in the discussion of Appellees' *res judicata* defense, that the breach of contract cause of action was not precluded by the prior suit, Mr. Smith is not entitled to summary judgment on these additional defenses.

[33][34][35] Mr. Smith's motion also included the affirmative defense known as "election of remedies." This defense bars recovery when a party successfully exercises an informed choice between two or more remedies, rights, or states of facts which are so inconsistent as to constitute a manifest injustice. *See Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848, 851 (Tex.1980). Although the Texas Supreme Court continues to recognize the defense, it is not favored, and should not be extended. *See Fina Supply, Inc. v. Abilene Nat'l Bank,* 726 S.W.2d 537, 541 (Tex.1987).

According to Mr. Smith's motion:

**\*218** It is undisputed that [Boyd] was successful in the Prior Litigation on the tortious interference claim. [Boyd] had the option, in the Prior Litigation, to sue for various causes of action, including breach of contract. [Boyd] elected to pursue a tortious interference claim rather than a breach of contract claim. Allowing [Sombrero] to bring a breach of contract claim that is inconsistent with the Prior Litigation would be manifestly unjust to [Appellees]. [Appellees] changed their position, by leasing their minerals to a third party after the Lease expired, based on the fact that all causes of action related to the alleged repudiation had been litigated in the Prior Litigation.[FN7]

> FN7. The only summary judgment evidence specifically referenced in this passage is a July 2, 2004, mineral lease between the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

Partnership and a lessee identified as Chalfant Properties, Inc.

To establish a right to this defense, Mr. Smith had to establish, as a matter of law, that Boyd's decision to pursue a tortious interference claim in the prior lawsuit was inconsistent with the breach of contract claim now asserted. *See Bocanegra,* 605 S.W.2d at 851. He has failed to carry his burden in this instance.

[36][37] It is important to recognize these two types of claims accrue in significantly different contexts. A claim for tortious interference is asserted by a plaintiff whose contractual rights have been interfered with by a stranger to the contract; a third party. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 207 (Tex.2002); *see also Marrs and Smith Partnership,* 223 S.W.3d at 19 (noting that Boyd's tortious interference claim alleged that the Partnership, a third party, interfered with Boyd's contractual relationships with two other entities). A breach of contract cause of action on the other hand, addresses a plaintiff's injury for non-performance by the other party to the agreement. *See Hornburg,* 20 S.W.3d at 758. Mr. Smith has failed to cite Texas precedent, and we are unaware of authority holding that such claims are *per se* inconsistent. Rather, in circumstances such as those presented here, where a non-repudiating party exercises its right to delay the assertion of a breach claim, it is not difficult to foresee that during that delay, events could transpire which could lead to a claim for tortious interference. To preclude a party from recovering for both injuries would constitute an improper extension of the election of remedies doctrine. Accordingly, summary judgment was not properly granted on this ground.

[38][39][40] Mr. Smith also asserted the doctrine of judicial estoppel as a bar to Sombrero's claim. Judicial estoppel precludes a party from adopting a position inconsistent with one that was successfully maintained in an earlier proceeding. *Pleasant Glade*

*Assembly of God v. Schubert,* 264 S.W.3d 1, 6 (Tex.2008). The elements of judicial estoppel in Texas are: (1) a sworn, prior inconsistent statement made in a judicial proceeding; (2) which was successfully maintained in the prior proceeding; (3) not made inadvertently or by mistake, or pursuant to duress; and (4) which was deliberate, clear, and unequivocal. *Andrews v. Diamond, Rash, Leslie & Smith,* 959 S.W.2d 646, 650 n. 2 (Tex.App.-El Paso 1997, writ denied).

In support of this defense, Mr. Smith presents a twenty-seven page excerpt from Mr. D.K. Boyd's testimony in the prior lawsuit. In the section provided, Mr. Boyd discusses the terms of the more than 200 leases he obtained in his endeavors to develop the mineral reserves of the Frying Pan Ranch. Mr. Boyd also explains how **\*219** the Partnership's refusal to consent to an assignment of the lease forced Boyd to re-negotiate an independent farmout agreement, specific to the Boyd–Smith lease, while 233 other leases were subject to a second farmout and an assignment to a third entity.

Mr. Smith fails to explain how Mr. Boyd's testimony is inconsistent with the position Sombrero now asserts. As the movant on this affirmative defense, it was Mr. Smith's burden to establish his right to the defense as a matter of law. *See Hood,* 924 S.W.2d at 121. Because the motion fails to address how the proffered evidence constitutes a prior inconsistent statement, Mr. Smith has failed to satisfy his burden and summary judgment was not properly granted on the judicial estoppel defense.

[41][42][43][44] In a section of his summary judgment motion and response titled "failure of contract and failure of consideration," Mr. Smith concludes that because the second and third lease bonus payments tendered by Boyd were returned, there was no consideration to support the lease extensions. A failure of consideration occurs when the plaintiff fails to perform a condition precedent to the defendant's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 S.W.3d 203
**(Cite as: 323 S.W.3d 203)**

duty to perform. *See Nat'l Bank of Commerce v. Williams,* 125 Tex. 619, 84 S.W.2d 691, 692 (1935). The doctrine assumes the contract is already in existence. Consideration consists of either a benefit to the promisor or a detriment to the promisee. *See Tamez v. Southwestern Motor Transp., Inc.,* 155 S.W.3d 564, 571 (Tex.App.-San Antonio 2004, no pet.).

Mr. Smith admits that Boyd tendered the lease bonus payments. Those tenders constituted a detriment to Boyd, and therefore satisfy the definition of consideration. *See id.* at 571. The Partnership's decision to refuse the payments did not simultaneously create a claim for breach and a defense to that claim by depriving the contract of consideration. The evidence established the presence of consideration to support the second and third extensions. The fact that the Partnership chose not to accept that consideration, does not establish a failure of consideration defense.

[45] In another section of his summary judgment response titled "impossibility of performance," Mr. Smith states:

[Sombrero] [has] not produced any evidence to show that they were ready willing, and able to drill the Section 27 well in the spring of 2002. Smith has discovered that there were other mineral interests that were not leased as such time and such mineral interest constituted a far greater percentage of the mineral estate than that of [the Partnership].

Mr. Smith has failed to provide, or cite to, any evidence in the summary judgment record which would support his conclusion that Boyd was unable to perform its obligations under the lease. As the movant on this affirmative defense, it was Mr. Smith's burden to establish his right to the defense as a matter of law. *See Hood,* 924 S.W.2d at 121. Because this conclusory statement fails to establish the elements of the defense as a matter of law, summary judgment was not properly granted on the impossibility de-

fense. Having determined that none of Appellees' affirmative defenses provide proper grounds for summary judgement, Issue One is overruled.

We have determined that Pagosa Oil & Gas Company lacks standing to assert a breach of contract claim in this instance and its claim must be dismissed. Having reviewed the cross-motions for summary judgment, we have concluded: (1) that Appellees are not entitled to a no-evidence summary judgment on the breach of contract**220** cause of action; (2) that Appellant Sombrero did not satisfy its traditional summary judgment burden regarding its claim for breach of contract; and (3) that Appellees were not successful in establishing any of their affirmative defenses as a matter of law. Therefore, we reverse and remand the case for trial on the merits.

Tex.App.–El Paso,2010.
Pagosa Oil and Gas, L.L.C. v. Marrs and Smith Partnership
323 S.W.3d 203

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



## REPUDIATION

**repudiation** (ri-pyoo-dee-**ay**-sh<<schwa>>n), *n.* (16c) **1.***Eccles. law. Rare.* A person's refusal to accept a benefice. **2.** A contracting party's words or actions that indicate an intention not to perform the contract in the future; a threatened breach of contract. Cf. REJECTION (1), (2); RESCISSION; REVOCATION (1)). [Cases: Contracts 313(2).] — **repudiatory** (ri-pyoo-dee-<<schwa>>-tor-ee), **repudiable** (ri-**pyoo**-dee-<<schwa>>-b<<schwa>>l), *adj.*

"A repudiation is (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach ... , or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." Restatement (Second) of Contracts § 250 (1979).

"In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform. Mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation, although such an expression may give an obligee reasonable grounds to believe that the obligor will commit a serious breach and may ultimately result in a repudiation.... However, language that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation." Restatement (Second) of Contracts § 250, cmt. b (1979).

***anticipatory repudiation.***(1913) Repudiation of a contractual duty before the time for performance, giving the injured party an immediate right to damages for total breach, as well as discharging the injured party's remaining duties of performance. • This type of repudiation occurs when the promisor unequivocally disavows any intention to perform when the time for performance comes. Once the repudiation occurs, the nonrepudiating party has three options: (1) treat the repudiation as an immediate breach and sue for damages; (2) ignore the repudiation, urge the repudiator to perform, wait for the specified time of performance, and sue if the repudiating party does not perform; or (3) cancel the contract. — Also termed *renunciation.* See *anticipatory breach* under BREACH OF CONTRACT. [Cases: Contracts 313.]

The Restatement lists three actions that constitute anticipatory repudiation: "(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties; (b) transferring or contracting to transfer to a third person an interest in specific land, goods, or in any other thing essential for the substantial performance of his contractual duties; (c) any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible." Restatement (Second) of Contracts § 318 (1979).

***total repudiation.***(1859) An unconditional refusal by a party to perform the acts required by a contract. • This type of repudiation justifies the other party in refraining from performance. [Cases: Contracts 313.]

© 2009 Thomson Reuters

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

C

United States District Court,
District of Columbia.
James C. MARTIN, Plaintiff,
v.
Michael B. DONLEY, Secretary of the Air Force,
Defendant.

Civil Action No. 11–1590 (RBW).
Aug. 21, 2012.

**Background:** Former reservist in the Air Force filed action challenging the decision of the Board for the Correction of Military Records, which denied his **request** for the change of the designation of his discharge to honorable. Defendant moved to dismiss.

**Holdings:** The District **Court**, Reggie B. Walton, J., held that:
(1) reservist's action did **not** fall under the purview of the Tucker Act, so that District **Court** jurisdiction under the **Administrative** Procedure Act (APA) was proper, and
(2) Board's decision was **not** arbitrary and capricious.

Motion granted.

West Headnotes

**[1]** Administrative Law and Procedure 15A
☞811

15A **Administrative** Law and Procedure
    15AV Judicial Review of **Administrative** Decisions
        15AV(F) Determination

15Ak811 k. In general. Most Cited Cases

Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the **administrative** record and consistent with the **Administrative** Procedure Act (APA) standard of review. 5 U.S.C.A. § 702.

**[2]** Administrative Law and Procedure 15A
☞788

15A **Administrative** Law and Procedure
    15AV Judicial Review of **Administrative** Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak788 k. Determination supported by evidence in general. Most Cited Cases

Under the **Administrative** Procedure Act (APA), it is the role of the **administrative** agency to resolve factual issues to arrive at a decision that is supported by the **administrative** record, whereas the function of the district **court** on judicial review is to determine whether or **not** as a matter of law the evidence in the **administrative** record permitted the agency to make the decision it did. 5 U.S.C.A. § 702.

**[3]** Administrative Law and Procedure 15A
☞662

15A **Administrative** Law and Procedure
    15AV Judicial Review of **Administrative** Decisions
        15AV(A) In General
            15Ak662 k. Other remedy, availability or prior use of. Most Cited Cases

An **Administrative** Procedure Act (APA) claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

is only appropriately pleaded when there is no other adequate remedy. 5 U.S.C.A. § 702.

**[4] United States 393 ⟷125(3)**

393 United States
   393IX Actions
     393k125 Liability and Consent of United States to Be Sued
       393k125(3) k. Necessity of waiver or consent. Most Cited Cases

**United States 393 ⟷125(7)**

393 United States
   393IX Actions
     393k125 Liability and Consent of United States to Be Sued
       393k125(7) k. Conditions and restrictions. Most Cited Cases

    As a sovereign, the United States may not be sued except by its consent, and a fortiori the government can place conditions on the circumstances under which it will consent to suit.

**[5] Federal Courts 170B ⟷974.1**

170B Federal Courts
   170BIX District Courts
     170BIX(A) In General
       170Bk974 Claims Against the United States
         170Bk974.1 k. In general. Most Cited Cases

    Federal jurisdiction under the Tucker Act is proper only if the plaintiff seeks money or the district court grants it. 28 U.S.C.A. § 1346(a)(2).

**[6] Federal Courts 170B ⟷974.1**

170B Federal Courts
   170BIX District Courts
     170BIX(A) In General
       170Bk974 Claims Against the United States
         170Bk974.1 k. In general. Most Cited Cases

    Because plaintiffs may try to avoid Tucker Act jurisdiction by converting complaints which at their essence seek money damages from the government into complaints **requesting** injunctive **relief** or declaratory actions, district **courts** must **look** to the complaint's **substance**, **not** merely its **form**. 28 U.S.C.A. § 1346(a)(2).

**[7] Federal Courts 170B ⟷974.1**

170B Federal **Courts**
   170BIX District **Courts**
     170BIX(A) In General
       170Bk974 Claims Against the United States
         170Bk974.1 k. In general. Most Cited Cases

    District **courts** weigh the relative importance of the monetary recovery against the equitable **relief**, and find Tucker Act jurisdiction where the injunctive **relief** sought is of negligible worth or lacks considerable value. 28 U.S.C.A. § 1346(a)(2).

**[8] Federal Courts 170B ⟷974.1**

170B Federal **Courts**
   170BIX District **Courts**
     170BIX(A) In General
       170Bk974 Claims Against the United States
         170Bk974.1 k. In general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

A district **court** will **not** lose **Administrative** Procedure Act (APA) jurisdiction over a claim for injunctive **relief** where that injunctive **relief** triggers the payments of money, so long as the injunctive **relief** is of sufficient importance relative to the monetary award to support jurisdiction. 5 U.S.C.A. § 702; 28 U.S.C.A. § 1346(a)(2).

**[9] Federal Courts 170B 🔑1036**

170B Federal **Courts**
    170BXI **Courts** of District of Columbia
        170BXI(A) In General; District **Court**
            170Bk1035 Jurisdiction of District **Court**
                170Bk1036 k. Subject-matter jurisdiction. Most Cited Cases

Former Air Force reservist's action seeking the correction of the characterization of his discharge from general to honorable did **not** fall under the purview of the Tucker Act, so that District **Court** jurisdiction under the **Administrative** Procedure Act (APA) was proper; reservist did **not** explicitly **request** money damages, his **requested relief** was **not** in essence a **request** for money, any financial benefit reservist could recover in the **form** of back pay or benefits would **not** come from an award of money damages, but would be the result of the change in his status from the record correction, and the nonmonetary **relief** he sought had considerable value in the **form** of elimination of stigma associated with general military discharge. 5 U.S.C.A. § 702; 28 U.S.C.A. § 1346(a)(2).

**[10] Federal Courts 170B 🔑974.1**

170B Federal **Courts**
    170BIX District **Courts**
        170BIX(A) In General
            170Bk974 Claims Against the United States

170Bk974.1 k. In general. Most Cited Cases

As it relates to a complaint against the government which does **not request** monetary **relief**, a plaintiff's waiver of damages in excess of $10,000 is ambiguous at best, and thus, does **not** support district **court's** subject matter jurisdiction under the Little Tucker Act; there is no monetary claim to waive. 28 U.S.C.A. § 1346(a)(2).

**[11] Armed Services 34 🔑11(2)**

34 Armed Services
    34I In General
        34k6 Officers
            34k11 Discharge or Dismissal
                34k11(2) k. Grounds in general. Most Cited Cases

**Armed Services 34 🔑11(6)**

34 Armed Services
    34I In General
        34k6 Officers
            34k11 Discharge or Dismissal
                34k11(6) k. Correction of records. Most Cited Cases

Decision of the Board for the Correction of Military Records, which denied former Air Force reservist's request for the change of the characterization of his discharge from general to honorable, was not arbitrary and capricious; reservist received general discharge because he had refused direct order to submit to vaccination which was mandatory at time, Board sought nine advisory opinions from various offices in the Air Force before making its final ruling, and reservist made an informed decision to resign, rather than face involuntary discharge proceedings. 5 U.S.C.A. § 702; 10 U.S.C.A. § 1552.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

**[12]** **Administrative Law and Procedure 15A** 751

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(D) Scope of Review in General
      15Ak751 k. Limitation of scope of review in general. Most Cited Cases

**Administrative Law and Procedure 15A** 760

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(D) Scope of Review in General
      15Ak754 Discretion of Administrative Agency
         15Ak760 k. Wisdom, judgment or opinion. Most Cited Cases

The Administrative Procedure Act (APA) sets forth a narrow standard of review as courts must defer to the administrative agency's expertise. 5 U.S.C.A. § 706(2).

**[13]** **Armed Services 34** 5(8)

34 Armed Services
   34I In General
      34k5 Persons in the Armed Services, and Militia Called Into Service of the United States
      34k5(8) k. Judicial intervention or review. Most Cited Cases

Decisions of the Board for the Correction of Military Records are evaluated by an unusually deferential application of the Administrative Procedure Act's (APA) arbitrary or capricious standard, in light of statutory discretion granted to the Board and the Secretary of the Air Force with respect to records corrections. 5 U.S.C.A. § 706(2); 10 U.S.C.A. § 1552(a).

**[14]** **Armed Services 34** 5(7)

34 Armed Services
   34I In General
      34k5 Persons in the Armed Services, and Militia Called Into Service of the United States
      34k5(7) k. Correction of records. Most Cited Cases

**Armed Services 34** 5(8)

34 Armed Services
   34I In General
      34k5 Persons in the Armed Services, and Militia Called Into Service of the United States
      34k5(8) k. Judicial intervention or review. Most Cited Cases

The decision by the Board of the Correction of Military Records need not be a model of analytic precision, but it must minimally contain a rational connection between the facts found and the choice made to be upheld on judicial review under the Administrative Procedure Act (APA). 5 U.S.C.A. § 706(2); 10 U.S.C.A. § 1552(a).

**[15]** **Administrative Law and Procedure 15A** 676

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(A) In General
      15Ak676 k. Record. Most Cited Cases

Under the Administrative Procedure Act (APA) standard of review, the court ensures that the administrative agency examined the relevant data and articulated a satisfactory explanation for its action, by limiting its review to the administrative record al-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

ready in existence and not some new record made initially in the reviewing court. 5 U.S.C.A. § 706(2).


**[16] Administrative Law and Procedure 15A ⬤═474**

15A Administrative Law and Procedure
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(D) Hearings and Adjudications
         15Ak469 Hearing
            15Ak474 k. Attorney, representation by. Most Cited Cases


**Attorney and Client 45 ⬤═62**

45 Attorney and Client
   45II Retainer and Authority
      45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases


    A district court and an administrative agency must take pains to protect the rights of pro se parties against the consequences of technical errors, by holding them to less stringent standards.


**[17] Administrative Law and Procedure 15A ⬤═502**

15A Administrative Law and Procedure
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(D) Hearings and Adjudications
         15Ak502 k. Stare decisis; estoppel to change decision. Most Cited Cases


    Although an administrative agency must adhere to its precedents in adjudicating the cases before it, under the Administrative Procedure Act (APA), a reviewing court does not require the agency to grapple with every last one of its precedents no matter

how distinguishable. 5 U.S.C.A. § 706(2).


**[18] Administrative Law and Procedure 15A ⬤═502**

15A Administrative Law and Procedure
   15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
      15AIV(D) Hearings and Adjudications
         15Ak502 k. Stare decisis; estoppel to change decision. Most Cited Cases


    Under the Administrative Procedure Act (APA), a reviewing court will permit the administrative agency action to stand where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears. 5 U.S.C.A. § 706(2).


**\*3** David Patrick Sheldon, Law Office of David P. Sheldon, Washington, DC, for Plaintiff.

Peter Bryce, U.S. Department of Justice, Washington, DC, for Defendant.


*MEMORANDUM OPINION*

REGGIE B. WALTON, District Judge.

    This case arises from claims that the defendant, in his official capacity as the head of the Department of the Air Force with "final authority over [the] correction of records," unjustifiably denied the plaintiff's request for various record corrections pertaining to his resignation from the Air Force Reserve. Complaint ("Compl.") ¶¶ 3, 7, 9. Currently before the Court is the Defendant's Motion to Dismiss ("Def.'s Mot.").[FN1] For the reasons explained below, the Court will grant the defendant's motions.

        FN1. In addition to the documents already referenced, in resolving the Defendant's Motion to Dismiss, the Court considered the following filings: the Defendant's Memo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

randum of Points and Authorities in Support of Defendant's Motion to Dismiss ("Def.'s Mem."); the plaintiff's Opposition the Defendant's Motion to Dismiss ("Pl.'s Opp'n"); the Defendant's Reply in Further Support of Motion to Dismiss ("Def.'s Reply"); and the **Administrative** Record ("A. R.").

## I. BACKGROUND

A. *The Anthrax Vaccination Immunization Program*

According to the Center for Disease Control ("CDC") "[a]nthrax is an acute infectious disease caused by [a] spore-**forming** bacterium." CDC, *Questions and Answers About Anthrax,* EMERGENCY PREPAREDNESS & RESPONSE (Aug. 20, 2008) http:// www. bt. cdc. gov/ agent/ anthrax/ faq/ (last updated Aug. 20, 2008). "Anthrax spores can be used as a bioterrorist weapon," with infections occurring in three forms: "cutaneous (skin), inhalation, and gastrointestinal." *Id.*

In 1970, the National Institutes of Health ("NIH"), the agency then responsible for licensing biological drugs, licensed Anthrax Vaccine Absorbed ("AVA") "for use against anthrax." Def.'s Mem. at 3; *see also* Pl.'s Opp'n at 1. The NIH's AVA license did not "differentiat[e] among possible uses or limit [ ] the license to particular routes of exposure." Def.'s Mem. at 21 (internal citation omitted). Subsequently, licensing authority was delegated to the Federal Drug Administration ["FDA"] and the FDA began a "review process to determine whether previously licensed products, including AVA, were safe, effective, and not misbranded." Def.'s Mem. at 3 (internal quotations and citations omitted). In 1985, an FDA panel noted that "AVA was **\*4** not licensed against inhalation anthrax." Pl.'s Opp'n at 29. In 1996, the maker of AVA submitted an Investigational New Drug Application to the FDA, for the "purpose of obtaining a specific indication for inhalation anthrax," which remained pending for several decades. *Id.* (internal quotations omitted). As a result, in December 2003, the AVA label still "did not specify

which method of anthrax exposure the [v]accine protected against." *Id.*

In 1997, the Department of Defense ("DoD") initiated the Anthrax Vaccination Immunization Program (the "vaccination program"), "which required members of the Armed Forces at risk of anthrax exposure to submit to mandatory vaccination." Def.'s Mem. at 3; *see also* Compl. ¶ 12. The following year, 1998, the vaccination program took effect and AVA inoculations began "as a preventative measure against inhalation anthrax." Compl. ¶¶ 12, 14. That same year, Congress enacted 10 U.S.C. § 1107, which proscribes the "administration of 'investigational' new drugs, or drugs unapproved for their intended use, to service members without their informed consent." *Id.* ¶ 13 (internal citations omitted). The requirement that the member provide consent to receive the investigational drug may be waived only by the President. *Id.* In 1999, President Clinton issued Executive Order 13139, which implemented the informed consent requirement and declared that presidential waiver would only be granted "when absolutely necessary." *Id.* ¶ 16 (internal quotation omitted).

The vaccination program was implemented without complications until July 17, 2000 when the DoD "dramatically reduce[d] the number of [AVA] inoculations due to an unexpected delay in the availability of vaccine supplies approved by the [FDA] as safe and effective." *Id.* ¶ 17. The DoD thus maintained the vaccination program only for personnel in areas of "highest threat." *Id.* In August 2000, the DoD "formally adopted the informed consent requirement" mandated by 10 U.S.C. § 1107. *Id.* ¶ 18. Nevertheless, on June 28, 2002, the DoD resumed the vaccination program with "mandatory inoculation[s] for military personnel ... at higher risk whose performance is essential for certain mission critical capabilities." *Id.* ¶ 19.

Since the 1997 initiation of the vaccination pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

gram, there have been several "challenges to the legality of orders requiring military personnel to take [AVA]." Def's Mem. at 3. Notably, in 2003, Judge Emmet Sullivan of this Court ruled that, with regard to inhalation anthrax, "AVA is an investigational drug ... [that was] being used for an unapproved purpose" in violation of 10 U.S.C. § 1107. *Id.* ¶ 35 (citing *Doe v. Rumsfeld,* 297 F.Supp.2d 119, 135 (D.D.C.2003)). He then granted the plaintiffs' request for a preliminary injunction and enjoined inoculation under the vaccination program. *Id.*

Shortly after the *Doe* ruling, the FDA issued a final rule and order "[finding] that AVA was safe and effective 'independent of the route of exposure.' " *Id.* ¶ 36 (quoting 69 Fed.Reg. 255, 260 (Jan. 5, 2004)). Judge Sullivan, nonetheless, vacated the FDA's rule and order because "the FDA failed to follow [required] notice and comment procedures." *Id.* ¶ 37 (citing *Doe v. Rumsfeld,* 341 F.Supp.2d 1, 16 (D.D.C.2004)). Finding a clear statutory prohibition on inoculation with investigational drugs, "Judge Sullivan issued a permanent injunction" on the vaccination program until the FDA certified AVA through the proper procedures. *Id.* ¶ 38 (citing *Doe,* 341 F.Supp.2d at 16).

Finally, in December 2005, the FDA issued a new final order "explicitly finding AVA efficacious against inhalation anthrax," *id.* ¶ 39 (citing *Doe v. Rumsfeld,* 501 F.Supp.2d 186, 188 (D.D.C.2007)) (internal **5** citation omitted)), causing the District of Columbia Circuit to subsequently conclude that the injunction against the vaccination program had "dissolved on its own terms." The program was thus reinstated. *Id.* ¶ 39 (citing *Doe v. Rumsfeld,* 172 Fed.Appx., 327, 327 (D.C.Cir.2006)).

Following the *Doe* rulings, Judge James Robertson, a former member of this Court, declared that "prior to the FDA's December 2005 rulemaking, it was a violation of federal law for military personnel to be subjected to involuntary AVA inoculation be-

cause the vaccine was neither the subject of a presidential waiver nor licensed for use against inhalation anthrax." *Id.* ¶ 40 (quoting *Rempfer v. U.S. Dep't of Air Force Bd. for Corr. of Military Records,* 538 F.Supp.2d 200, 210 (D.D.C.2008)).

Notwithstanding the prior litigation in this Court, other courts have found that AVA has been properly licensed since 1970 and, therefore "the vaccination program [is] ... a 'lawful response by [the military] to the dangers with which the military personnel of the United States may be confronted in the future.' " Def's Mem. at 3 (quoting *O'Neil v. Secretary of the Navy,* 76 F.Supp.2d 641, 645 (W.D.Pa.1999)). And the Court of Appeals for the Armed Forces concluded in 2006 that AVA was properly licensed since 1970 and held "that the *Doe* court decisions did not affect the legality of the [v]accination order." *Id.* at 6–7 (referencing *United States v. Kisala,* 64 M.J. 50, 54 (C.A.A.F.2006)).

**B.** *The Plaintiff's Factual Assertions*

Drawing all justifiable inferences in favor of the plaintiff, as the Court must, the factual allegations underlying this lawsuit are as follows. In 1992, the plaintiff enlisted in the United States Marine Corps Reserve and was later discharged in 1995. Compl. ¶ 8. Subsequently, the plaintiff joined the Air Force Reserve and was gradually promoted until he reached the rank of First Lieutenant in 1999. *Id.* ¶¶ 8, 10. Throughout his military career, the plaintiff "amassed an exemplary military record" demonstrating that he was a "highly competent officer" who "met all performance standards and earned positive assessments from his raters and reviewers." *Id.* ¶ 11.

By April 2000, the plaintiff had received three shots of a six-shot series of AVA as part of the DoD's vaccination program. *Id.* ¶¶ 21, 12, 14. The plaintiff had adverse reactions to AVA and "his reaction worsened" with each shot. *Id.* ¶ 21. After his third shot of AVA, the plaintiff became "dizzy," felt "extreme pain throughout his body that made it difficult

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

to move," and experienced "extreme sore[ness] and ... severe headaches." *Id.* The worst effects lasted approximately ten days and it took "another week [for the plaintiff] to fully recover." *Id.* On April 18, 2000, the plaintiff reported his symptoms and expressed his "concerns about severe, long-term reactions to [AVA]" to "medical personnel who completed a Vaccine Adverse Event Reporting System report." *Id.* ¶¶ 22, 23. That same day, the plaintiff requested to be "separated from the Air Force," but his request was later denied. *Id.* ¶¶ 23, 24.

On May 10, 2000, the plaintiff "willfully disobey[ed] a lawful command from his superior officer ... to have himself inoculated with [AVA]." *Id.* ¶ 27. The following day the plaintiff was offered a nonjudicial punishment for his transgression, which he accepted. *Id.* ¶ 25. The punishment consisted of "a forfeiture of $605[ ] per month for two months and a Letter of Reprimand." *Id.* ¶ 26.

Approximately a month later, the plaintiff's commander informed him that "he was facing involuntar[y] discharge from the Air Force for the commission of a serious offense." Pl.'s Opp'n at 6. Rather than face "further administrative actions," **\*6** the plaintiff "[t]endered his resignation" on June 12, 2000. Compl. ¶ 28. A few weeks later, the plaintiff's "request [for resignation] was found legally sufficient" and was endorsed by several superior officers, including the Secretary of the Air Force. *Id.* ¶¶ 29–30. Ultimately, the plaintiff's resignation was approved and he was "discharged with a general (under honorable conditions)" characterization. *Id.* ¶¶ 31, 32.

## C. *The Plaintiff's Pursuit of **Administrative** Remedies and the **Parties' ** Arguments*

On July 30, 2003, the plaintiff applied to the Air Force Discharge Review Board ("Review Board"), "**requesting** an upgrade of [his] discharge characterization to Honorable" as a matter of equity. *Id.* ¶¶ 41, 42. His **request** was based on the DoD's "change in ... policy regarding **administration** of the vaccination

program," which would have allowed him to withhold consent and avoid AVA inoculation without disobeying a lawful order, and on "his otherwise meritorious service." *Id.* ¶ 42. The Review Board denied the plaintiff's **request** in February 2004. *Id.* ¶ 43.

In October 2008, the plaintiff petitioned the Air Force Board for the Correction of Military Records ("Board for Correction"), seeking several **forms** of **relief**, including his previous demand for a "[c]hange of character of service to Honorable," on the basis that the order to submit to AVA injection was illegal. *Id.* ¶ 44. Following nine advisory opinions, two supplementary advisory opinions, and an additional advisory opinion from the Air Force Administrative Law Division—all of which recommended denial— the plaintiff's request was formally denied on April 23, 2010. *Id.* ¶¶ 47–73.

As a result, the plaintiff brought this case challenging the Board for Correction decision as "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise contrary to law." *Id.* ¶ 87. In response, the defendant filed the motion to dismiss currently before the Court. Def.'s Mot. The defendant asserts that the plaintiff's challenge to the Board for Correction decision is meritless because "[AVA] has been legally licensed for inoculation against anthrax since 1970" and the order to submit to AVA inoculation was lawful. Def.'s Mem. at 20. The plaintiff responds by arguing that his claim is meritorious because he was properly entitled to the requested corrections from the Board for Correction because, pursuant to the rulings in *Doe*, "it is settled law in this jurisdiction that pre–2005 military orders to involuntarily inoculate service members were illegal." Pl.'s Opp'n at 26. Accordingly, he contends that the Board for Correction was required "to correct all orders emanating from the illegal orders, [including] non-judicial punishment records as well as the adverse discharge documentation." *Id.* at 33. This Memorandum Opinion addresses these arguments.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

## II. STANDARD OF REVIEW

The defendant has moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). However, Rule 12(d) provides that "if, on a motion under Rule 12(b)(6) ..., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). Because both parties have presented material outside the pleadings (namely, the administrative record) for the Court to consider in adjudicating the motions, the Court deems it appropriate to treat the defendant's motion to dismiss as a motion for summary judgment. *See* **\*7** *Marshall Cnty. Health Care. Auth. v. Shalala,* 988 F.2d 1221, 1226 & n. 5 (D.C.Cir.1993) (noting that a district court considering a Rule 12(b)(6) motion "*can* consult the [administrative] record to answer the legal question[s] before the court," but that "[i]t is probably *the better practice* for a district court always to convert to summary judgment." (emphases added)).

[1][2] "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [Administrative Procedure Act, 5 U.S.C. § 702 (2006),] standard of review." *Loma Linda Univ. Med. Ctr. v. Sebelius,* 684 F.Supp.2d 42, 52 (D.D.C.2010) (citing *Stuttering Found. of Am. v. Springer,* 498 F.Supp.2d 203, 207 (D.D.C.2007)); *see also Richards v. INS,* 554 F.2d 1173, 1177 & n. 28 (D.C.Cir.1977). But due to the limited role of a court in reviewing the administrative record, the typical summary judgment standards set forth in Rule 56 are not applicable. *Stuttering,* 498 F.Supp.2d at 207 (citation omitted). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a mat-

ter of law the evidence in the administrative record permitted the agency to make the decision it did.' " *Id.* (quoting *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769–70 (9th Cir.1985)).

## III. LEGAL ANALYSIS

A. *The Court's Jurisdiction Over Claims Against the Federal Government*

[3] As an initial matter, the Court must decide whether, and on what basis, it possesses jurisdiction to review the parties' claims. The defendant contends that the plaintiff is seeking monetary damages, and that this action is thus one based in part on the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (2006).[FN2] Def.'s Mem. at 12–15. The plaintiff maintains, however, that this suit is one properly brought under the Administrative Procedure Act ("APA"). Compl. ¶ 1. Because an APA claim is only appropriately pleaded "when there is no other adequate remedy," the Court must first determine whether this action is one properly brought under the Tucker Act. *Calloway v. Brownlee,* 366 F.Supp.2d 43, 50 (D.D.C.2005) (internal citation omitted).[FN3]

> FN2. "The Tucker Act consists of 28 U.S.C. § 1491, which sets out the jurisdiction of the Claims Court, and § 1346(a)(2), which gives concurrent jurisdiction to the district courts for claims not exceeding $10,000. The Federal Circuit affectionately refers to the latter section as the "Little Tucker Act." " *Van Drasek v. Lehman,* 762 F.2d 1065, 1067 (D.C.Cir.1985). Both sections will be referenced in this Memorandum Opinion as the Tucker Act.

> FN3. If this suit were characterized as one for money damages, there is no dispute that this Court's jurisdiction would be pursuant to the Tucker Act, as the plaintiff has waived "any right or entitlement to recover monetary damages greater than $10,000," Compl. ¶ 5; Def.'s Mem. at 12–13; Pl.'s

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

Opp'n at 15–17.

[4] "As a sovereign, the United States may not be sued except by its consent, and *a fortiori* the government can place conditions on the circumstances under which it will consent to suit." *Bublitz v. Brownlee,* 309 F.Supp.2d 1, 5 (D.D.C.2004) (internal citations omitted). The APA and the Tucker Act both waive sovereign immunity, allowing plaintiffs to sue the United States in specific circumstances. Under the APA, a plaintiff may sue the United States "in the district courts for remedies *other* than money damages arising from an agency's unlawful action." *Id.* (emphasis *8 in the original); *see* 5 U.S.C. §§ 701–06. Alternatively, the Tucker Act grants the United States Court of Federal Claims exclusive jurisdiction to "hear monetary claims against the United States founded either upon an express or implied contract or upon a provision of the Constitution, or any Act of Congress, or any regulation of an executive department that 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained,' " *Cartwright Int'l Van Lines, Inc. v. Doan,* 525 F.Supp.2d 187, 194 (D.D.C.2007) (quoting *United States v. Mitchell,* 463 U.S. 206, 217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)), "even if such claims could be brought within the terms of some other jurisdictional grant," *Brown v. West,* 1995 WL 623038 *1, *3 (D.D.C.1995); *see* 28 U.S.C. § 1491; *Bowen v. Massachusetts,* 487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). Additionally, the Tucker Act grants "district courts concurrent jurisdiction with the Court of Federal Claims in most Tucker Act cases seeking less than $10,000." *Kidwell v. Dep't of the Army,* 56 F.3d 279, 283 (D.C.Cir.1995) (citing 28 U.S.C. § 1346(a)(2)).

[5] The District of Columbia Circuit has established a bright-line test for determining whether a plaintiff's claim regarding an agency's actions should be considered under the district court's APA jurisdiction or its Tucker Act jurisdiction. *Kidwell,* 56 F.3d at 284–87. Under this test, a case is considered a Tucker

Act case "only if the plaintiff seeks money or the district court grants it." *Id.* at 285. Accordingly, "complaints requesting injunctive relief generally will be taken at their word for jurisdictional purposes." *Bublitz,* 309 F.Supp.2d at 6 (citing *Vietnam Veterans of Am. v. Sec'y of the Navy,* 843 F.2d 528, 535 (D.C.Cir.1988)).

[6][7][8] Nevertheless, as this **Court** has noted, "the bright-line rule ... turns out to be rather dim, for the **court** of appeals has recognized that **not** all complaints asking for equitable **relief** will be taken at face value." *Id.; see Kidwell,* 56 F.3d at 283 ("The plain language of a complaint ... does **not** necessarily settle the question of Tucker Act jurisdiction."). Because plaintiffs may try to avoid Tucker Act jurisdiction "by converting complaints which 'at their essence' seek money damages from the government into complaints **requesting** injunctive **relief** or declaratory actions," district **courts** must "**look** to the complaint's **substance**, **not** merely its **form**." *Kidwell,* 56 F.3d at 284. To do this, district **courts** "weigh the relative importance of the monetary recovery against the equitable **relief**, and [find Tucker Act] jurisdiction where the injunctive **relief** sought is of 'negligible' worth or lacks 'considerable' value." *Bublitz,* 309 F.Supp.2d at 8 (citing *Kidwell,* 56 F.3d at 284). Thus "a district **court** will **not** lose [APA] jurisdiction over a claim for injunctive **relief** where that injunctive **relief** triggers the payments of money, so long as the injunctive **relief** is of sufficient importance relative to the monetary award to support jurisdiction." *Id.* (emphasis omitted); *see Wolfe v. Marsh,* 846 F.2d 782, 784 n. 3 (D.C.Cir.1988).

[9] Applying this Circuit's *Kidwell* bright-line test and subsequent cases interpreting that test to the present litigation, the Court finds: (1) that the plaintiff has not explicitly requested money damages, and (2) that the plaintiff's requested relief is not in essence a request for money. Accordingly, the plaintiff's cause of action does not fall under the purview of the Tucker Act. In *Kidwell,* a plaintiff asked the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

court to "correct [his] army record to reflect military retirement in pay grade E–4 ... [and] any other relief he may be entitled to," 56 F.3d at 283. Similarly, the plaintiff in the instant case has asked the Court to "correct [his] record to **\*9** reflect credit for back pay and allowances ... and grant any other relief." Compl. (Prayer for Relief) at 20. The District of Columbia Circuit held that because the plaintiff in *Kidwell* "d[id] not explicitly request monetary relief from the United States, jurisdiction under the APA would appear to lie." 56 F.3d at 284. Correspondingly, because the plaintiff here has not explicitly sought monetary relief his suit is properly pleaded under the APA.

Moreover, "any financial benefit [the] plaintiff may receive would not come from an award of money damages by this Court but from the change in his status that would result from the correction of his military records." *Charlton v. Donley,* 611 F.Supp.2d 73, 76 (D.D.C.2009); *see Kidwell,* 56 F.3d at 285–86 ("[A]ny monetary benefits that may flow from [the plaintiff's record correction] would not come from [this] court's exercise of jurisdiction, but from the structure of the statutory and regulatory requirement governing compensation when a servicemember's files change."); *Tootle v. Sec'y of Navy,* 446 F.3d 167, 175 (D.C.Cir.2006) ("[A]ny monetary benefits that might flow if [the plaintiff] prevails on his nonmonetary claims [for record corrections] will not come from the [d]istrict [c]ourt's exercise of jurisdiction." (citing *Kidwell,* 56 F.3d at 285–86)). As this Circuit has acknowledged, such "collateral consequences of equitable relief do not implicate the Little Tucker Act." *Wolfe,* 846 F.2d at 784. Accordingly, it is irrelevant that the plaintiff here may receive credit for back pay as a consequence of his requested record corrections, or that he "hints at some interest in a monetary reward from the federal government," *Kidwell,* 56 F.3d at 284, because "a claim is not for money [damages] merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff," *Vietnam Veterans of Am.,* 843 F.2d at 534.

[10] Additionally, the defendant's contention that the plaintiff's waiver of "any right or entitlement to recover monetary damages greater than $10,000 in this action," Compl. ¶ 5, "avails [the plaintiff] of this [Court's] concurrent jurisdiction under the Little Tucker Act," Def.'s Mem. at 13, is incorrect. It is well established in this Circuit that "[a]s it relate[s] to a complaint which does not request monetary relief, [a plaintiff's] waiver [of damages in excess of $10,000] is ambiguous at best; there [is] no monetary claim to waive." *Wolfe,* 846 F.2d at 784. Because "it is an extremely rare plaintiff who has trouble asking for money, if that is what he wants," courts will not imply monetary claims when the plaintiff has not explicitly requested them. *Id.* at 784 n. 2. "Given the need for certainty ..., [the Court] cannot allow [the] plaintiff's subjective intent, ambiguously expressed, to control the issue [of proper subject matter jurisdiction]." *Id.* at 785.

Furthermore, this Court finds that beyond the complaint's plain language, the plaintiff's request is not "in essence" one for money damages because the record correction it seeks is "valuable non-monetary relief." *Kidwell,* 56 F.3d at 286. As this Circuit has repeatedly recognized "a plaintiff seeking a change in discharge status has sought non-monetary relief that is not 'negligible in comparison' to the likely monetary benefit [the] plaintiff might receive as a result of the change in status." *Charlton,* 611 F.Supp.2d at 77; *see Smalls v. United States,* 471 F.3d 186, 190 (D.C.Cir.2006) (holding that a district court has jurisdiction to change a plaintiff's discharge status even if doing so would automatically entitle the plaintiff to retirement benefits); *Tootle,* 446 F.3d at 176 (finding that a district court has jurisdiction over a plaintiff's record correction claim even if such a correction would entitle him to retirement benefits).

**\*10** Here, the plaintiff requests "relief [that] is equitable, seeking declaratory or injunctive relief." Pl.'s Opp'n at 14. Most importantly, the plaintiff asks

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

this Court to "[o]rder the Board for Correction to remove the adverse 'Misconduct' narrative characterization [in his record] ... and to modify [his] record to reflect that [he] was retired and not adversely discharged," Compl. (Prayer for Relief) at 19–20; *see* Compl. ¶ 32 (currently the plaintiff's record reflects a "general [discharge] (under honorable conditions)"). This Circuit has recognized that raising a plaintiff's discharge status "would lift some of the shame associated with failing to receive an honorable discharge." *Kidwell*, 56 F.3d at 284; *see generally* Christopher H. Lunding, *Judicial Review of Military Administrative Discharges*, 83 Yale L.J. 33, 35 (1973) (noting the stigma that flows from a general discharge). Furthermore, this Court has previously accepted that the elimination of such stigma has "considerable value." *Calloway*, 366 F.Supp.2d at 51. In the case at hand, then, the plaintiff seeks equitable "non-monetary relief that is 'not negligible in comparison' to the likely monetary benefit [the] plaintiff might receive as a result of the change in status." *Charlton*, 611 F.Supp.2d at 77.

After carefully weighing the "relative importance of the [plaintiff's] monetary recovery," *Bublitz*, 309 F.Supp.2d at 8, which, as noted, cannot exceed $10,000, *see* Compl. ¶ 5, against the valuable equitable relief sought, the Court determines that the plaintiff's claims in this case are not "in essence" for money damages. Thus, the plaintiff's claims are not predicated on the Tucker Act; rather, the plaintiff has pleaded APA claims, which the Court may review pursuant to its federal question jurisdiction.

While this Court recognizes the effort made by Congress to ensure that claims for money damages against the United States receive uniform adjudication, the Court joins other judges from the courts of this Circuit in noting its frustration with the quagmire that is the Tucker Act and its imprecisely drawn jurisdictional provision. *See Sharp v. Weinberger*, 798 F.2d 1521, 1522 (D.C.Cir.1986) ("If there is a less profitable expenditure of the time and resources of

federal courts and litigants than resolving a threshold issue of [Tucker Act jurisdiction], it does not readily come to mind."); *Van Drasek*, 762 F.2d at 1072 ("The burden of wading through this jurisdictional quagmire outweighs, we think, the limited utility of providing uniform adjudication of such relatively small money claims against the United States.")

### B. *The Plaintiff's APA Claims*

[11] The plaintiff asserts that the Board for Correction's decision to deny his requested record correction was "arbitrary, capricious, [and] an abuse of discretion," Compl. ¶ 89, for three separate reasons: (1) that "[t]he [Board for Correction] erroneously concluded that the order to submit to the [vaccination program] was not illegal," *id.* ¶ 85; (2) that "[t]he [Board for Correction] erroneously concluded that 10 U.S.C. § 1552(f) prohibited the [Board for Correction] from considering legal arguments attacking military justice actions that are not court-martial actions," *id.* ¶ 86; and (3) that "[t]he [Board for Correction] failed to apply [its own] precedent as required by the law of this Circuit," *id.* ¶ 87. In contrast, the defendant asserts that "there is no basis to question the [Board for Correction]'s decision, much less set it aside under the 'unusually deferential' standard applicable here," Def.'s Mem. at 2.

As the plaintiff correctly notes, the correction of military records is governed by 10 U.S.C. § 1552. Compl. ¶ 80. This statute "provides that '[t]he Secretary of a **11** military department may correct any military record ... when the Secretary considers it necessary to correct an error or remove an injustice.' " *Schwalier v. Panetta*, 839 F.Supp.2d 75, 82 (D.D.C.2012) (alterations in original) (citing 10 U.S.C. § 1552(a)(1)). Within the Air Force, the correction of military records is undertaken by "a panel of at least three [Board for Correction] members ... act[ing] for the Secretary of the Air Force." *Id.* at 83 (citing 32 C.F.R. § 865.0–865.8 (outlining the procedures governing the correction of military records for the Air Force)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

[12] Federal courts may review the "decisions made by the [Board for Correction] under the APA." *Wilhelmus v. Geren,* 796 F.Supp.2d 157, 161 (D.D.C.2011); *see Kidwell,* at 283–84. These decisions are assessed under the "arbitrary, capricious, or contrary to law" standard, *Kidwell,* 56 F.3d at 286, which directs that "an agency action is arbitrary and capricious if the agency failed to follow procedures as required by law, or has entirely failed to consider an important aspect of the case." *Calloway,* 366 F.Supp.2d at 53; *see* 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Wilhelmus,* 796 F.Supp.2d at 160 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856).

[13][14][15] Furthermore, this Circuit has recognized that because the language of 10 U.S.C. § 1552(a) "fairly exudes deference" to the Secretary, decisions of the Board for Correction are evaluated by an "unusually deferential application of the 'arbitrary or capricious' standard." *Kreis v. Sec'y of Air Force,* 866 F.2d 1508, 1514 (D.C.Cir.1989). Although the "unusually deferential" standard does not make the Board for Correction's decisions "utterly unreviewable, ... only the most egregious decisions may be prevented." *Id.* at 1514–15. Accordingly, the Board for Correction's decision "need not be 'a model of analytic precision,' " but "[it] 'must minimally contain a rational connection between the facts found and the choice made.' " *Wilhelmus,* 796 F.Supp.2d at 163 (quoting *Dickson v. Sec'y of Defense,* 68 F.3d 1396, 1404 (D.C.Cir.1995)). In this way, the deferential standard ensures that a court does not "substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856, or "supply a reasoned basis for the agency's decisions that the agency itself has not offered," *Puerto Rico Higher Educ. Assistance Corp. v. Riley,* 10 F.3d 847, 850 (D.C.Cir.1993) (internal citation omitted). Rather,

"the court ... ensure[s] that the agency 'examined the relevant data and articulate[d] a satisfactory explanation for its action,' " *Calloway,* 366 F.Supp.2d at 54 (citing *Riley,* 10 F.3d at 850), by limiting its review to "the administrative record already in existence [and] not some new record made initially in the reviewing court," *Wilhelmus,* 796 F.Supp.2d at 161; *see Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

As far as the plaintiff's first two challenges are concerned, the Court is not persuaded that the Board for Correction acted arbitrarily or capriciously in concluding that "the order to submit to the vaccination program was not illegal," and that it should "defer to the Court of Appeals for the Armed Forces in [ *United States v. Kisala,* 64 M.J. 50 (2006) ]." Def.'s Mem. at 10. The parties agree, and the Administrative Record is clear, that before the Board for Correction made its final ruling it sought the recommendations of nine advisory opinions from various offices in the Air Force, as well as from the Air Force Administrative Law Division. Compl. ¶ 47, 59; *see also* Def.'s Mem. at 10; A.R., Ex. A (May 13, 2010 R. of Proceedings)**12** at 10–11. After consulting these opinions, the Board for Correction decided not to second-guess the military court's decision on a "basic legal issue" of military justice. A.R., Ex. A (May 13, 2010 R. of Proceedings) at 10–11. In the alternative, the Board for Correction concluded that even if it were to undertake its own review of the legality of the vaccination program order it was "not convinced the order was illegal." *Id.* at 11. The Board for Correction then gave several justifications for why it would not invalidate the order, relying heavily on the analysis in the advisory opinions. *Id.* A reasoned decision is certainly not the type of "egregious decision[ ]" the Court should undo. *See Kreis,* 866 F.2d at 1515. In fact, the Court finds that the Board for Correction's decision is supported by substantial evidence. *See Kight v. U.S.,* 850 F.Supp.2d 165, 168–69, 174–75 (D.D.C.2012) (setting forth standard of review requiring determination only whether conclu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

sion is supported by substantial evidence); *Walker v. Shannon,* 848 F.Supp. 250, 255 (D.D.C.1994). Because a review of the Board for Correction's decision is not intended to "reweigh[ ] ... the evidence," *id.,* and because the deferential standard of review prohibits a court from "substitut[ing] its judgment for that of the [Board for Correction]," *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856, the Court is satisfied that the Board for Correction's decision sufficiently contains a "rational connection between the facts ... and the choice made," *Dickson,* 68 F.3d 1396.

Lastly, the plaintiff contends that the Board for Correction's failure to consider or distinguish a relevant precedent was arbitrary and capricious. Compl. ¶ 87. The plaintiff points to the Board for Correction's review of Docket No. 00–01870, A.R., Ex. B (Jan. 31, 2001 R. of Proceedings) at 3–7. In that case, the plaintiff had also refused "a lawful order directing her to take a mandatory [AVA] vaccination," after suffering adverse effects from previous AVA injections. *Id.* at 3. After facing discharge proceedings, she was ultimately discharged for her refusal with a "general (under honorable conditions) discharge." *id.* at 4, and subsequently she sought a change in her record to indicate a "medical discharge" instead, *id.* at 6. There, the Board for Correction granted the applicant's correction and instructed her discharge status to be changed to an "Honorable Discharge." *Id.* at 7.

[16] The defendant asserts that because the plaintiff "never cited [the precedent] or otherwise called attention to it in proceedings before the Board ... he waived this issue at the agency level, and many not now challenge the [Board for Correction's] decision on this basis." Def.'s Mem. at 29. While the plaintiff does not dispute his failure to cite to this specific precedent during the administrative process, he does note that he pursued his case as a "*pro se* applica[nt]" at the agency level. Pl.'s Oppn' at 7. It is well established that when it comes to *pro se* applicants, "this

Court and the agency must take pains to protect the rights of *pro se* parties against the consequences of technical errors," *Calloway,* 366 F.Supp.2d at 55, by "hold [ing] [them] to less stringent standards," *Crisafi v. Holland,* 655 F.2d 1305, 1308 (D.C.Cir.1981). *See also Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Accordingly, the Court will not hold against the plaintiff the fact that his *pro se* application at the agency level failed to cite precedent he now relies upon.

The defendant alleges that "[e]ven if the plaintiff had cited the [Board for Correction's previous] decision, it would provide no basis for remand" because that decision was "an act of grace ... rather than precedential application of agency policy." **\*13** Def.'s Mem. at 30. In the alternative, the defendant contends that even if the Board for Correction's decision in the instant case was a departure from precedent, "the [Board for Correction] clearly predicated its decision on considerations that were not applicable in Docket No. 00–01870." *Id.*

[17][18] The Court will not reach whether Docket No. 00–01870 was in fact precedential or not because it is clear that, here, the Board for Correction sufficiently distinguished the plaintiff's case from the circumstances in Docket No. 00–01870 by undertaking new considerations not previously contemplated. Although "an agency must adhere to its precedents in adjudicating [the] cases before it," *Consol. Edison Co. of N.Y., Inc. v. FERC,* 315 F.3d 316, 323 (D.C.Cir.2003), a reviewing court "do[es] not require an agency to grapple with every last one of its precedents no matter how distinguishable," *Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1120 (D.C.Cir.2010) (citing *LeMoyne–Owen College v. NLRB,* 357 F.3d 55, 60 (D.C.Cir.2004)). Indeed, the court will "permit agency action to stand ... where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears." *Bush-Quayle '92 Primary Comm., Inc. v. FEC,* 104 F.3d 448, 454 (D.C.Cir.1997). Fur-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

886 F.Supp.2d 1
**(Cite as: 886 F.Supp.2d 1)**

thermore, "[w]here the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing," *Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C.Cir.1989), and an agency "may distinguish precedent simply by emphasizing the importance of considerations not previously contemplated.... [I]n so doing it need not refer to the cases being distinguished by name." *Envtl. Action v. FERC,* 996 F.2d 401, 411–12 (D.C.Cir.1993).

Here, the Board for Correction based much of its decision on the *Kisala* decision, in which the court determined that a 2000 order to submit to AVA was lawful, 64 M.J. 50, 55 (C.A.A.F 2006). A.R. at 10–11. As *Kisala* was decided in 2006, and Docket No. 00–01870 was decided in 2000, it is clear that here the Board for Correction took into account considerations that were not previously contemplated. In its deliberation of the instant case, the Board for Correction also focused on the fact that the plaintiff "made an informed decision to resign." A.R. at 12. This is patently different than was the situation in Docket No. 00–01870, where the plaintiff was facing discharge proceedings. Accordingly, the Court finds that this case is distinguishable from the earlier case cited by the plaintiff and the Board for Correction considered factors that were not presented in the prior case—Docket No. 00–01870—in reaching its decision. Thus the plaintiffs APA challenges to the Board for Correction's decision must be rejected.

### IV. CONCLUSION

For the foregoing reasons, this Court grants the defendant's motion to dismiss.[FN4]

> [FN4]. The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

D.D.C.,2012.

Martin v. Donley
886 F.Supp.2d 1

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-5030   Case: 14-5030   Document: 14   Page: 140   Filed: 02/11/2014







Similar information is available for

- FY 2012
- FY 2011
- FY 2010
- FY 2009
- FY 2008
- FY 2007
- FY 2006
- FY 2005
- FY 2004
- FY 2003
- FY 2002
- FY 2001
- FY 2000
- FY Revised 1999
- FY 1998

**PD&R Mission**

*To inform policy development and implementation to improve life in American communities through conducting,
supporting, and sharing research, surveys, demonstrations, program evaluations, and best practices*

Download Adobe Acrobat Reader to view PDF files located on this site.
Privacy Statement

**HUD USER**
P.O. Box 23268, Washington, DC 20026-3268
**Toll Free:** 1-800-245-2691   **TDD:** 1-800-927-7589
**Local:** 1-202-708-3178   **Fax:** 1-202-708-9981

# HUD Handbook 4350.3:
# Occupancy Requirements of Subsidized Multifamily Housing Programs

## Figure 3-3: Income Limits by Program

| Subsidy | Type of Income Limit |
|---------|----------------------|
| Section 8 (pre-1981) | Low, very low, and extremely low-income limit |
| Section 8 (post-1981) | Very low and extremely low-income limit |
| Section 236 | Low-income limit |
| Rent Supplement | Low-income limit |
| Rental Assistance Payment (RAP) | Low-income limit |
| Section 202 without assistance | Low-income limit<br>See paragraph 3-6 D 3 for exceptions |
| Section 202 with Section 8 Assistance | Pre-1981 Low, very low, and extremely low-income limit<br>Post-1981 Very low and extremely low-income limit |
| Section 202 with Rent Supplement | Low-income limit |
| Section 202 PACs | Low-income limit |
| Section 202/811 PRACs, except those funded in FY1995 | Very low-income limit |
| Section 202/811 PRACs funded in FY 1995 | Low-income limit |
| Section 221(d)(3) BMIR | BMIR income limit |

E. **Income Limits and Family Size**

1. Income limits vary by family size. Income limits are published based on the number of persons in the household (for example, 1 person, 2 persons, 3 persons) with increasingly higher income limits for families with more members.

2. Once the owner determines the applicable income limits based on the type of subsidy in the property, the owner must determine the appropriate limits to apply to a family based on family size. In determining the appropriate income limits, the owner must include some individuals as part of the family but exclude others.

3. When determining family size for establishing income eligibility, the owner must include all persons living in the unit except the following:

    a. *Live-in aide.*

Certificate of Filing and Service

I hereby certify that on this 11th day of February, 2014, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

    Antonia R. Soares
    DEPARTMENT OF JUSTICE
    COMMERCIAL LITIGATION BRANCH
     CIVIL DIVISION
    Post Office Box 480
    Ben Franklin Station
    (202) 305-7405

    *Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

                /s/ Edward M. Lavin
                *Counsel for Appellant*

<u>Certificate of Compliance</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*8,015*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>February 11, 2014</u>          <u>/s/ Edward M. Lavin</u>
                                         *Counsel for Appellant*